UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLEVELAND R. JACKSON | ) | CASE NO: 3:07CV0400 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| -vs- | ) | |
| | ) | MEMORANDUM OF OPINION |
| MARC HOUK, WARDEN | ) | AND ORDER |
| | ) | |
| | ) | |
| Respondent. | ) | |

This matter is before the Court upon Petitioner, Cleveland Jackson's ("Jackson" or "Petitioner"), Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed with this Court on June 26, 2007. (ECF 14). Jackson challenges his convictions and death sentence imposed by the Court of Common Pleas of Allen County, Ohio. The Court has before it the Petition, Respondent Marc Houk's ("Houk" or "Respondent") Return of Writ (ECF 20), Jackson's Traverse (ECF 28), and Respondent's Sur-Reply. (ECF 30). Thus, the matter is fully briefed and ready for disposition.

**FACTUAL BACKGROUND**

On January 10, 2002, the Grand Jury of Allen County, Ohio indicted Jackson for the aggravated murder of Leneshia Williams and three-year-old Jayla Grant in violation of R.C. 2903.01(A), alleging that he had purposely caused their deaths. Included in the indictment were two death penalty specifications charging aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons, R.C. 2929.04 (A)(5), and aggravated murder during an aggravated robbery. Further, the indictment charged that the murders were committed with prior calculation and

design, R.C.  2929.04(A)(7). Count three charged Jackson with aggravated robbery, R.C. 2911.01, and counts four through nine charged him with the attempted murders of six other individuals during an aggravated robbery, R.C. 2923.02, 2903.01(B). Apx. Vol. 1, pgs. 36-45.

The following facts were set forth by the Ohio Supreme Court in *State v. Jackson*, 107 Ohio St.3d 53 (2005).

On the afternoon of January 3, 2002, Tara Cunningham, appellant's half-sister and Jeronique's sister, saw appellant and Jeronique in her bedroom with a gun. According to Tara, Jeronique was wiping off the gun, and appellant was wiping off the clip, which had bullets in it. Tara heard appellant tell Jeronique that he was going to rob somebody and heard appellant mention LaShane ("Shane") Liles. Earlier that afternoon, Shane had sold Jeronique crack cocaine at Shane's apartment.

In the evening of January 3, appellant and Jeronique went to Shane's apartment in Lima, Ohio. When appellant and Jeronique arrived, Shane was not home, but several of his relatives and friends were there. Shane returned to his apartment shortly thereafter, and he and appellant discussed a drug transaction. While Shane and appellant talked on the staircase near the living room, Jeronique sat in the living room and watched a movie with teenagers Coron Liles, Dwight Goodloe Jr., and Leneshia Williams.

As Shane and appellant continued to talk, Jeronique stood up and ordered Coron, Dwight, and Leneshia into the kitchen. When they did not immediately obey, Jeronique pulled out a gun and struck Coron in the face with the barrel, breaking his jaw. When Jeronique hit Coron, appellant drew his gun and aimed it at Shane.

Appellant forced Shane upstairs and robbed him of money and drugs. Appellant then tied Shane's hands behind his back and forced him into the kitchen at gunpoint. In the kitchen, Jeronique was holding at gunpoint Coron, Dwight, Leneshia, Armetta Robinson, Tomeaka and James Grant, and James's three-year-old daughter, Jayla.

After appellant forced Shane into the kitchen, he asked Shane for the rest of the money. When Shane said that he had given him all he had, appellant shot him in the back. Appellant and Jeronique then fired their weapons at the others. Once the shooting stopped, the victims heard clicking sounds, as appellant and Jeronique continued pulling the triggers even after they were out of bullets. Appellant and Jeronique left the kitchen, and James Grant heard appellant say, "We have to make sure nobody in there is moving."

 The deputy coroner determined that Jayla and Leneshia had both been killed by gunshot wounds to the head. Jayla was shot twice in the head: once above the right ear and once behind the right ear. Both bullets exited Jayla's head. Leneshia suffered a gunshot wound to the back of her head, and she died almost instantly. The coroner recovered no bullets or bullet fragments from the victims during the autopsies and could not determine the caliber of the bullets that had caused the deaths.

2

The surviving victims all suffered gunshot injuries as well. Shane had been shot in the back, and the bullet had exited through the left side of his chest. Armetta had been shot in the head and was in a coma for several weeks. James had been shot five times and had sustained injuries to his head, arm, and hand. Tomeaka had been shot in the head and arm and had lost her left eye. Coron had been shot in the face, which knocked out some of his teeth and caused other injuries to his mouth. A bullet had grazed Dwight's side, fracturing a rib.

Police found eight spent shell casings, five spent bullets, and one fragment of lead core from a full-metal-jacketed bullet at the scene. When Tomeaka testified at trial, one bullet was still lodged in her arm. Coron testified that he had spat a bullet from his mouth outside the apartment, but police never found that bullet.

John Heile, a firearms expert for the Bureau of Criminal Identification and Investigation, tested the casings and bullets and identified all but one shell casing as .380-caliber automatic-weapon ammunition. Thus, Heile established that one of the weapons used in the shootings was a .380 automatic pistol. Heile also determined that state's exhibits 10 through 17 (shell casings) and 18, 19, 21, and 23 (spent bullets), were all fired from the same .380 automatic pistol. One spent bullet and the core fragment did not have enough markings on them to determine whether they had been fired from the same weapon as the other bullets and casings. No guns were recovered, but the victims testified that appellant had fired a black automatic handgun with a clip and that Jeronique had fired a larger, silver revolver.

Appellant was indicted on two counts of aggravated murder. Count One charged appellant with purposely causing the death of Jayla Grant during an aggravated robbery. R.C. 2903.01(B). Count Two charged appellant with purposely causing the death of Leneshia Williams during an aggravated robbery. R.C. 2903.01(B). Appellant was charged with aggravated robbery (R.C. 2911.01(A)(1)) in Count Three and with six counts of attempted aggravated murder (R.C. 2923.02(A) and 2903.01(B)) in Counts Four through Nine.

The aggravated-murder counts each contained two death-penalty specifications. The first specification charged aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons. R.C. 2929.04(A)(5). The second specification charged aggravated murder during an aggravated robbery and alleged that the murder was committed with prior calculation and design. R.C. 2929.04(A)(7). Firearm specifications were attached to all counts.

At trial, Officer David Parker testified as a defense witness. Parker, who had assisted in photographing and videotaping the crime scene, identified defense's exhibit CC, a videotape of the crime scene. The defense then played the videotape for the jury. Appellant also testified at trial. According to appellant, on January 3, 2002, he and Jeronique had planned to rob a drug dealer (not Shane), but their plan had not been carried out.

Appellant said that he later took Jeronique to pick up a gun. After another discussion about robbing the drug dealer, Jeronique suggested that he and appellant go to Shane's apartment so appellant could pick up some crack cocaine for their sister, Tara. When appellant and Jeronique arrived, Shane was not home. Appellant told Jeronique that

they should leave, but Jeronique insisted that they wait for Shane. According to appellant, he and Jeronique had not discussed robbing Shane.

Appellant testified that after Shane came home, Shane gave appellant a bag of crack cocaine for Tara. Shane tried to sell more drugs to appellant, but appellant was not interested. At that point, Jeronique pulled out a gun and ordered Coron, Dwight, and Leneshia into the kitchen. Dwight and Leneshia immediately ran into the kitchen, but when Coron did not move fast enough, Jeronique hit him in the mouth with his gun. Appellant said that when Jeronique struck Coron, Shane jumped up from the stairs and appellant "got scared" and pulled his gun out. After Jeronique went into the kitchen, appellant talked with Shane on the stairs. At trial, appellant denied that he had pointed his gun at Shane while they talked on the stairs. Appellant said that Jeronique had then come out of the kitchen and robbed Shane of money that Shane had hidden in his sock. Jeronique then returned to the kitchen, and appellant remained at the bottom of the stairs while Shane went upstairs alone. When Jeronique found out that appellant was not with Shane, Jeronique pointed his gun at appellant and ordered him to go after Shane. Appellant went upstairs, where Shane offered him an ounce of cocaine to get Jeronique out of the house. Appellant agreed to get Jeronique out of the house for three ounces of cocaine. Shane gave appellant the drugs, and he and Shane went downstairs. At trial, appellant denied that he had forced Shane downstairs and said that Shane had agreed to have his hands tied together so that Jeronique would think that appellant had robbed Shane.

According to appellant, when appellant and Shane went into the kitchen, Jeronique asked appellant how much money Shane had. Appellant told Jeronique that Shane did not have any more money but that appellant had Shane's drugs. James Grant then called appellant and Jeronique punks and told them to leave. Jeronique pointed his gun at James's head and pulled the trigger, but the gun did not fire. Appellant said that after the third click of Jeronique's gun, appellant's own gun accidentally went off, shooting Shane. Appellant then allegedly suggested to Jeronique that they leave, but Jeronique said that he was not going to leave any witnesses. Appellant said that as he had turned to leave, Jeronique "put his hand politely around the barrel of [appellant's] three-eighty," and appellant let Jeronique have the gun and ran out the front door.

Appellant said that he had heard one gunshot as he ran down an alley near Shane's apartment. Eventually, appellant met up with Jeronique at their car, and they fled the scene together. Appellant testified that Shane was the only person he shot and that he did not find out until later that others had been shot.

The jury convicted appellant of all charges and specifications. After a penalty hearing, the trial court sentenced appellant to death on both Counts One and Two, consistent with the jury's recommendation. The trial court imposed consecutive sentences of ten years each for appellant's convictions for aggravated robbery and six counts of attempted aggravated murder, plus a three-year consecutive sentence for the firearm specifications.

*State v. Jackson*, 107 Ohio St.3d at 54-57.

4

## PROCEDURAL HISTORY

Petitioner has been unsuccessful in his efforts to have his convictions and death sentence overturned in the Ohio courts. In order to obtain the proper understanding of this case, an outline of the procedural history in the Ohio courts follows.

Jackson was indicted by an Allen County Grand Jury on two counts of aggravated murder of Leneshia Williams and Jayla Grant committed on January 3, 2002. Each aggravated murder count contained two death penalty specifications: (1) aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons, R.C. 2929.04(A)(5); and (2) aggravated murder during an aggravated robbery, R.C. 2929.04(A)(7).  In count three of the indictment, Jackson was charged with aggravated robbery, R.C. 2911.01(A)(1), and with six counts of attempted aggravated murder in counts four through nine. Also, firearm specifications were included as to each count. Apx. Vol. 1, pgs. 36-45.

Jackson entered a plea of not guilty on January 18, 2002. Tr. Vol. 1, pg. 6. The court appointed William Kluge and John Sabol to represent Jackson. Apx. Vol. 1, pgs. 49-50. On February 7, 2002, Jackson filed Motions for Appropriation of Funds for Defense Mitigation Specialist, Apx. Vol. 1, pg. 104, and for Appropriation of Funds for a Defense Investigator. Apx. Vol. 1, pg. 92. On February 11, 2002, Jackson filed a Motion for the Appropriation of Funds for a Defense Psychologist. Apx. Vol. 1, pg. 80. On the same day, the court granted funds for an investigator and a psychologist. Tr. Vol. 1, pg. 9; Apx. Vol. 1, pgs. 103-104.  A mitigation expert was allowed on February 25, 2002. Tr. Vol. 1, pg. 17; Apx. Vol. 1, pg. 341.

On February 22, 2002, Jackson filed a Motion for Change of Venue. Apx. Vol. 1, pg. 277. Thereafter, he filed a Motion to Suppress his Statements to Police on March 20, 2002, and on April

5

30, 2002, he filed a Motion to Dismiss the Venire. Apx. Vol. 2, pg. 330; Apx. Vol. 3, pg. 135. An evidentiary hearing on the Motion to Suppress was conducted on April 22, 2002. Tr. Vol. 1, pg. 1. On May 7, 2002, the court denied Jackson's Motion to Suppress. Apx. Vol. 3, pg. 34. The Motion to Dismiss the Venire was denied on June 3, 2002. Apx. Vol. 3, pg. 143.

On July 16, 2002, the parties began *voir dire*. Tr. Vol. 2, pg. 18. On July 22, 2002, after completing *voir dire*, the court denied Jackson's Motion for Change of Venue. Apx. Vol. 3, pg. 287. That same day, both parties gave opening statements. Tr. Vol. 8, pgs. 1289, 1296.  On July 26, 2002, the jury convicted Jackson of all nine counts and all specifications. Tr. Vol. 11, pgs. 2001-05; Apx. Vol. 3, pg. 318. On July 30, 2002, following a penalty phase trial, the jury recommended that Jackson receive the death penalty. Tr. Vol. 12, pgs. 2160-61. The court accepted the recommendation and sentenced Jackson to death on August 5, 2002. Tr. Vol. 12, pg. 2181. The trial court entered its opinion on the same day. Apx. Vol. 3, pgs. 355- 64.

### DIRECT APPEAL

On August 6, 2002, David Stebbins and Angela Miller were appointed by the Court of Common Pleas of Allen County, Ohio to represent Jackson for purposes of appeal. Apx. Vol. 4, pg. 8. They filed a Notice of Appeal to the Ohio Supreme Court on September 17, 2002. Apx. Vol. 4, pg. 5.  Jackson raised the following assignments of error:

**Proposition of Law 1**
Cleveland Jackson was entitled to a trial by a fair and impartial jury free from bias or preconceived opinions about guilt or punishment under Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments. The jury selection process here denied Jackson an opportunity to insure that a fair and impartial jury was seated.
**Proposition of Law 2**
The State's improper introduction of irrelevant yet highly inflammatory evidence at the trial phase denied Cleveland Jackson a fair trial and due process.
**Proposition of Law 3**

6

Cleveland Jackson was convicted and sentenced to death in a trial conducted in a highly emotional atmosphere. Victim impact evidence and argument was [sic] improperly introduced in both phases of the trial through direct testimony in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 4**

The cumulative and gruesome photographs admitted at trial deprived Cleveland Jackson of due process, a fair trial, and a fair and reliable sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 5**

The jury must be given clear and legally correct jury instructions to insure a fair and reliable determination of guilt or innocence at the trial phase of a capital case in violation of the Ohio Constitution, Art. I, §§ 2, 9, 10 and 16 and the Fifth, Sixth, Eighth and Fourteenth Amendments.

**Proposition of Law 6**

The jury was permitted to consider irrelevant and inflammatory evidence at the penalty phase of the trial. The result was an unreliable sentencing procedure in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 7**

Cleveland Jackson's right to a fair sentencing proceeding and an impartial jury are [sic] violated when the surviving victims are permitted to remain in the courtroom throughout the penalty phase, under the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 8**

Jury instructions at the penalty phase must convey to the jury adequate information to properly guide the jury's exercise of its discretion. The instructions here failed to provide the mandated guidance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 9**

The prosecutor has an obligation to seek justice and to refrain from unfairly seeking a conviction based on improper evidence, improper argument and other misconduct under the Fifth, Sixth, Eighth and Fourteenth Amendments and Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 10**

The representation provided to Cleveland Jackson fell far below the prevailing norms for counsel in a capital case, was unreasonable, and affected the outcome in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments  as well as Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

**Proposition of Law 11**

The Ohio sentencing review process as implemented by the trial court denied Cleveland Jackson an adequate safeguard against the arbitrary and capricious imposition of the death penalty. The death penalty in this case is inappropriate under

7

the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

### Proposition of Law 12

Ohio's death penalty law is unconstitutional. Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, 2929.05 and 2929.06 are unconstitutional on their face and as applied to Cleveland Jackson under the Fifth, Sixth, Eighth and Fourteenth Amendments and Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution. Further, Ohio's death penalty statute violates the United States' obligation under international law.

### Proposition of Law 13

Cleveland Jackson is forced to present the issues in his appeal without a complete transcript and record of the proceedings in the trial court, thus denying him due process and the effective assistance of appellate counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

Apx. Vol. 4, pg. 52.

On May 28, 2003, the Ohio Supreme Court entered an order granting Jackson's Motion to Correct and Supplement the Record. Apx. Vol. 4, pg. 51. The record was ordered supplemented and corrected by incorporating questionnaires that were used by the parties and by the court during the jury selection process.

On August 15, 2003, Jackson filed with the Ohio Supreme Court his supplemental brief on the merits wherein he withdrew his Proposition Of Law XIII contained in the original brief on the merits filed June 4, 2003, and he submitted the below revised proposition of law.

### Revised Proposition of Law I

Cleveland Jackson was entitled to a trial by a fair and impartial jury free from bias or preconceived opinions about guilt or punishment under Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments. The jury selection process here denied Jackson an opportunity to insure that a fair and impartial jury was seated. The trial court denied Jackson the "careful and searching *voir dire*" necessary to permit counsel to develop the factual basis for challenges for cause and to exercise peremptory challenges of jurors who were exposed to massive pretrial publicity or who were biased on questions of guilt, innocence, or sentence.

Apx. Vol. 5, pg. 1.

On November 23, 2005, the Ohio Supreme Court issued an opinion in which it unanimously affirmed the convictions and one of the two death sentences imposed upon Cleveland Jackson. *State v. Jackson*, 107 Ohio St.3d 53 (2005).  The sentence of death imposed for the death of three-year-old Jayla Grant was reversed because of an unreasonable limitation placed on defense counsel's *voir dire* examination. The matter was remanded for sentencing in compliance with the provision of R.C. 2929.06.

On April 24, 2006, Jackson filed his Petition for Writ of Certiorari with the United States Supreme Court in connection with Case Number 05-10616. He was represented by Attorney David Stebbins and raised the following questions.

### Questions Presented for Review

Did prohibitions on questioning prospective jurors about their knowledge or the trial, conviction, and death sentence of Jackson's co-defendant and brother permit biased jurors to sit on Jackson's jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments?

Where the Supreme Court of Ohio found that prohibitions on questioning prospective jurors about their ability to consider mitigating evidence where the murder victims were children denied Jackson a fair, impartial jury, does due process require the vacation of both death sentences and the underlying convictions, under the Fifth, Sixth, Eighth and Fourteenth Amendments?

On June 26, 2006, the Supreme Court of the United States denied Cleveland Jackson's Petition for Writ of Certiorari. Apx. Vol 5, pg. 330.

On January 8, 2007, the trial court conducted a resentencing hearing pursuant to the Remand Order of the Ohio Supreme Court. Jackson was represented by attorneys David Stebbins and Donald Schumacher. The trial court sentenced Jackson to life without parole on count one. The sentences on counts 3, 4, 5, 6, 7, 8, and 9 remained and were ordered to be served concurrently to the sentences imposed in counts 1 and 2. Apx. Vol. 12, pgs. 67-75.

### POST-CONVICTION RELIEF

9

Jackson commenced state post-conviction proceedings in the trial court pursuant to R.C. 2953.21 on August 13, 2003 while his appeal from his convictions was still pending in the Ohio Supreme Court. Attorney David Stebbins had previously been appointed on February 28, 2003 to represent him. Apx. Vol. 6, pg. 40. He raised the following issues in the Court of Common Pleas of Allen County.

**Claim 1: Failure to Develop and Present Compelling Mitigation:**
Cleveland Jackson's sentence of death is void or voidable because he was denied the effective assistance of counsel at the penalty phase of this trial. *Strickland v. Washington,* 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith,* ____ U.S. _____, 123 S.Ct. 2527 (2003). Counsel unreasonably failed to present compelling mitigating evidence, that was readily available.

**Claim 2: Failure to Introduce Records:**
The voluminous records concerning Jackson's lengthy and bizarre history with Children's Services were not introduced into evidence. (Tr. Vol. XI, pg. 2129). While the psychologist referred to these records, she did not explain any of the compelling details of this bizarre history. The jury could not review these records on their own and draw their own conclusions about the nature and extent of the difficulties and problems that Jackson encountered as a child and the devastating effect these would have had on his development. While the psychologist testified to some degree about the effects of these events on his development, without the lurid details of his exceptional childhood to support these observations, the psychologist's conclusions carried little impact and little weight. The details of Jackson's many placements with Children's Services and with multiple foster families would have had an impact on the jury and would have provided the type of insight into Jackson's background that jurors rely on in imposing a sentence of life imprisonment as opposed to death.

**Claim 3: Failure to Present Mother's History of Mental Illness, Addiction, and Neglect of Her Children:**
Counsel did not present testimony and documentation from Allen County Children's Services demonstrating Cleveland Jackson's long and strained history with that agency. The testimony and records would have fleshed out the bare outline that was presented and demonstrated that Jackson's mother, Bettye Cunningham had substandard to no parenting skills. On numerous occasions, Children's Services demonstrated that her children were being neglected or abused and that Bettye completely failed to care for the children or provide them food or shelter. Bettye had a pattern of leaving her young children at home unsupervised and simply going off to live in other areas, abandoning her children. Bettye was likewise hostile to all attempts by Children's Services to assist her in raising her children. "Betty was very upset, and stated the reason for the children's absent [sic] was due to illness. She threatened to blow the worker away if another HC was made." (Ex. 3-A).

10

**Claim 4: Failure to Introduce Records From Children's Services About Cleveland Jackson:**

Given the history of his mother, it is no surprise that Cleveland Jackson also had a long and richly detailed history with Children's Services and other agencies charged with the protection and care of juveniles. This story likewise went unexplored and untold to the jury that determined Cleveland Jackson's fate. While there was testimony from a psychologist to attempt to explain the results of these problems, virtually none of the rich details of Jackson's difficult and devastating young life were presented to the jury.

**Claim 5: Failure to Introduce Additional Records:**

For the next year or so, the situation appeared relatively stable in the Cunningham household. The children were reunited with Bettye and she was attempting to provide the services that they needed. Children's Services continued to monitor the situation, however: "CW will continue to visit the Cunningham family in order to ensure they are no longer at risk. Bettye provides for all their basic needs such as medical, food and education."

**Claim 6: Failure to Introduce Juvenile Court Records:**

Cleveland Jackson also began to encounter with the court system in 1991 when he was charged with the attempted rape of a twelve year old girl and found guilty of the lesser offense of gross sexual imposition.

**Claim 7: Failure to Present Cultural Expert:**

Counsel likewise failed to employ and present a cultural expert to help explain the effects of Jackson's heritage and horrendous upbringing on his behavior as a young adult. A person's culture consists of the ideas, beliefs and customs that are communicated to him from birth through adulthood by persons within the culture of his environment. This person's personality, value systems, his view of himself and others, and how he operates in the world are tied to the cultural environment in which he exists.

**Claim 8: Failure to Obtain Expert and Investigative Assistance:**

Trial counsel failed to request and or to demonstrate the need for adequate investigative and expert assistance reasonably necessary at both the trial and penalty phase, in order for counsel to fully and thoroughly investigate the life history and background of Cleveland Jackson, and to fully present that life history and background and explain the effect of that history on his development at the penalty phase of the trial, [sic] additional expert and investigative assistance is necessary, specifically an expert to explain the devastating effects of being raised in a family and in an environment where drugs and alcohol abuse played such a dominant role. Counsel likewise failed to employ and present ballistic, firearm and trajectory experts for the trial phase to demonstrate that the wounds (both fatal and nonfatal) to the victims did not come from the same gun being fired from the same spot. A crime scene reconstruction expert was also reasonable and necessary to counter the State's (inconsistent) evidence and argument that all of the bullets had been fired from Jackson's gun.

**Claim 9: Pretrial Motion Practice:**

11

Counsel failed to effectively investigate, prepare, and present evidence to support his legal arguments contained in the pre-trial motions that were filed. Counsel failed to investigate, present and otherwise demonstrate at pretrial hearings that there was substantial evidence to support the legal arguments contained in the pre-trial motions. This failure fell below the prevailing professional norms for counsel representing capital defendants in 2002. As such counsel's actions were unreasonable and denied Jackson the effective assistance of counsel.

**Claim 10: Counsel's Failure to Conduct Any Inquiry Into Whether Tara Cunningham Received Consideration in Exchange for Her Testimony:**

Tara Cunningham was a state's key witness. Counsel did not conduct adequate inquiry into Tara Cunningham's motivation to testify. Trial counsel did not inquire about her numerous discussions with police or with prosecutors to discover whether any promises were made or any consideration was received in exchange for her testimony.

**Claim 11: Counsel's Failure to Interview Expert Witness Prior to Trial and to Obtain Expert Assistance:**

Dr. Cynthia Beisser was called by the state as a forensic pathologist. Based on his experience in cross-examining Dr. Beisser in the past, counsel attempted to qualify her as a ballistics expert and to elicit favorable testimony on the trajectory of the bullets that killed Jayla Grant and injured others. Counsel, however, attempted to elicit this testimony without having interviewed Dr. Beisser to determine if she would agree with his hypotheticals. (Tr. Vol. IX, p. 1731). Counsel was apparently attempting to bolster James Grant's testimony that he saw Jeronique Cunningham and not Cleveland Jackson shoot him and bolster the inference that Jeronique Cunningham, therefore, also shot Jayla Grant. (Tr. Vol. IX, pp. 1695). Counsel attempted to elicit from Beisser's testimony that those same bullets that injured James Grant (fired by Jeronique Cunningham) killed Jayla Grant while she was sitting on his lap. Dr. Beisser would not confirm counsel's theory. (Tr. Vol. IX, pp. 1750-1751).

**Claim 12: Jury Selection:**

Cleveland Jackson's conviction and sentence are void or voidable because he was denied his right to a fair and impartial jury free from bias or preconceived opinion about guilt of punishment under Art. I, §§ 2, 9, 10 and 16 of the Ohio Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments. The jury selection process here denied Jackson an opportunity to insure that a fair and impartial jury was seated.

**Claim 13: Improper Excusal of Jurors:**

The trial court refused to apply Ohio Rev. Code § 2945.25 (C). (Motion #37, Hearing March 15, 2002, Transcript at 8). Ohio Rev. Code § 2945.25 (C) requires the juror to unequivocally state that he could never impose the death sentence. This is adopted from the Supreme Court standard enunciated in *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

**Claim 14: Limitations on *Voir Dire*:**

The trial court limited counsel examination of prospective jurors as to whether they would automatically impose a sentence of death upon a finding of guilt, whether they could fairly consider mitigating evidence, whether they could ever consider a life

sentence for someone who had killed a child, and whether they could consider specific mitigating evidence. Counsel were not permitted to question jurors about their intention to impose death in every murder case and were therefore unable to successfully challenge any of them for cause. *See State v. Group*, 98 Ohio St. 3d 248, 200-Ohio-7247, at ¶ 62.

**Claim 15: Improper Consideration of Irrelevant Victim Impact Evidence:**

Victim impact evidence is never relevant to the determination of whether the state has proven beyond a reasonable doubt all of the elements of the offense at issue in the trial phase nor on the determination of whether the statutory aggravating circumstance outweighs the properly presented factors in mitigation. The impact a crime may have had on the survivors does not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ohio R. Evid. 401. The loss caused by a crime simply has no bearing on the determination of who committed the crime.

**Claim 16: Cleveland Jackson's Sentence of Death is Disproportionate and Inappropriate in this Case:**

The trial court's sentencing opinion does not contain a statement of the statutory aggravating circumstances that the jury found; the mitigating factors found to exist by the trial court; and the reasons why the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt, and why death was the appropriate sentence. Ohio Rev. Code § 2929.03(F); *State v. Maurer*, 15 Ohio St.3d 239 (1984). The trial court simply afforded "very little" or "no weight" to each mitigating factor. The trial court did not explain why very little or no weight was given to any particular piece of mitigation or why the mitigation as a whole was outweighed by the sole statutory aggravating circumstance.

**Claim 17: Improper and Inflammatory Evidence:**

The introduction of inflammatory evidence with no probative value – at both phases of the trial – denied Jackson a fundamentally fair trial and due process in violation of the Ohio Rules of Evidence, Art. I, §§ 2, 9, 10, and 16 of the Ohio Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Claim 18: Gruesome Photographs:**

Gruesome photographs unrelated to causation or any other issue relevant to the determination of the case were presented by the state at trial, thus denying Jackson a fair trial, a reliable sentencing determination, and due process of law.

**Claim 19: Irrelevant and Inflammatory Evidence at the Penalty Phase:**

At the beginning of the penalty phase, the state introduced as evidence all of the victim's trial testimony as well as numerous photos of the deceased victims, Jayla Grant and Leneshia Williams. (Tr. Vol. 11, pp. 2028, 2042). The photos had no evidentiary value for the penalty phase. The vast majority of the victim's trial testimony presented was inflammatory victim impact evidence, presented for a second time at the penalty phase. (Vol. 11, pg. 2042).

**Claim 20: Surviving Victims in the Courtroom at the Penalty Phase:**

During the penalty phase, the court permitted the surviving victims to remain in the courtroom. Each of the five victims had provided emotionally charged testimony and

graphic descriptions of their injuries at the trial phase, including victim impact evidence that was wholly irrelevant as well as inflammatory.

**Claim 21: The Prosecutor Appealed to the Passions and Prejudices of the Jury:**
In closing argument at the trial phase, the prosecutor called upon the jury to convict Cleveland Jackson based not upon the evidence, but upon its passions and prejudices. The prosecutor's focus during closing argument was the pain and suffering of the victims. The prosecutor displayed photos of the injuries suffered by the victims, detailed which injuries were suffered by each victim, displayed photos of dead bodies and called upon the jurors to align themselves with the victims and the State of Ohio. (Tr. Vol. X, pp. 1940-1950, 1959-1965). Appealing to the passions and prejudices of the jury to obtain a conviction or sentence is always improper. A conviction based on passionate appeals and a duty to "protect society" is not a verdict in which this Court can have confidence. *See United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991).

**Claim 22: The Prosecutor Argued That Mitigation Was Merely a Ploy by the Defendant to Avoid Punishment:**
During penalty phase closing argument, the prosecutor misstated Jackson's right to present mitigation evidence, suggesting that Jackson's mitigation amounted to nothing more than an excuse and was an attempt to avoid any moral culpability. Mitigation evidence is evidence to be considered in determining the appropriateness of a life sentence. (Tr. Vol. 11, pp. 2138-39). (Tr. Vol. 11, pg. 2140).

**Claim 23: The Prosecutor Improperly Relied on Opposing Theories on Which of Two Co-Defendants was Primarily Responsible at the Trials of Jeronique Cunningham and Cleveland Jackson.** [1]
At the trial of Cleveland Jackson, the state presented evidence and argument that Cleveland Jackson was the person primarily responsible for the events of January 3, 2002, in that he planned the robbery and that he was the primary shooter during the assault that resulted in the two deaths. During the trial of Jeronique Cunningham, the state presented evidence and argument in support of the opposite theory, that Jeronique Cunningham was the one who planned the robbery, who planned the shootings, and who was the primary shooter during the assaults that lead to the murders. *See,* Appendix, Transcript of *State v. Jeronique Cunningham,* Allen County Court of Common Pleas, No. CR2002-00010, Exhibit 4, Vols. 1-4)

**Claim 23: The Prosecutor Failed to Provide Jackson With Material Exculpatory Evidence Prior to Trial:**
The State failed to disclose material exculpatory and mitigating evidence to Cleveland Jackson. Prior to trial, defense counsel filed numerous discovery motions specifically requesting that law enforcement officials advise the prosecutor of information that was gained during the investigation. The state failed to turn over to the defense a photo

---

[1] Petitioner's Post-Conviction Petition was misnumbered in that two claims were numbered as 23. Respondent has used the same numbers as indicated in Petitioner's Post-Conviction Petition.

array use [sic] for identification purposes. This was not discovered until the cross examination of Coron Liles. (Tr. Vol. VIII, pp. 1608-1609). The photo array should have been disclosed. The failure to disclose this material exculpatory evidence violated Jackson's right to a fair trial.

**Claim 24: Cleveland Jackson's Sentence of Death Was Obtained in Violation of Art. I, Sec. 2, 9, 10 and 16 of the Ohio Constitution. [sic] The Fifth, Sixth, Eighth and Fourteenth Amendments as Well as the Various Treaty and Compact Obligations of the United States Under International Law:**

Ohio has systemic constitutional problems in the administration of capital punishment. The American Bar Association has recently called for a moratorium on capital punishment unless and until each jurisdiction attempting to impose such punishment "implements policies and procedures that are consistent with . . . longstanding American Bar Association policies intended to (1) ensure that death penalty cases are administered fairly and impartially, in accordance with due process, and (2) minimize the risk that innocent persons may be executed. . . . As the ABA has observed, in a report accompanying its resolution, "administration of the death penalty, far from being fair and consistent, is instead a haphazard maze of unfair practices with no internal consistency." The ABA concludes that this morass has resulted from the lack of competent counsel in capital cases, the lack of a fair and adequate review process, and the pervasive effects of race.

**Claim 25: Ohio's Provides an Inadequate Post Conviction [sic] Remedy to Permit Jackson to Fully and Fairly Vindicate His Federal Constitutional Claims:**

Cleveland Jackson is required to fairly present and exhaust constitutional challenges to his conviction and sentence in the state courts through post conviction [sic] proceedings before taking these claims to federal court, thereby under the principles of comity and federalism, permitting the Ohio courts the first opportunity to consider the federal constitutional claims. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1982); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). The state courts must be provided the first opportunity to "address and resolve" a state prisoner's federal constitutional claims, and the prisoner must first fully litigate these claims in the state courts. *Keeney v. Tamayo – Reyes*, 504 U.S. 1, 9 (1992); *Coleman v. Thompson*, 501 U.S. 722 (1991). Denying Jackson any opportunity to prove his constitutional claims will reduce the Ohio post conviction [sic] procedure to an "arid ritual," *Osborne v. Ohio*, 495 U.S. 103 (1990), that will render the pursuit of post conviction [sic] procedures in Ohio futile.

Apx. Vol. 6, pgs. 44-130.

On November 20, 2003, the State filed its Motion for Summary Judgment/Motion to Dismiss.

Apx. Vol. 9, pg. 1. On December 18, 2003, the Allen County Court of Common Pleas issued its

Judgment Entry and denied the Petition. Apx. Vol. 9, pg. 225. The court filed a second Judgment

Entry denying the Petition on March 18, 2004. Apx. Vol. 9, pg. 277.

On April 12, 2004, Jackson filed his Notice of Appeal in the Third District Court of Appeals in Case No. CA 20040031. Apx. Vol. 10, pg. 4. In his appeal, he raised the following assignments of error:

### Assignment of Error No. I

The trial court erred in dismissing Jackson's post-conviction petition where sufficient operative facts were presented to merit relief or, at least warrant, an evidentiary hearing.

### Assignment of Error No. II

The trial court erred when it denied Jackson's post-conviction petition without first affording him the opportunity to conduct discovery.

### Assignment of Error No. III

The trial court erred when it denied Jackson access to reasonable and necessary expert and investigative assistance.

On October 4, 2004, the Ohio court of appeals affirmed the decision of the trial court. *State v. Jackson*, 2004 WL 2260095 (Ohio App. 3rd Dist. Oct. 4, 2004). Exactly a month later, Jackson filed a Notice of Appeal with the Ohio Supreme Court, again represented by David Stebbins. The following three propositions of law were presented:

### Proposition of Law I

Under Ohio Rev. Code §2953.21, where a defendant in a capital case submits evidence *dehors* the record sufficient to demonstrate that his conviction and/or sentence are void or voidable under the United States or Ohio Constitution, the trial court must grant the petition, or permit discovery and an evidentiary hearing to further develop the factual bases [sic] for the constitutional claim.

### Proposition of Law II

Under Ohio Rev. Code §2953.21, where a defendant in a capital case submits evidence *dehors* the record sufficient to demonstrate that his conviction and/or sentence may be void or voidable under the United States or Ohio Constitution, due process required that the defendant be permitted to conduct discovery under the Ohio Rules of Civil Procedure.

16

**Proposition of Law III**

Under Ohio Rev. Code §2953.21 and §2929.024, where a defendant in a capital case submits evidence *dehors* the record sufficient to demonstrate that his conviction or sentence may be void or voidable under the United States or Ohio Constitution, due process requires that the defendant be provided all reasonable and necessary expert and investigative assistance to develop the factual bases for his Petition.

Apx. Vol. 11, pgs. 3, 5-46.

On December 28, 2005, the Ohio Supreme Court dismissed the appeal as not involving a substantial constitutional question. Apx. Vol. 11, pg. 63. Jackson filed a Motion for Reconsideration with the Ohio Supreme Court on January 6, 2006 raising one issue, i.e., "Explanation of why this is a case of public or great general interest and involves a substantial constitutional question." Apx. Vol.11, pg. 64. The Motion for Reconsideration was denied on February 22, 2006. Apx. Vol. 11, pg. 79.

**MURNAHAN APPEAL**

On April 24, 2006, Jackson filed a Motion for Leave to File a Delayed Reopening With Good Cause Shown in the Supreme Court of Ohio  pursuant to Ohio App. R. 26(B) and *State v. Murnahan,* 63 Ohio St.3d 60 (1992), claiming that his appellate counsel were ineffective.   Apx. Vol. 5, pg. 291. The court appointed Carol Wright, Esq. to represent him. Apx. Vol. 5, pg. 259. The following two assignments of error were raised:

**Assignment of Error No. 1:**

Trial counsel were ineffective when they failed to offer evidence of Jeronique Cunningham's prior conviction in the penalty phase thereby denying Cleveland Jackson his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments and Article I, §§ 2, 9, 10, & 16 of the Ohio Constitution.

**Assignment of Error No. 2:**

Cleveland Jackson was denied his rights under the Fifth, Sixth, Eighth and Fourteenth

17

Amendments to the United States Constitution and Article I, §§ 2, 9, 10 & 16 of the Ohio Constitution because the cumulative effect of trial counsel's errors and omissions deprived appellant of the effective assistance of counsel, a fair trial and a fair sentencing. The trial counsel improperly sustained the prosecutor's objection during trial counsel's opening statement and closing argument thereby depriving Cleveland Jackson of a fair trial, fair sentencing and the effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 2, 9, 10 & 16 of the Ohio Constitution.

The Ohio Supreme Court denied the *Murnahan* application on August 2, 2006. Apx. Vol. 5, pg. 328.

## HABEAS CORPUS

Following the denial of the Petition for Writ of Certiorari and the Supreme Court of Ohio's decision, the Petitioner filed a Notice of Intention to File Habeas Corpus Petition on February 13, 2007. (ECF 1). Subsequently, the Petitioner filed a Petition for Writ of Habeas Corpus in this Court on June 26, 2007. (ECF 14). The following issues were raised:

### GROUND I

Petitioner Cleveland Jackson Was Denied His Constitutional Right To Due Process Of Law And A Fair Trial By The State Trial Court And The Ohio Supreme Court When His Counsel Was Prohibited From Examining Potential Jurors In A Capital Case About The Bias They Would Have Against A Person Who Was Accused Of Homicide Of A Young Child.

(A) The Ohio Supreme Court Decision Was Contrary To Or Involved An Unreasonable Application Of Federal Law As Determined By The United States Supreme Court When It Found A Clear Constitutional Violation But Did Not Grant Jackson A New Trial On All Counts Of The Indictment.

### GROUND II

Cleveland Jackson Was Denied His Right To Due Process Of Law As Guaranteed By The United States Constitution By The State Trial Courts' [sic] Denial Of His Right To Conduct A Careful And Searching Examination Of Prospective Jurors In Order To Challenge Said Biased Jurors.

### GROUND III

The Petitioner Cleveland Jackson Was Denied His Right To A Fair Trial And Due Process Of Law As Guaranteed By The United States Constitution When The State Trial Judge Limited His Ability To Uncover Juror Bias Against Him And Failed To

18

Grant A Change Of Venue Away From Allen County.

## GROUND IV

Petitioner Cleveland Jackson's Right To A Fair Trial And Due Process Of Law As Guaranteed By The United States Constitution Was Denied When The State Court Trial Judge Prohibited This [sic] Trial Counsel From Examining Prospective Jurors About Whether They Could Consider A Life Sentence For Killing Of A Young Child, And Whether They Would Automatically Impose The Death Penalty Upon A Finding Of Guilt And Whether The Prospective Jurors Could Be Fair And Impartial.

## GROUND V

Petitioner Cleveland Jackson Was Denied His Right To A Fair Trial And Due Process Of Law As Guaranteed By The United States Constitution When The State Court Trial Judge Prohibited His Counsel From Examining Jurors Who Expressed Reservations About The Imposition Of The Death Penalty [sic] Whether They Would Nonetheless Follow The Court's Instruction And Consider The Imposition Of That Penalty.

## GROUND VI

Petitioner Cleveland Jackson Was Denied His Right To A Fair Trial And Due Process Of Law As Guaranteed By The United States Constitution When The State Trial Judge Applied As [sic] Legally Improper Constitutional Standard In Excusing Prospective Jurors Who Expressed Objections To The Imposition Of The Death Penalty But Were Not Completely Opposed To Capital Punishment Under All Circumstances And Could Fairly Consider The Imposition Of That Penalty.

## GROUND VII

Petitioner Cleveland Jackson Was Denied His Right To A Fair Trial In A State Of Ohio Court And His Right To Due Process Of Law As Guaranteed By The Constitution Of The United States Because Of The Cumulative Effect Of The Many Prejudicial Errors Committed By The State Trial Judge In The *Voir Dire*, Jury Selection Process And In The Failure To Grant A Change A [sic] Venue Away From Allen County, Ohio.

## GROUND VIII

The Petitioner, Cleveland Jackson, Was Denied By The State Of Ohio His Right To A Fair Trial And Due Process Of Law As Guaranteed By The United States Constitution When The Trial Court Permitted The State Prosecutor To Introduce At The Guilty [sic] And Penalty Phase [sic] Of Trial Lengthy Inflammatory, Emotional Irrelevant Victim Impact Evidence To Include A Tooth Fragment Found At The Crime Scene, The Bloody Clothing Worn By A Three-year-old Shooting Victim, And The Hearsay Statements Of Cries For Help Of A Young Victim.

## GROUND IX

Petitioner Cleveland Jackson's Right To Due Process Of Law As Guaranteed By The United States Constitution Was Denied When The State Of Ohio Trial Judge Failed

19

To Prohibit The Prosecuting Attorney From Introducing Into Evidence Highly Emotional, Prejudicial "Victim Impact" Evidence In The Guilt Phase Of The Trial.

### GROUND X

The Petitioner, Cleveland Jackson, Was Denied His Right To Due Process Of Law As Guaranteed By The United States Constitution When The State Trial Judge Permitted The Introduction Of Prejudicial And Highly Emotional, But Irrelevant, Trial Evidence At The Penalty Phase Of The Capital Trial.

### GROUND XI

Petitioner Cleveland Jackson's Right To Due Process Of Law As Guaranteed By The United States Constitution Was Denied When The State Of Ohio Trial Judge Permitted The Victims Of The Offenses To Be Present In The Courtroom, In Front Of The Jury During The Penalty Phase Of The Trial.

### GROUND XII

The Petitioner, Cleveland Jackson, Was Deprived Of His Right To Due Process Of Law As Guaranteed By The United States Constitution Due To The Misconduct At All Stages Of His Capital Trial By The State Of Ohio Prosecuting Attorney.

### GROUND XIII

Cleveland Jackson Was Deprived Of His Right To Due Process Of Law As Guaranteed By The United States Constitution When He Was Provided Ineffective Counsel At Numerous Points In The Trial.

### GROUND XIV

Cleveland Jackson Was Denied His Right To Effective Assistance Of Counsel In A Capital Prosecution When His Trial Counsel Was Ineffective In The Investigation And Introduction Of Helpful And Explanatory Mitigation Evidence At The Penalty Phase Of The Trial.

### GROUND XV

The State Of Ohio Trial Court Denied Petitioner His Right To Due Process Of Law As Guaranteed By The United States Constitution When It Denied His Post Conviction Relief Petition Without First Affording Him His Right To Effective Assistance Of Counsel And Granting Him The Right To Conduct Discovery.

### GROUND XVI

The State Of Ohio Erred And Denied The Petitioner His Right To Due Process Of Law As Guaranteed By The United States Constitution By Failing To Provide Him, As An Indigent Person, The Necessary Expert And Investigative Assistance In Order ------- [sic] Presented His Petition For Post Conviction Relief.

### GROUND XVII

Petitioner Jackson Was Denied Due Process Because Both The Trial Court And The

Appellate Courts Failed To Fulfill Their Statutory Duties In Imposing And Reviewing His Sentence Of Death, And The Appellate Courts Failed To Fulfill Their Obligation To Meaningfully Review The Proportionality Of Petitioner Jackson's Death Sentence.

### GROUND XVIII

Petitioner Jackson's Death Sentence Is Unfairly Disproportionate To Similar Cases, The Ohio Courts Denied Him Due Process By Failing To Properly Consider The Proportionality Of His Death Sentence.

### GROUND XIX

Ohio's Death Penalty Statute Is Unconstitutional In Numerous Respects.

### GROUND XX

Mr. Jackson's Conviction And Sentence Are Unconstitutional Because Of The Cumulative Effect Of The Many Errors That Occurred During His Trial And In All Subsequent Proceedings.

Respondent filed a Return of Writ on September 26, 2007. (ECF 20). Petitioner filed his Traverse on December 10, 2007 (ECF 28), and Respondent filed a Sur-reply to the Traverse on January 15, 2008. (ECF 30).

## DISCUSSION

A person held in custody under a state court judgment may challenge the legality of that custody in federal court through a Petition for Writ of Habeas Corpus. 28 U.S.C. § 2254. Section 2254 allows the state prisoner to challenge his custody "on the ground that [it is] in violation of the Constitution or laws or treaties of the United States." *Id.* The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA" or "Act"), effective April 24, 1996, amended Chapter 153 of Title 28, which concerns the procedures for the federal habeas remedy generally, and added Chapter 154, which sets forth special procedures applicable to capital habeas cases, but only in states that meet certain eligibility requirements.[2] The instant case involves the provisions of Chapter 153. Because the Petition for Writ of Habeas Corpus was filed on June 26, 2007, well after the April 24, 1996 effective date, the Act's revisions are applicable.

### Statute of Limitations

Section 101 of the Antiterrorism Act amends 28 U.S.C. § 2244 to impose a one-year limitation to file habeas petitions pursuant 28 U.S.C. § 2254. The limitations period runs from the latest of:

A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

---

[2]Ohio does not meet these requirements and thus does not qualify for opt-in treatment. *Hamblin v. Anderson*, 947 F. Supp.2d 1179, 1180-82 (N.D. Ohio 1996).

22

28 U.S.C. § 2244(d)(1). However, time during which a properly filed application for state post-conviction or other collateral review pertinent to the claim is pending is not to be counted toward any period of limitation under this subsection. 28 U.S.C. § 2244(d)(2).

In order to determine whether the Petition was timely filed, it is necessary to review the procedural history of this case:

> August 13, 2003: Petitioner files a Post-conviction Petition in the trial court;
>
> March 18, 2004: the trial court dismisses the Post-conviction Petition;
>
> October 4, 2004: the court of appeals affirms the trial court's dismissal of the Post-conviction Petition;
>
> November 23, 2005: the Supreme Court of Ohio affirms Petitioner's convictions and sentence;
>
> December 28, 2005: the Ohio Supreme Court refuses to accept an appeal from the court of appeals' dismissal of the Post-conviction Petition;
>
> June 26, 2006: the United States Supreme Court denies the Petition for Writ of Certiorari.

On June 26, 2007, Petitioner filed this Petition for Writ of Habeas Corpus. From the time of the United States Supreme Court's decision on June 26, 2006, denying Jackson's Petition for Writ of Certiorari, until the filing of this Petition on June 26, 2007, one year elapsed. Accordingly, the Petition was filed within the one-year statute of limitations.

**Exhaustion and Procedural Default**

The Court must next determine whether the claims are properly presented for review. Federal claims that were evaluated on the merits in some fashion by a state court are properly brought before a federal court for habeas review. Federal claims that were not so evaluated, either because they were not presented to the state court or because they were presented improperly, generally are not cognizable on federal habeas review.

23

A petitioner's failure to present a federal claim to the state courts for initial resolution involves an issue of exhaustion of state court remedies. Invoking principles of comity and federalism, federal courts have long required state prisoners to exhaust the "available state remedies" before addressing the merits of a federal claim on federal habeas review. *Coleman v. Thompson,* 501 U.S. 722, 731 (1991). As the Supreme Court reiterated in *Coleman*:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490-491(1973). Under our federal system, the federal and state courts [are] equally bound to guard and protect rights secured by the Constitution.' *Ex parte Royall,* 117 U.S., at 251. Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." *Darr v. Burford*, 339 U.S. 200, 204 (1950).

*Coleman,* 501 U.S. at 731 (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). The exhaustion doctrine is codified in both the former and revised provisions of section 2254(b).[3]

Even if a petitioner presents a federal claim to the state courts for resolution, that claim generally is inappropriate on federal habeas review if the state courts refused to address the merits of the claim because the petitioner failed to follow a state procedural rule. This is called the procedural default rule. As the Supreme Court noted in *Coleman*, "Just as in those cases in which a state prisoner

---

[3] The Antiterrorism Act amended section 2254(b), however, to specifically allow federal courts to *deny a habeas petition on the merits* even in the absence of exhaustion. *See* 28 U.S.C. § 2254(b)(2). This amendment promotes judicial efficiency and economy, for if a claim is meritless, it will not acquire merit by virtue of exhaustion. Allowing the federal court to review such a claim on the merits prior to exhaustion preserves judicial resources without unduly undermining the authority of the state court to consider the claim.

24

fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 731-32. Where a state prisoner procedurally defaults a federal claim in state court, it is said that an "independent and adequate state ground support[s] [the] habeas petitioner's custody[.]" *Id.* at 731.[4]

Application of the procedural default rule is necessary in the context of federal habeas corpus, because "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Id.* at 732 (citations omitted). In other words, without the procedural default rule, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the State's interest in correcting their own mistakes is respected in all federal habeas cases." *Id.*

A habeas petitioner may avoid application of the procedural default rule (or "excuse" the default) by demonstrating what is called "cause and prejudice" -- cause for the procedural default and prejudice resulting from the alleged constitutional violation. *Id.* at 750. In the absence of cause and prejudice, a habeas petitioner may "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.*

The cause element of the cause and prejudice test requires more than the mere proffer of an

---

[4] However, "if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition."
*Coleman*, 501 U.S. at 735.

excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor *external to the defense* impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)) (emphasis added). An example of sufficient cause is "a showing that the factual or legal basis for a claim was not reasonably available to counsel, * * * or that 'some interference by officials' * * * made compliance impracticable." *Id*. at 753 (quoting *Murray*, 477 U.S. at 488). An error by counsel will not constitute adequate cause unless the error amounts to constitutionally ineffective assistance of counsel.  *Id.* at 753-54.

### Procedural Default, Ohio Law

Under Ohio law, all claims that were known, or that should have been known, by the defendant at the time of trial or direct appeal must be raised on direct appeal from the judgment of conviction. If they are not so raised, they are waived.[5] If a defendant fails to raise a known claim on direct review, the only possible avenue of relief from waiver is to demonstrate that the failure to raise the claim resulted from ineffective assistance of appellate counsel. For those claims that are *unknown*, or could not reasonably have been known, to the defendant until after the judgment of conviction, Ohio provides an avenue of relief through its post-conviction statute, R.C. 2953.21. That section,

---

[5] *See State v. Perry*, 10 Ohio St. 2d 175, 180 (1967) ("Under the doctrine of *res judicata*, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment."); *State v. Cole*, 2 Ohio St. 3d 112, 113 (1982) (quoting *Perry*); *see also State v. Glaros*, 170 Ohio St. 471, 471 (syllabus note 1) ("It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.").

26

entitled "Petition to Vacate or Set Aside Sentence," provides in relevant part as follows:

> (A)(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief.

Ohio Rev. Code 2953.21(A)(1).

This post-conviction statute has been interpreted to bar post-conviction consideration of any claim that was raised or could have been raised before the judgment of conviction or on direct review of that judgment. *See State v. Perry*, 10 Ohio St. 2d 175, 180 (1967); *State v. Roberts*, 1 Ohio St. 3d 36, 38-39 (1982) (citing *Perry*). Accordingly, claims that are capable of resolution by an examination of the trial court record, rather than evidence *dehors* the record, are inappropriate on a petition for post-conviction review. As the Supreme Court of Ohio stated in *Perry*:

> Constitutional issues cannot be considered in post-conviction proceedings under Section 2953.21 *et seq.*, Revised Code, where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him.
>
> * * *
>
> [W]e are of the opinion that our courts should apply th[e] doctrine [of *res judicata*] in determining whether post-conviction relief should be given. Under the doctrine of *res judicata*, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*Perry*, 10 Ohio St. 2d at 176 (syllabus note 7), 180.

The United States Court of Appeals for the Sixth Circuit has established a four-step analysis

27

to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). Under this test, this Court must determine: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the state procedural sanction; (3) whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and, if the previous elements are met, (4) whether the petitioner has demonstrated "cause" and "prejudice." Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005) (citing *State v. Smith*, 89 Ohio St.3d 323, 332 (2000)). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.*; *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *See Stojetz v. Ishee*, 2006 WL 328155 *12 (S.D. Ohio Feb. 10, 2006).

A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,* 380 F.3d at 968; *Hinkle*, 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle*, 271 F.3d at 244 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

## APPLICATION TO PETITIONER'S GROUNDS

Petitioner raises twenty grounds for relief. Subpart I below will address the procedural default arguments. As discussed in that subpart, Petitioner's grounds 3, 7, 8(c), 9, 12(a), (b), (c), 17(b), 18, 19(d), (e), (h), (n), (q), (r) and 20 are procedurally defaulted and accordingly are dismissed. The Court

nevertheless addresses the merits of those defaulted grounds in subpart II, believing that such a course of action best promotes the vital interests in judicial efficiency and economy. Petitioner's grounds 1, 2, 4, 5, 6, 8(a), (b), 10, 11, 12(d), (e), 13, 14, 15, 16, 17(a), and 19(a), (b), (c), (f), (g), (i), (j), (k), (l), (m), (o), (p), and (s) are not procedurally defaulted and are properly before this Court. Those grounds will be addressed in subpart III.

## I. PROCEDURAL DEFAULT[6]

### FIRST GROUND FOR RELIEF

In his first ground for relief, Jackson alleges that he was denied due process of law and a fair trial because the Ohio Supreme Court erred when determining that defense counsel should have been allowed to question potential jurors during *voir dire* concerning their views on the killing of a three year old child, and it should have vacated the underlying conviction on both sentences instead of vacating only the death sentence as to the three-year-old. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

### SECOND GROUND FOR RELIEF

In his second ground for relief, Jackson alleges that the trial court abused its discretion in preventing his counsel from making inquires into pretrial publicity during *voir dire*. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

### THIRD GROUND FOR RELIEF

---

[6]The cause and prejudice analysis as to all grounds found to be defaulted appears at the end of this section.

29

In his third ground for relief, Jackson argues that the trial judge limited his ability to uncover juror bias against him when the trial judge asked only one question of the jurors pertaining to pretrial publicity, thereby shifting the burden of proof to the defendant to disprove the negative facts the jurors had been exposed to. Further, he was allegedly denied due process by the court's failure to grant a change of venue. This ground was never presented to the Ohio courts and is therefore unexhausted. In such case, a federal court can deny the claim on the merits. 28 U.S.C. § 2254(b)(2). A claim may not be considered exhausted if any remedy remains in state court. 28 U.S.C. § 2254(c). If no remedy exists in state court, the claim is procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). As it appears that this ground cannot now be reviewed in state court, it is procedurally defaulted. This ground will be discussed in subpart II.

## FOURTH GROUND FOR RELIEF

In his fourth ground for relief, Jackson alleges that he was denied due process of law and a fair trial when the trial judge prohibited his counsel from examining prospective jurors about whether they could consider a life sentence for the killing of a young child and whether they would automatically impose the death penalty upon a finding of guilt. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

## FIFTH GROUND FOR RELIEF

Jackson asserts in his fifth ground for relief that the trial court erred when it prevented his counsel from rehabilitating jurors who admitted that they could not impose the death penalty. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

## SIXTH GROUND FOR RELIEF

In his sixth ground for relief, Jackson contends that the trial court erred by denying his pretrial motion to apply R.C. 2945.25(C) during *voir dire* which imposes standards for excusing jurors because of their views on capital punishment. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

## SEVENTH GROUND FOR RELIEF

In his seventh ground for relief, Jackson contends that the trial court's cumulative errors during *voir dire* violated his right to due process of law and a fair trial. This ground was never presented to the Ohio courts and is therefore unexhausted. In such case, a federal court can deny the claim on the merits. 28 U.S.C. § 2254(b)(2). A claim may not be considered exhausted if any remedy remains in state court. 28 U.S.C. § 2254(c).  If no remedy exists in state court, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 847-48. As it appears that this ground cannot now be reviewed in state court, it is procedurally defaulted. This ground will be discussed in subpart II.

## EIGHTH GROUND FOR RELIEF

In his eighth ground for relief, Jackson asserts that the trial court erred by allowing the prosecutor to introduce inflammatory, irrelevant impact evidence that included: (a) an unidentified tooth; (b) bloody clothing of Jayla Grant; and (c) Jayla Grant's pleas for help.  The Respondent agrees that sub-claims (a) and (b) are preserved for federal habeas review. The Supreme Court of Ohio determined that Petitioner had failed to object to the issue raised in sub-claim (c). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice.

31

*Hinkle*, 271 F.3d at 244; *See Stojetz*, 2006 WL 328155 at * 12. Sub-claim (a) will be discussed in subpart II, while sub-claims (a) and (b) will be addressed in subpart III.

## NINTH GROUND FOR RELIEF

In his ninth ground for relief, Jackson contends that the trial court erred by failing to prevent the prosecutor from introducing into evidence prejudicial victim impact evidence. The Supreme Court of Ohio determined that Petitioner had failed to object. The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Hinkle,* 271 F.3d at 244; *See Stojetz*, 2006 WL 328155 at * 12. This issue was reviewed under the plain error standard. Under this standard, the Supreme Court of Ohio still rejected Petitioner's ground. Petitioner's procedural default was not excused by the Supreme Court of Ohio, because the court plainly stated that Petitioner failed to object at the time of trial. The Supreme Court of Ohio merely supplemented its holding that the ground was procedurally defaulted by reviewing the ground under a plain-error analysis. In *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000), petitioner Scott argued that by conducting a plain error review, the Supreme Court of Ohio excused the procedural default and therefore did not enforce the procedural bar. The Sixth Circuit found Petitioner's argument unpersuasive. "A plain error analysis is not tantamount to a review on the merits, so the Ohio Supreme Court did not wholly overlook [Petitioner's] procedural default." *Id.* A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams*, 380 F.3d at 968; *Hinkle*, 271 F.3d at 244. Accordingly, Petitioner has procedurally defaulted this ground.

## TENTH GROUND FOR RELIEF

In his tenth ground for relief, Jackson contends that the trial court erred by allowing prejudicial and irrelevant trial evidence at the penalty phase of the trial. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

## ELEVENTH GROUND FOR RELIEF

In his eleventh ground for relief, Jackson asserts that the trial judge erred by allowing the victims of the offense to remain in the courtroom during the penalty phase of the trial. Although the court rejected this ground, it was properly presented to the state court, and it is exhausted but not procedurally defaulted.

## TWELFTH GROUND FOR RELIEF

In his twelfth ground for relief, Jackson asserts that prosecurororial misconduct occurred when: (a) the prosecutor made inflammatory statements during closing; (b) the prosecutor mislead the jury as to mitigating evidence; (c) the prosecutor improperly vouched  for Tara Cunningham's credibility; (d) the prosecutor presented inconsistent theories in the Jackson and Cunningham trials; and (e) the prosecutor withheld an exculpatory photo array in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). The Supreme Court of Ohio determined that Petitioner had failed to object to the issues raised in sub-claims (a), (b) and (c). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Hinkle*, 271 F.3d at 244; *See Stojetz*, 2006 WL 328155 at * 12.  The issues were reviewed under the plain error standard. Under this standard, the Supreme Court of Ohio still rejected Petitioner's grounds. Petitioner's procedural default was not

excused by the Supreme Court of Ohio, because the Court plainly stated that Petitioner failed to object at the time of trial. The Supreme Court of Ohio merely supplemented its holding that the grounds were procedurally defaulted by reviewing them under a plain-error analysis. In *Scott*, 209 F.3d at 865, petitioner Scott argued that by conducting a plain error review, the Supreme Court of Ohio excused the procedural default and therefore did not enforce the procedural bar. The Sixth Circuit found Petitioner's argument unpersuasive. "A plain error analysis is not tantamount to a review on the merits, so the Ohio Supreme Court did not wholly overlook [Petitioner's] procedural default." *Id.* A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams*, 380 F.3d at 968; *Hinkle*, 271 F.3d at 244. Accordingly, Petitioner has procedurally defaulted this ground. Although the court rejected sub-claims (d) and (e), they were properly presented to the state court and are exhausted but not procedurally defaulted.

### THIRTEENTH GROUND FOR RELIEF

In his thirteenth ground for relief, Jackson alleges that he was denied effective assistance of counsel when they: (a) failed to demonstrate the need for adequate investigative and expert assistance; (b) failed to investigate and prepare evidence in support of a motion to suppress; (c) failed to effectively investigate and present evidence in support of pre-trial motions; (d) were ineffective during *voir dire*; (e) failed to provide any guidance during opening statements; (f) failed to object to inflammatory portions of the State's opening statement; (g) failed to properly cross-examine Tara Cunningham concerning bias; and (h) failed to effectively cross-examine Dr. Cynthia Beisser. Although the court rejected all of the sub-claims, they were properly presented to the state court and are exhausted but not procedurally defaulted.

### FOURTEENTH GROUND FOR RELIEF

In his fourteenth ground for relief, Jackson alleges that he was denied effective assistance of counsel when: (a) counsel failed to investigate and present compelling evidence about Jackson's childhood during mitigation; (b) counsel failed to employ and present a cultural expert; and (c) counsel failed to obtain expert and investigative assistance to uncover Jackson's history. Although the court rejected all of the sub-claims, they were properly presented to the state court and are exhausted but not procedurally defaulted.

**FIFTEENTH GROUND FOR RELIEF**
**AND**
**SIXTEENTH GROUND FOR RELIEF**

The fifteenth and sixteenth grounds for relief pertain to Jackson's post-conviction proceedings. In his fifteenth ground for relief, Jackson alleges that the trial court erred when it denied Jackson's request for leave to conduct discovery during state post-conviction proceedings. He contends in his sixteenth ground for relief that the trial court erred when it denied Jackson's request for appropriation of funds for expert and investigative assistance in post-conviction proceedings. Although the court rejected these grounds, they were properly presented to the state court and are exhausted but not procedurally defaulted.

**SEVENTEENTH GROUND FOR RELIEF**

In his seventeenth ground for relief, Jackson contends that he was denied due process of law when the trial court and the Ohio Supreme Court: (a) failed to give effect to mitigation evidence and improperly considered aggravating factors; and (b) failed to consider cases where the death penalty was sought and not obtained. Although the court rejected sub-claim (a), it was properly presented to the state court, and it is exhausted but not procedurally defaulted. Sub-claim (b) was never presented

35

to the Ohio courts and is therefore unexhausted. In such case, a federal court can deny the claim on the merits. 28 U.S.C. § 2254(b)(2). A claim may not be considered exhausted if any remedy remains in state court. 28 U.S.C. § 2254(c).  If no remedy exists in state court, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 847-48. As it appears that this sub-claim cannot now be reviewed in state court, it is procedurally defaulted.

## EIGHTEENTH GROUND FOR RELIEF

In his eighteenth ground for relief, Jackson asserts the trial court and the Ohio Supreme Court failed to properly consider the proportionality of his death sentence. This ground was never presented to the Ohio courts and is therefore unexhausted.  In such case, a federal court can deny the claim on the merits. 28 U.S.C. § 2254(b)(2). A claim may not be considered exhausted if any remedy remains in state court. 28 U.S.C. § 2254(c). If no remedy exists in state court, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 847-48. As it appears that this ground cannot now be reviewed in state court, it is procedurally defaulted.

## NINETEENTH GROUND FOR RELIEF

Jackson asserts in nineteen sub-claims that the death penalty is unconstitutional. In sub-claim 19 (a), Jackson claims Ohio's death penalty statute is unconstitutional because too much discretion is given to prosecutors during the indictment stage. In sub-claim 19 (b), Jackson contends that proof of aggravating factors at the guilt phase precludes an individualized determination as required by the Constitution. In sub-claim 19 (c), Jackson asserts that Ohio's death penalty statute creates an impermissible risk of death. In sub-claim 19 (d), Jackson contends  R.C. 2929.04(A)(7) delegates harsher punishment to felony murder defendants than premeditated murder and therefore violates the Constitution. In sub-claim 19 (e), Jackson argues that Ohio's death penalty statutory scheme is

unconstitutional because it does not require a finding that the defendant had: (1) a conscious desire to kill; (2) premeditation; or (3) deliberation as a required mental state. In sub-claim 19 (f), Jackson claims R.C. 2929.03(D)(1) causes ineffective assistance of counsel because mental examination results are shared with the prosecution. In sub-claim 19 (g), Jackson argues Ohio's death penalty statute is unconstitutional because the state should have the burden of proving the absence of mitigating factors during the penalty phase. In sub-claim 19 (h), Jackson contends the Ohio death penalty scheme is unconstitutional because the defendant is required to prove mitigating factors by a "preponderance of the evidence." In sub-claim 19 (i), Jackson alleges that the death penalty scheme is unconstitutional because there is no "mercy" option. In sub-claim 19 (j), Jackson asserts the mitigating factors are unconstitutionally vague. In sub-claim 19 (k), Jackson argues a bifurcated capital case with the same jury during the guilt and penalty phases violates the Constitution. In sub-claim 19 (l), Jackson claims that a jury must give reasons when it gives a life sentence. In sub-claim 19 (m), Jackson alleges the death penalty statute in Ohio is unconstitutional because it requires a finding of death if the aggravating factors outweigh the mitigating factors. In sub-claim 19 (n), Jackson claims that juries must find that the death penalty is the only appropriate punishment under the Constitution. In sub-claim 19 (o), Jackson argues that the Constitution requires proportionality review. In sub-claim 19 (p), Jackson claims Ohio's appellate review is inadequate. In sub-claim 19 (q), Jackson asserts that the Ohio death penalty serves no legitimate purpose. In sub-claim 19 (r), Jackson claims lethal injection is unconstitutional. Finally, in sub-claim 19 (s), Jackson contends Ohio's death penalty violates international law. Sub-claims (a), (b), (c), (f), (g), (i), (j), (k), (l), (m), (o), (p), and (s), were properly presented to the state court, and although rejected, are exhausted but not procedurally defaulted.  Sub-claims (d), (e), (h) (n), (q) and (r) were never presented to the Ohio

courts and are therefore unexhausted.  In such case, a federal court can deny the claim on the merits. 28 U.S.C. § 2254(b)(2). A claim may not be considered exhausted if any remedy remains in state court. 28 U.S.C. § 2254(c).  If no remedy exists in state court, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 847-48. As it appears that these sub-claims cannot now be reviewed in state court, they are procedurally defaulted. However, these sub-claims will be discussed together in subpart III.

### TWENTIETH GROUND FOR RELIEF

In his twentieth ground for relief, Jackson asserts that his conviction and death sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial. This ground was never presented to the Ohio courts and is therefore unexhausted.  In such case, a federal court can deny the claim on the merits. 28 U.S.C. § 2254(b)(2). A claim may not be considered exhausted if any remedy remains in state court. 28 U.S.C. § 2254(c).  If no remedy exists in state court, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 847-48. As it appears that this ground cannot now be reviewed in state court, it is procedurally defaulted.

### CAUSE AND PREJUDICE

Having determined that Jackson has procedurally defaulted all or parts of nine of his grounds for relief, it is now necessary to determine whether he has demonstrated the requisite cause and prejudice necessary to excuse the defaults. Jackson submits several arguments concerning procedural default. First, he presents the conclusory argument that the claims were exhausted in the state courts. No further explanation is provided.  Review by the Court shows that the claims he is referring to were not before the state courts. Several claims were barred by the contemporaneous objection rule. Jackson incorrectly asserts that raising those claims on appeal is sufficient to avoid procedural default.

Finally, Jackson correctly contends that unexhausted claims that lack merit can be reviewed, but those claims with merit must be remanded to state court for further review. He has not argued cause and prejudice as to any defaulted claims. None has been found by this Court.

## STANDARD OF REVIEW

Two of the AEDPA's revisions are significant here. These revisions are contained in subsections 2254(d) and 2254(e)(1). Revised subsection 2254(d) specifically addresses the power of federal courts to grant habeas relief with respect to claims that were adjudicated on the merits by the state court, and it limits that power to two instances:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This revision reinforces respect for state court judgments, which is vital in our federal system.

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the

facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

The term "contrary," the Court said, is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." *Id.* at 405. Therefore, the Court determined the text of § 2254(d)(1) suggests the state court's decision must be substantially different from relevant Supreme Court precedent. *Id.*

With regard to the "unreasonable application," the Supreme Court rejected a "reasonable jurist" standard for determining the "unreasonable application" language of the statute stating that this standard would tend to mislead federal habeas courts by focusing attention on the subjective inquiry rather than on an objective one. *Id.* at 410.

Citing the Fourth Circuit's interpretation of the "unreasonable application" clause, the Court determined a state-court decision:

> involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407.

The revision contained in subsection 2254(e)(1) is also significant. This subsection sets forth the standard of review regarding state court factual findings. Subsection (e)(1) establishes a presumption of correctness for all factual findings, rather than those determined after a hearing and

evidenced by a writing as provided under the former version of section 2254. Moreover, this presumption is stronger than that contained in the former version of section 2254, because it can be rebutted only by a showing of "clear and convincing evidence," rather than simply "convincing evidence." 28 U.S.C.A. § 2254(e)(1).[7] In this case, Petitioner challenges not only section 2254(d)(1), but he also challenges all of the factual finding of the state courts.

## II. MERITS OF DEFAULTED CLAIMS

Although the Court finds all or some portion of nine of Petitioner's claims for relief are procedurally defaulted and should be dismissed, the Court has determined to reach the merits of these defaulted claims in an effort to promote judicial efficiency and preserve judicial resources. Such an approach is consistent with the procedural default doctrine, for, as the Supreme Court reiterated, "in the habeas context, a procedural default, that is, a critical failure to comply with state procedural law, is not a jurisdictional matter." *See Day v. McDonough*, 547 U.S. 198 (2006); *Trest v. Cain*, 522 U.S. 87 (1997) (citing *Lambrix v. Singletary*, 520 U.S. 518 (1997) and *Coleman*, 501 U.S. at 730-31).

## THIRD GROUND FOR RELIEF

In his third claim for relief, Jackson argues that the trial judge limited his ability to uncover juror bias against him when the trial judge asked only one question of the jurors pertaining to pretrial publicity thereby shifting the burden of proof to the defendant to disprove the negative facts the jurors had been exposed to, and he was denied due process by the court's failure to grant a change of venue.

---

[7]Under the former version of section 2254 (which is part of Chapter 153), a state court's factual findings "shall be presumed to be correct," provided the factual findings were made "after a hearing on the merits of [the] issue" and were "evidenced by a written finding, written opinion, or other reliable and adequate written indicia." 28 U.S.C. § 2254(d) (1994). This presumption may be overcome, however, by a showing of "convincing evidence that the factual determination by the State court was erroneous." *Id.*

41

This claim is similar to the second ground for relief. The Court's same reasoning in rejecting the second claim applies.[8] Jackson has not supported his contention that there is a burden of proof on *voir dire*. Further, in order to succeed on a change of venue claim, a petitioner has the burden to prove prejudice. *Jones v. Bradshaw,* 489 F.Supp.2d 786, 820 (N.D. Ohio 2007). This claim is without merit.

## SEVENTH GROUND FOR RELIEF

Jackson contends that the trial court's cumulative errors during *voir dire* violated his right to due process of law and a fair trial. This claim is actually a restatement of grounds one through six. Since the Court has found, or will find, all of those claims for relief to be consistent with the Constitution, this claim must be considered to be without merit. Further, the Court will discuss the issue of cumulative error in Jackson's twentieth claim for relief.

## EIGHTH GROUND FOR RELIEF - SUB-CLAIM (c)

In his eighth ground for relief, Jackson asserts that the trial court erred by allowing the prosecutor to introduce inflammatory, irrelevant impact evidence that included Jayla Grant's pleas for help.

Errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions. *Estelle, v. McGuire*, 502 U.S. 62, 67 (1991). The Ohio Supreme stated:

> Appellant also raises issues regarding the testimony of the police officer who identified the tooth fragment at trial and testimony from James Grant about Jayla's plea for help. Appellant failed to object in both instances and thereby waived these issues. *See* Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. There was no error, plain or otherwise.

---

[8] The second claim for relief, not having been defaulted, will be discussed in subpart III.

\*\*\*

> In addition no error occurred regarding James Grant's testimony about his daughter's plea for help. James testified that after the shooting ended, he laid his daughter on the floor to see if she was injured. When James attempted to go for help, Jayla put up her arms and asked James to help her. Appellant describes this testimony as hearsay and contends that it should not have been admitted because it was inflammatory victim-impact evidence.
>
> First, Jayla's plea for help after she was shot was admissible under the excited-utterance exception of Evid.R. 803(2). *See, e.g.*, *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 94. Second, the statement was relevant to the circumstances surrounding the shooting and the victim's death. Therefore, we reject appellant's second proposition of law.

*State v. Jackson*, 107 Ohio St.3d at 66-68.

Jayla Grant's plea for help was admitted under the Ohio rules of evidence under the excited utterance exception to hearsay, Evid. R. 803(2). It also was relevant to the circumstances surrounding the shooting and her death, as the state court found. This sub-claim is without merit.

## NINTH GROUND FOR RELIEF

In his ninth ground for relief, Jackson contends that the trial court erred by failing to prevent the prosecutor from introducing into evidence prejudicial victim impact evidence. Specifically, he asserts that all of the jurors were familiar with the victims, the impact that the crime had on the community and were struggling to not have that influence their decision. During the guilt phase of the trial, the State presented testimony detailing the injuries suffered by each shooting victim, including pain and suffering.

The law regarding state evidentiary matters set forth in Jackson's eighth ground for relief also applies to this claim. Further, a state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether

43

or not the death penalty should be imposed. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). The court

must determine whether the victim impact evidence was so unduly prejudicial as to render Petitioner's

trial fundamentally unfair. *Id.* at 825. The Ohio Supreme Court addressed this issue even though it

was procedurally defaulted, stating as follows:

> In his third proposition of law, appellant contends that the state introduced impermissible victim-impact evidence when the prosecutor elicited irrelevant and inflammatory testimony from the surviving victims. However, defense counsel failed to object to the admission of this allegedly irrelevant and inflammatory testimony and waived all but plain error. *State v. Tibbetts,* 92 Ohio St.3d at 160-161, 749 N.E.2d 226. Appellant complains about guilt-phase testimony from the surviving victims describing where they had been shot, the extent of their injuries, and, in some cases, the lingering effects of their injuries. However, we have previously held that evidence that depicts the facts and circumstances surrounding the commission of an offense and the impact of the offense on the victims is admissible during the guilt phase. *See State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878; *State v. Loza* (1994), 71 Ohio St.3d 61, 82-83, 641 N.E.2d 1082.
>
> Appellant was charged with six counts of attempted aggravated murder, and testimony of the surviving victims regarding the nature and extent of their injuries was relevant to prove the elements of these offenses, including intent. Other testimony describing where the bullets entered the victims' bodies and the resulting wounds is probative of intent to cause death. *See, e.g.*, *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 473 N.E.2d 768. This testimony was also probative of the firearm specifications, the aggravated-robbery charge and specification, and the course-of-conduct specification. *See, e.g.*, *State v. Allard* (1996), 75 Ohio St.3d 482, 499-500, 663 N.E.2d 1277 (victim-impact evidence is permissible if it relates to the facts attendant to the offenses). Accordingly, we overrule appellant's third proposition.

*State v. Jackson*, 107 Ohio St.3d at 68.

As the Respondent points out, the State was required to prove every element of the six separate

attempted murder counts beyond a reasonable doubt. The detailed descriptions of the injuries were

relevant to prove intent to kill, a necessary element of this crime, and to distinguish attempted murder

from any lesser included offense. Any prejudice experienced by Jackson was substantially outweighed

by the high probative value of the victim impact evidence. Jackson's trial was not fundamentally

44

unfair.  The Court concludes that this ground is without merit.

### TWELFTH GROUND FOR RELIEF - SUB-CLAIMS (a), (b) and (c)

In his twelfth ground for relief, Jackson asserts that prosecutorial misconduct occurred when: (a) the prosecutor made inflammatory statements during closing; (b) the prosecutor misled the jury as to mitigating evidence; and (c) the prosecutor improperly vouched  for Tara Cunningham's credibility.

The measure of whether due process is lacking in cases of alleged prosecutorial misconduct is the fairness of trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219 (1982). *Accord Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003). A death sentence should not be reversed on constitutional grounds even if the prosecutor's actions are undesirable or even universally condemned, unless those actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). Inappropriate prosecutorial comments, standing alone, will not justify reversal of a conviction obtained in an otherwise fair proceeding. *United States v. Young*, 470 U.S. 1 (1985); *United States v. Bond,* 22 F.3d 662 (6th Cir. 1994). The determination is made by examining the totality of the circumstances. *Hawkins v. Coyle,* 2005 WL 1684022 *18 (S.D. Ohio Jul.19, 2005)(citing *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)).

The court must first find whether the prosecutor's statements were improper. *Slagle v. Bagley,* 457 F.3d 501, 516 (6th Cir. 2006).  If the statements are found to be improper, four factors are considered in weighing the extent of a prosecutor's misconduct: (1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and

(4) the strength of the competent proof to establish the guilt of the accused. *Hamblin v. Mitchell*, 354 F.3d 482, 494 (6th Cir. 2003); *accord Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003); *Hutchison  v. Bell*, 303 F.3d 720, 750 (6th Cir. 2002); *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000); *Pritchett v. Pitcher,* 117 F.3d  959, 964 (6th Cir. 1997). The prosecutorial misconduct must likely have had an impact on the outcome of the trial. *Byrd*, 209 F.3d at 529.  The Sixth Circuit has stated that, "For denial of due process to exist, the misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Pritchett*, 117 F.3d at 964. Extensive prosecutorial misconduct during trial and during closing argument justifies the granting of a writ of habeas corpus. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). However, where the evidence pointing to the defendant's guilt is strong and the prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's guilt or innocence of the crime, the improper comments may be "error, but the jury would probably have returned the verdict of guilty anyway," and habeas relief is not warranted. *Hamblin*, 354 F.3d at 495.

**(a) The Prosecutor Made Inflammatory Statements During Closing**

Jackson submits that the following comments were improper:

Prosecutor: ...I'm going to show you the pictures now. I want you, in your mind, to run through the testimony. Eight people went into the kitchen. Two people with guns. That's ten. Only six came out. That's what this case is all about. It's about eight people that didn't have guns and two people that were not lucky enough to make it out alive. Against that wall – that's what this case is about. Do you remember Shane telling you that he was shot and he falls down even after he turned over everything that they wanted from him? He'd given them what he had. There was nothing more. It's about Coron getting his mouth, his jaw broken and then being shot in the mouth and now having to put his mouth so his speech is at least somewhat proper. He lost teeth. It's about Coron seeing not one, but two people shooting. He doesn't know where the bullets went. The law doesn't require that. It doesn't require him to know where the bullets went. It's about D.J. – Dwight. He was the young boy from Columbus. It's about him seeing his cousin get shot in the mouth, his head snapping back and hitting

the wall, that wall right there. He, too, saw two young people firing their weapons in the kitchen. It's about Tomeka. Tomeka lost an eye. She was shot in the top of the head. She was cowering on the floor. Steadfastly under cross-examination she told you no, two people were firing. "I saw them, I looked up. I saw them. I saw him firing." No. But, again you know the law doesn't require that. Then you saw Arnetta. Maybe Arnetta is the luckiest of all. *She doesn't look so lucky there*. But, today she really has no independent memory of what happened that terrible day in the kitchen. She wasn't in that condition because she was in a car accident. She was in that condition because that man right there, and his brother, came into the kitchen and fired their guns and struck her in the back of the head. That's why she was in that condition. That's Leneshia. Leneshia was just seventeen years old. She can't tell us is [sic] because he and his brother shot her and she died. This case is about James. James Grant. He cradles his daughter. He tries to turn away from the gunmen. He finally falls on top of her, but to no avail. He has five wounds. Five wounds. He, too, told you that two people were shooting and that he was one of them. He told you he heard him say, he heard that man right there say, "We can't leave anyone moving."

Tr. Vol. 11, pgs. 1947-49.

The Ohio Supreme Court ruled as follows:

In his ninth proposition of law, appellant contends that he was denied a fair trial because of prosecutorial misconduct. Whether a prosecutor's remarks at trial require a reversal of conviction requires an analysis as to (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

Guilt-phase closing argument. First, appellant argues that prosecutorial misconduct occurred during the guilt-phase closing argument, when the prosecutor focused on the pain and suffering of the victims and presented graphic photographs that appealed to the jurors' passions and prejudices.

"Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915, *overruled on other grounds*, *State v. McGuire*, 80 Ohio St.3d at 402-404, 686 N.E.2d 1112. Most of the comments complained of here reflected evidence that had been presented at trial and were not improper. The prosecutor merely stressed the strength of the evidence that appellant had committed the charged offenses. *See, e.g.*, *State v. Hicks* (1989), 43 Ohio St.3d 72, 76, 538 N.E.2d 1030.

Appellant urges that the prosecutor exceeded the scope of proper argument when he displayed and commented on photographs depicting the deceased victims. The prosecutor first identified a photo of Leneshia Williams and stated: "Leneshia was just

47

seventeen years old. She can't tell us what happened. The reason she can't tell us is because he and his brother shot her and she died." The prosecutor then displayed an autopsy photo of Jayla Grant, and commented: "Then there's Jayla, who even in death is a beautiful little girl. The last thing she did is reach up to her dad and say, 'Help me, daddy. Help me.' * * * He (appellant) and his brother * * * turned this, this young girl, and he turned her into that. * * * He turned that beautiful little three year old girl into a specimen on the Lucas County Coroner's Table."

There was no objection to either comment, and, therefore, the prosecutor's remarks cannot be grounds for error unless they served to deny appellant a fair trial. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus, *death penalty vacated on other grounds*, *Wade v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157.

We find that the prosecutor's comments do not rise to the level of plain error. Evidence of appellant's guilt was overwhelming, and the statements in this case were not so inflammatory that appellant's convictions were the product of passion and prejudice rather than proof of guilt. *See State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 490 N.E.2d 906. Cf. *State v. Keenan,* 66 Ohio St.3d 402, 613 N.E.2d 203. In addition, a prosecutor's argument must be viewed in its entirety to determine prejudice. *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068. In this case, the prosecutor's remarks did not materially prejudice appellant. Finally, the trial court instructed the jurors that they must not be influenced by any consideration of sympathy or prejudice.

*State v. Jackson*, 107 Ohio St.3d at 74-76.

It is not improper for a prosecutor either to ask the jury to make a particular defendant answer for his crimes, or to characterize a defendant's actions as evil. *Hutchison*, 303 F.3d at 751. In the present case, the prosecutor's remarks pointed out the offensive nature of the crime and asked the jury to hold Petitioner responsible for his actions. *DeJesus v. Jones*, 2007 WL 2479338 * 2 (W.D. Mich. Aug. 28, 2007). *See Slagle*, 457 F.3d at 520 (the fact that a particular murder was particularly cruel or heinous is relevant to the determination of the appropriateness of actually imposing a death sentence on a death-eligible perpetrator). The jury was not misled. The prosecutor was merely reiterating the evidence.  His statements amounted to a recount of each victim's testimony and the injuries they received as a result of the shooting. Although the statements were deliberate, any

48

impropriety is overcome by the overwhelming proof of guilt.

**(b) The Prosecutor Mislead the Jury as to Mitigating Evidence**

This sub-claim concerns the prosecutor's suggestion that Jackson's mitigation amounted to nothing more than an excuse and was an attempt to avoid moral culpability.

The following comments by the prosecutor were allegedly improper:

> Prosecutor: How about the fact that he has not benefitted from treatment? Over ten years he's been in treatment. You heard the expert say he's been in all kinds of treatment for over a decade. Does that somehow lessen his moral culpability? Does that diminish the appropriateness of the death sentence? No.  How about the fact that he's not mentally ill? Does that somehow lessen his moral culpability or diminish the appropriateness of the death sentence? No.

Tr. Vol. 12, pgs. 2138-39.

> Prosecutor: Thank you. So, does the fact the he had a poorly developed conscience, well, does that somehow lessen his moral culpability or diminish the appropriateness of the death penalty? No. How about the fact that he had choices on January 3rd? That doesn't lessen his moral culpability; does it? It doesn't diminish the appropriateness of the death sentence in this case; does it? In the prior closing, I talked about what this wasn't about. I've just got a couple of things of what this isn't about in this case, too. The first thing is, the question is not did Cleveland Jackson have a chance. The question is, did he have a choice? Yes, he did. It's not about seeing an end.  It's about following the law. He had a terrible childhood. No doubt about it. But, does that terrible childhood, does that terrible childhood lessen his culpability? No. He's twenty-four years old.

Tr. Vol. 12, pg. 2140.

The Ohio Supreme Court addressed this sub-claim and rejected it as follows:

> Appellant next contends that the prosecutor misled the jury by equating his mitigation evidence with an attempt to avoid moral culpability. Appellant, however, did not object to the comments he now complains of and has waived all but plain error. *State v. Lundgren,* 73 Ohio St.3d at 492, 653 N.E.2d 304.

49

Several times during rebuttal closing argument, the state questioned whether appellant's mitigating evidence "lessen[ed] his moral culpability or diminish[ed] the appropriateness of the death sentence." Although the prosecutor's comments did stray from the definition of "mitigating evidence" approved in *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, the trial court properly defined "mitigating factors," and the jury was not limited in its consideration of mitigating evidence, *State v. Getsy,* 84 Ohio St.3d at 200-201, 702 N.E.2d 866. Moreover, the trial court correctly instructed the jury on the appropriate weighing of mitigating factors, and the jury was advised that the issue before them in the penalty phase was punishment and not an assessment of culpability. Therefore, plain error did not occur.

*State v. Jackson*, 107 Ohio St.3d at 76.

The Ohio Supreme Court found that the prosecutor strayed from the definition of mitigating evidence. However, as found by the state court, the trial court correctly instructed the jurors how to weigh the aggravating circumstances with the mitigating factors, and it advised them that the issue before them was punishment. Tr. Vol. 12, pgs. 2003-05. The prosecutor was commenting on Jackson's mitigating evidence, which he was entitled to do.

**(c) The Prosecutor Improperly Vouched  for Tara Cunningham's Credibility**

A prosecutor cannot improperly vouch for the credibility of a state's witness. *Young,* 470 U.S. at 8-9; *Slagle,* 457 F.3d at 513. "Improper vouching occurs when a jury could reasonably believe that a prosecutor was indicating a personal belief in a witness's credibility."  *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001); *Alder v. Burt,* 240 F. Supp.2d 651, 669 (E.D. Mich. 2003).  The personal opinion of counsel has no place at trial. *United States v. Carroll,* 26 F.3d 1380, 1384-85 (6th Cir. 1994).

Jackson contends that the following comments constitute vouching:

Prosecutor: …Now you know, they're vilifying her. She was badgered. They [defense counsel] were belligerent. She had a brutal cross-examination. She stood up. You

50

know, it's not easy for someone to come in and testify against their brother. But, apparently she has – she may lead a different life style than most of us, but she has a sense of decency. She knows a little bit of what's right and what's wrong and what's just. She has no motive to lie. No motive. None whatsoever.

Tr. Vol. 11, pg. 1963.

The Ohio Supreme Court considered this sub-claim as follows:

Appellant argues that the prosecutor committed misconduct by improperly vouching for the credibility of Tara Cunningham, appellant's half-sister. It is improper for an attorney to express a personal belief or opinion as to the credibility of a witness. *State v. Williams,* 79 Ohio St.3d at 12, 679 N.E.2d 646. In order to vouch for the witness, the prosecutor must imply knowledge of facts outside the record or place the prosecutor's personal credibility in issue. *See State v. Keene* (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246.

Appellant claims that the following comment made during the state's guilt-phase rebuttal closing argument constituted improper vouching:

"Then, Tara. Tara has become just such a horrible witch who didn't like her brother much. Well, it's amazing. Just hours before [the murder] they're [appellant and Jeronique] over to her house. They're upstairs and they're using her shirt to wipe off the gun and to wipe off the bullets. Now, you know, they're [defense counsel] vilifying her. She was badgered. They were belligerent. She had a brutal cross-examination. She stood up. You know, it's not easy for someone to come in and testify against their brothers. But, apparently she has-she may lead a different life style than most of us, but she has a sense of decency. She knows a little bit of what's right and what's wrong and what's just. She had no motive to lie. No motive. None whatsoever."        The prosecutor did not improperly vouch for Tara's credibility as a witness. The prosecutor merely argued that Tara was a reliable witness and that she lacked any motive to lie. This type of argument is not improper vouching when, as here, the prosecutor is responding to defense counsel's attacks on a witness's credibility and refers to facts in evidence that tend to make the witness more credible. *See State v. Green,* 90 Ohio St.3d at 373-374, 738 N.E.2d 1208. Moreover, defense counsel did not object, and there was no plain error. When viewed in its entirety, the prosecutor's rebuttal argument neither materially prejudiced appellant nor denied him a fair trial. *See State v. Loza,* 71 Ohio St.3d at 78, 641 N.E.2d 1082.

*State v. Jackson*, 107 Ohio St.3d at 76-77.

The prosecutor's comments concerning Tara Cunningham were not improper. Her testimony

was important for establishing prior calculation and design. She testified that she saw Jackson and his half brother, Jeronique Cunningham, wiping down guns and bullets shortly before the murders. Tr. Vol. 9, pgs. 1437-39. Also, Jackson told her they were going to "hit a lick," i.e., rob someone. Tr. Vol. 9, pg. 1439.  During cross-examination, the defense depicted her as a liar who was willing to lie about her brothers to save her housing. Tr. Vol. 9, pgs. 1445-52.  The prosecutor was commenting on her credibility.

Even if the prosecutor's remarks were improper, they were not so egregious as to render the trial fundamentally unfair. *Donnelly,* 416 U.S. at 643. The statements did not mislead the jury, and Jackson was not prejudiced. The facts showed that the evidence against him was overwhelming.

### SEVENTEENTH GROUND FOR RELIEF - SUB-CLAIM (b)

In his seventeenth ground for relief, sub-claim (b), Jackson contends that he was denied due process of law when the trial court and the Ohio Supreme Court failed to consider cases where the death penalty was sought and not obtained.

The Ohio Supreme Court conducted a proportionality review:

> Finally, the sentence imposed here is proportionate to death sentences we approved in other cases of murder as a course of conduct involving the purposeful killing of two or more persons. *See, e.g.*, *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895; *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

*State v. Jackson*, 107 Ohio St.3d at 87-88.

This claim is without merit because no proportionality review is required. *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001)(citing *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984)).  Since Ohio

52

law requires proportionality review, the review must be consistent with constitutional requirements. *Dickerson v. Mitchell*, 336 F. Supp.2d 770, 789 (N.D. Ohio 2004), *rev'd on other grounds by Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006). A trial judge has the duty to reweigh the aggravating circumstances and mitigating factors before determining whether to impose a death sentence or a life sentence, R.C. 2929.03(D)(3), and to state this finding in a separate opinion. R.C. 2929.03(F). The judge must examine the state's proportionality review to determine whether the imposition of a death sentence on the petitioner is patently unjust or "shocks the conscience." The court is not to second guess the state court's comparison of other cases in which the death penalty was imposed. *Id.* at 789; *Taylor v. Mitchell*, 296 F. Supp.2d 784, 839 (N.D. Ohio 2003). Because proportionality review is not required by the Constitution, states have a great latitude in defining the pool of cases used for comparison. *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003). The Sixth Circuit has held that, by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed. *Id.*; *Buell*, 274 F.3d at 369. *See Getsy v. Mitchell*, 456 F.3d 575, 587 (6th Cir. 2006)(Constitution does not require the state to provide for a system of proportionality review so proportionality review is not constitutionally required, and the state therefore has "great latitude" in defining its system of proportionality review).

Review of the Ohio Supreme Court's opinion shows that it conducted a meaningful review of his sentence. Even though Jackson may not have been the actual killer, Ohio law provides for a death sentence to be based on conduct amounting to prior calculation and design. R.C. 2929.04(A)(7). Furthermore, the Supreme Court in *Tison v. Arizona*, 481 U.S. 137, 158 (1987), held that major participation in the felony committed, combined with reckless indifference to human life, is sufficient

to satisfy a sentence of death.

## EIGHTEENTH GROUND FOR RELIEF

In his eighteenth ground for relief, Jackson asserts the trial court and the Ohio Supreme Court failed to properly consider the proportionality of his death sentence. The reasoning set forth in the seventeenth ground for relief applies here.

## TWENTIETH GROUND FOR RELIEF[9]

In his twentieth ground for relief, Jackson asserts that his convictions and death sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial.

While trial-level errors that would be considered harmless when viewed in isolation might require reversal when considered cumulatively, "the accumulation of non-errors cannot collectively amount to a violation of due process." *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004), *cert. denied*, 543 U.S. 1119 (2005). Consequently, where a petitioner fails to show that any of the alleged instances of ineffective assistance of counsel deprived him of a fair trial, "he cannot show that the accumulation of these non-errors warrant relief." *Id.* Moreover, the Sixth Circuit has noted that, "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).[10] *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)(even constitutional errors that would not individually support habeas relief cannot be cumulated to support habeas relief.) Jackson has not established that any error occurred in the state

[9] The defaulted sub-claims of the nineteenth ground will be discussed in section III.

[10] The Court acknowledges that, in a later case, the Sixth Circuit granted habeas relief on cumulative error grounds. *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002). Because the *DePew* petitioner had filed his petition prior to the AEDPA's effective date, however, the AEDPA provisions did not apply. *Id.* at 748.

courts. Thus, this claim is without merit.

### III. MERITS OF NON-DEFAULTED GROUNDS

### FIRST GROUND FOR RELIEF

In his first ground for relief, Jackson alleges that he was denied due process of law and a fair trial because the Ohio Supreme Court erred when determining that defense counsel should have been allowed to question potential jurors during *voir dire* concerning their views on the killing of a three year old child, and it should have vacated the underlying conviction on both sentences instead of vacating only the death sentence as to the three-year-old.

Jackson argues that the trial judge and the Ohio Supreme Court mistakenly treated defense counsels' Motion for a Mistrial as a mere matter of procedural state law to be reviewed on an "abuse of discretion" standard and ignored the fact that the remedy sought was a mistrial on all counts. If Jackson was denied a fair trial on the sentencing phase of the murder of Jayla Grant, he was allegedly denied a fair trial and due process of law on each and every count of the indictment in both phases. Allegedly, no juror could separate the fact that Jackson was accused of a homicide of a three year old child as they individually and collectively judged his guilt on all the related counts of the indictment.

A defendant has the constitutional right to be tried by a panel of impartial jurors. *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965). *Voir dire* is an important stage in a trial, assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled," while "lack of adequate *voir dire* impairs

55

the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts." *Id*. A defendant is entitled to ask specific questions only if failure to ask them would result in an unfair trial. *Mu'Min v. Virginia,* 500 U.S. 415, 426 (1991). A general but thorough inquiry as to the impartiality of the prospective jurors is all that is constitutionally required. *Ristaino v. Ross*, 424 U.S. 589, 598 (1976). *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992)(the right to an impartial jury includes an adequate *voir dire* to identify unqualified jurors).

The Ohio Supreme Court determined this issue as follows:

> Appellant also contends that the trial court unduly restricted *voir dire* by precluding defense counsel from questioning prospective jurors concerning their views about imposing the death penalty on a person who is convicted of killing a three-year-old child. Appellant bases this claim on the following events.
>
> During individual *voir dire*, after six prospective jurors had been questioned, including four who eventually were seated as jurors, defense counsel requested that the trial court inform prospective jurors that one murder victim was three years old and allow the defense to question prospective jurors about that fact to reveal any bias toward imposing the death penalty. At the time this issue was raised, the trial court had not informed the venire that one murder victim was three years old. Nor did the court inform any of the remaining prospective jurors of this fact.
>
> The trial court rejected defense counsel's request and would not permit counsel to discuss the ages of the murder victims with the venire. The judge believed that "the death penalty qualification process should be in the abstract" and that *voir dire* concerned only whether prospective jurors, "without knowing the specifics of the case, * * * can keep an open mind on penalty determinations."
>
> After another 15 prospective jurors had been individually questioned, including three who eventually became jurors, defense counsel again asked to examine prospective jurors about their views on imposing the death penalty on child murderers.
>
> The trial court denied defense counsel's second request, ruling that a defendant is not entitled to question prospective jurors on the specifics of the case. The trial court reiterated that *voir dire* should be conducted in the abstract and further noted that it viewed defense counsel's request to question prospective jurors about specific facts as an attempt " 'to predispose jurors to react a certain way to anticipated evidence,' " quoting *Missouri v. Clark* (Mo.1998), 981 S.W.2d 143, 147.
>
> Defense counsel then moved for a mistrial on the basis that they had been precluded from making an inquiry on this subject. The trial court denied the motion.
>
> On appeal, appellant claims that the trial court's refusal to tell prospective jurors that one of the murder victims was three years old prevented him from discovering a bias

on the part of prospective jurors. Due to this restriction, appellant argues that he was unable to develop and exercise challenges for cause and peremptory strikes against prospective jurors who could not fairly consider mitigation or a life sentence.

Crim.R. 24 and R.C. 2945.27 afford both the prosecution and defense the opportunity to conduct reasonable *voir dire* of prospective jurors. Nevertheless, the scope of *voir dire* falls within the trial court's sound discretion and varies depending on the circumstances of a given case. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40, citing *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. While restrictions on *voir dire* have generally been upheld, any limits on *voir dire* must be reasonable. *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913; *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 31. We will not find prejudicial error in a trial court's qualification of venire persons as fair and impartial jurors unless appellant can show a clear abuse of discretion. *State v. Cornwell* (1999), 86 Ohio St.3d 560, 565, 715 N.E.2d 1144. A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40.

We conclude that the trial court's limitation on *voir dire* in this case was an abuse of discretion. The trial court erred when it held that appellant was not entitled to have prospective jurors informed that one of the murder victims was three years old. While fairness requires that jurors be impartial, prospective jurors need not be totally ignorant of the facts and issues involved to be qualified as jurors. *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 38, citing *State v. Sheppard* (1998), 84 Ohio St.3d 230, 235, 703 N.E.2d 286; *Murphy v. Florida* (1975), 421 U.S. 794, 799-800, 95 S.Ct. 2031, 44 L.Ed.2d 589.

The trial court cited *State v. Lundgren,* 73 Ohio St.3d 474, 653 N.E.2d 304, for the principle that *voir dire* should be conducted in the abstract. *Lundgren,* however, does not stand for this broad proposition. In *Lundgren,* the defense counsel wanted to ask prospective jurors whether they would consider specifically identified mitigating factors. *Id.* at 481, 653 N.E.2d 304. The trial court denied the request, ruling that "such questions constituted juror 'indoctrination,' " but did allow counsel to ask prospective jurors generally whether they would consider mitigating factors as instructed. *Id.* We held that the trial court had exercised appropriate discretion. *Id.*

Moreover, in *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576, we rejected the argument that it was improper to outline the facts of the case during *voir dire*. In *Tyler,* the prosecutor told several veniremen that the victim was an elderly man who sold fruits and vegetables, the location of his produce stand, and that he had been robbed and shot to death. We held that in examining prospective jurors the state had the right to state the nature of the alleged offense in order to determine whether the jurors had read about the crime. *Tyler,* 50 Ohio St.3d at 32, 553 N.E.2d 576.

In this case, the trial judge misconstrued defense counsel's request to inform the prospective jurors of Jayla's age as an attempt " 'to predispose jurors to react a certain way to anticipated evidence,' " quoting *Missouri v. Clark,* 981 S.W.2d 143, 147. Counsel were merely attempting to discover whether prospective jurors could fairly

consider imposition of a life sentence in a case involving a three-year-old murder victim. While it is improper for counsel to seek a commitment from prospective jurors on whether they would find specific evidence mitigating, *State v. Bedford,* 39 Ohio St.3d at 129, 529 N.E.2d 913, counsel should be permitted to present uncontested facts to the venire directed at revealing prospective jurors' biases. *Turner v. Murray* (1986), 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27.

Even without being informed that one of the victims in this case was a child, some members of the venire indicated a possible bias in favor of imposing the death penalty on murderers of children. For example, prospective juror No. 257 stated on her juror questionnaire that she had "conflicting feelings" regarding capital punishment: "Catholicism teaches that I shouldn't sit in judgment. However, many violent criminals probably deserve to die, especially those who commit crimes against children." During *voir dire*, she confirmed that her opinion had not changed.

Prospective juror No. 282 stated that she considered crimes against children and the elderly to be the most serious crimes because persons in those groups are "closer to my heart than anybody." She also explained that in her opinion, people convicted of crimes against children and the elderly are not punished as severely as they ought to be.

Prospective juror No. 288 stated on her questionnaire and during *voir dire* that she believed that the death penalty is a proper remedy when a murder is premeditated, when the defendant showed no remorse, or when the victim was a child.

"The Constitution * * * does not dictate a catechism for *voir dire,* but only that the defendant be afforded a fair and impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492; *State v. Wilson,* 74 Ohio St.3d at 386, 659 N.E.2d 292. "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22. Accordingly, the exercise of the trial court's discretion to restrict inquiry by counsel is subject to the essential demands of fairness. *Morgan,* 504 U.S. at 730, 112 S.Ct. 2222, 119 L.Ed.2d 492, citing *Aldridge v. United States* (1931), 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054.

Questions on *voir dire* must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors. *Morgan,* 504 U.S. at 734-735, 112 S.Ct. 2222, 119 L.Ed.2d 492. Moreover, the fact that defendant bears the burden of establishing juror partiality, *see Wainwright v. Witt,* 469 U.S. at 423, 105 S.Ct. 844, 83 L.Ed.2d 841, makes it all the more imperative that a defendant be entitled to meaningful examination at *voir dire* in order to elicit potential biases held by prospective jurors. *Mu'Min v. Virginia,* 500 U.S. at 441, 111 S.Ct. 1899, 114 L.Ed.2d 493 (Marshall, J., dissenting).

The trial court here was on notice that some prospective jurors harbored a strong bias in favor of imposing death for murderers of children. If an issue of bias surfaces before trial, it is the trial court's responsibility to conduct an adequate inquiry. *Oswald v.*

*Bertrand* (C.A.7, 2004), 374 F.3d 475, 484. *See, also*, *United States v. Barber* (C.A.4, 1996), 80 F.3d 964, 968 (an inquiry is required during *voir dire* to eliminate prejudice that threatens the fairness of the process or the result). The greater the probability of bias, "the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald v. Bertrand,* 374 F.3d at 480.

At a minimum, the trial court should have granted defense counsel's request to inform the venire that one murder victim was a three-year-old child. If the prospective jurors had been aware of this fact when they were asked general questions of fairness and impartiality, they may well have been prompted to admit to a predisposition to recommend the death penalty for those who murder children. However, without knowledge of this fact, prospective jurors could respond truthfully to general questions of fairness and impartiality while the specific concern was left unprobed.

In this case, appellant was charged with killing a three-year-old child. "[I]t is in just these circumstances, when the crime itself is likely to inflame the passions of jurors, that courts must be vigilant in ensuring that the demands of due process are met." *McKenzie v. Smith* (C.A.6, 2003), 326 F.3d 721, 727-728 (case involving brutal assault on three-year-old child). Protecting children from harm is a common human characteristic, and many people harbor strong feelings and emotions whenever a child is a victim of a violent crime. Some prospective jurors, when presented with this fact, may have been unable to remain dispassionate and impartial when deciding whether the death sentence should be imposed. The possibility that one juror might not have fairly considered sentencing options and may have voted for the death penalty solely because appellant murdered a three-year-old child is a risk too great to ignore. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222, 119 L.Ed.2d 492. Therefore, we find that due process required that defense counsel be allowed to determine whether any members of the venire harbored prejudices regarding this fact in order to exercise their challenges intelligently.

We hold that in a death-penalty case involving the murder of a young child the defendant is entitled, upon request, to have the prospective jurors informed of that fact and to ask questions that seek to reveal bias. The trial court retains its discretion as to the form and number of questions on the subject, including whether to question the prospective jurors individually or collectively. *See State v. Wilson,* 74 Ohio St.3d at 386, 659 N.E.2d 292; *Ham v. South Carolina,* 409 U.S. at 527, 93 S.Ct. 848, 35 L.Ed.2d 46.

The trial court abused its discretion by refusing defense counsel's requests to advise prospective jurors that one of the murdered victims was a three-year-old child and by refusing to allow *voir dire* on that fact. Therefore, the death sentence imposed on appellant in Count I for the aggravated murder of Jayla Grant is vacated. The matter is remanded to the trial court for resentencing consistent with R.C. 2929.06. Our disposition of this issue does not affect the separate death sentence imposed on Jackson for the death of Leneshia Williams.

*State v. Jackson*, 107 Ohio St.3d at 61-65.

Jackson relies on *Turner v. Murray*, 476 U.S. 28 (1986), referring to the dissenting opinion. The petitioner, an African American was sentenced to death for the murder of a white storekeeper. The Supreme Court vacated the death sentence because the trial court refused to allow defense counsel to question prospective jurors about racial prejudice during *voir dire.* The Court held that the inadequacy of the *voir dire* required the death sentence be vacated. But it was not necessary to retry the petitioner on the issue of guilt. *Id.* at 37. The decision was based on a combination of three factors: (1) the fact that the crime charged involved interracial violence; (2) the broad discretion given the jury at the death penalty hearing; and (3) the special seriousness of the risk of improper sentencing in a capital case. *Id.* "At the guilt phase of petitioner's trial, the jury had no greater discretion than it would have had if the crime charged had been noncapital murder."  *Id.*

Based on *Turner,* the state court in Jackson's case was not obligated to vacate his conviction for the murder of Jayla Grant or the conviction and death sentence of Leneshia Williams. Jackson's counsel were not precluded from asking about possible bias because of the murder of a seventeen-year-old (Williams). Two people were murdered. There is no relation to the court's refusal to allow questions about a three-year-old and the murder of Williams, who was seventeen years old.  He received the death penalty for the murder of Williams. The Court concludes that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

## SECOND GROUND FOR RELIEF

In his second claim for relief, Jackson alleges that  the trial court abused its discretion in preventing his counsel from making inquires into pretrial publicity during *voir dire.*  In cases involving pretrial publicity, "[t]he relevant question is not whether the community remembered the

case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035 (1984).  However, "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint." *White v. Mitchell,* 431 F.3d 517, 531 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 578 (2006)(quoting *DeLisle v. Rivers,* 161 F.3d 370, 382 (6th Cir.1998)).

The United States Supreme Court determined that, in cases where a media-run "carnival atmosphere" replaces the solemnity and dignity of a courtroom proceeding, a defendant may presume that the media attention so prejudiced his proceeding as to deny him or her due process of law. *Sheppard v. Maxwell*, 384 U.S. 333, 355 (1966); *Foley v. Parker,* 488 F.3d 377, 387 (6th Cir. 2007). Prejudice is shown through a review of *voir dire* testimony and the extent and nature of the publicity that a fair trial was impossible. *White*, 431 F.3d at 532. "[I]n extraordinary cases, where the trial atmosphere has been utterly corrupted by press coverage, a court must presume that pre-trial publicity has engendered prejudice in the members of the venire." *Williams,* 380 F.3d at 945. A fair juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)*; White*, 431 F.3d at 532. *See United States v. Jamieson,* 427 F.3d 394, 412 (6th Cir. 2005).  In *Mu'Min*, 500 U.S. at 422, the Court determined that, while a trial court may question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed. *Id.* at 431. In upholding the trial court's questioning of the venire, the Court reiterated that, "A trial court's findings of juror impartiality may be overturned only for 'manifest error.'" *Id.* at 428 (citations omitted).

The Ohio Supreme Court considered this issue ruling as follows:

Appellant claims that due to the trial court's restrictions, the *voir dire* inadequately addressed the impact of pretrial publicity on prospective jurors. Appellant argues that the extent of pretrial publicity and the number of prospective jurors who knew about the crime demanded that a comprehensive *voir dire* examination be conducted. Appellant filed a motion for a change of venue before trial. The trial court denied the motion after *voir dire* was completed.

"The manner in which *voir dire* is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212. A trial court has " 'great latitude in deciding what questions should be asked on *voir dire*.' " *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493. Crim.R. 24(A) requires that counsel be given an opportunity to question prospective jurors or to supplement the court's *voir dire* examination. Accord R.C. 2945.27. But restrictions on *voir dire* have generally been upheld. Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire. *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674; *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274.

Despite appellant's assertions to the contrary, the portion of the *voir dire* focusing on pretrial publicity was adequate. The *voir dire* in this case was not cursory: it lasted five days and covered nearly 1,300 pages of transcript. Prospective jurors also completed an extensive juror questionnaire, and the trial court repeatedly advised jurors to avoid media coverage about the case. The trial court individually questioned prospective jurors in sequestered sessions and asked each prospective juror whether he or she knew about the case from either media coverage or other sources. Nearly every prospective juror acknowledged some familiarity with the case. The court, as well as counsel, also individually questioned prospective jurors regarding the source of their knowledge of the case, whether they had formed any fixed opinions regarding appellant's guilt or innocence because of their exposure to pretrial publicity, whether they could decide the case solely on the evidence presented at trial, and whether they could deliberate in a fair and impartial manner. Following thorough questioning, the trial court readily excused members of the venire who had formed fixed opinions due to pretrial publicity or were otherwise unsuitable.

Appellant, however, complains that he was unfairly prohibited from inquiring into the content of what prospective jurors had heard from media accounts of his case, as well as media coverage of the trial of appellant's accomplice, Jeronique Cunningham. But a criminal defendant does not have a constitutional right to question prospective jurors about the contents of media reports that they have been exposed to. *Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493. The *voir dire* is sufficient if it shows that jurors will be able to set aside any impression they have formed because of pretrial publicity and decide the case solely on the law and evidence presented at trial. *State v. Spirko* (1991), 59 Ohio St.3d 1, 23-24, 570 N.E.2d 229; *Patton v. Yount* (1984), 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847. Here, every empaneled juror stated either that he or she had formed no opinions based on pretrial publicity or that, if he or she had, he or she could set aside those opinions and

render a fair and impartial verdict. *See, e.g.*, *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 30. Thus, the trial court took effective steps to protect appellant's rights, and appellant has not proven that his jury was impaired by pretrial publicity. *See, e.g., State v. White* (1998), 82 Ohio St.3d 16, 21, 693 N.E.2d 772; *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 30-31. Finally, defense counsel waived any potential error by failing to challenge any seated juror about prejudicial publicity. *See State v. Smith* (1997), 80 Ohio St.3d 89, 105, 684 N.E.2d 668, citing *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, *vacated in part on other grounds by Williams v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. A juror who is not challenged for cause is presumed to be impartial. *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682.

*State v. Jackson*, 107 Ohio St.3d at 57-59.

In this case, each of the potential jurors ultimately seated on Jackson's jury was questioned and asked whether he or she knew about the case from media sources. Almost every juror knew about the case. The court and defense counsel individually questioned each prospective juror regarding the source of their knowledge of the case, whether they had fixed opinions as to Jackson's guilt or innocence because of their exposure to publicity, whether they could reach a verdict based solely on the evidence and whether they could be fair and impartial. All of the empaneled jurors indicated that he or she had not formed an opinion based on pretrial publicity, and that he or she could render an impartial verdict. The court's finding that a prospective juror has the ability to be impartial is all the Constitution requires. *Irvin*, 366 U.S. at 722.

Jackson argues that he was entitled to a change of venue. As the court determined in *Bell v. Hurley*, 97 F. App'x 11 * 5 (6th Cir. 2004), the standard of presuming prejudice from denial of a change of venue only applies in "extraordinary" circumstances. Prejudice is rarely presumed. *Id.* In *Bell*, voluminous newspaper reports were insufficient to create a presumption of prejudice requiring reversal of an order denying a change of venue based on pretrial publicity. Any pretrial publicity did

not create a circus-like atmosphere at trial. *See* exhibits to mt. change of venue June 8, 2002, pretrial exhibits j, k July15, 2002. The Court concludes that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### FOURTH GROUND FOR RELIEF

Jackson alleges that he was denied due process of law and a fair trial when: (a) the trial judge prohibited his counsel from examining prospective jurors about whether they could consider a life sentence for the killing of a young child; and (b) whether they would automatically impose the death penalty upon a finding of guilt. As in the first claim for relief, Jackson contends that defense counsels' *voir dire* was restricted by the trial judge.

The Ohio Supreme Court resolved sub-claim (a), i.e., the trial judge prohibited Jackson's counsel from examining prospective jurors about whether they could consider a life sentence for the killing of a young child, in Jackson's favor. Based on defense counsels' argument, the court vacated the death sentence for the aggravated murder of Jayla Grant and remanded the matter to the trial court for resentencing.

The Sixth Amendment right to an impartial jury includes the right to an adequate *voir dire* to identify unqualified jurors. *Morgan*, 504 U.S. at 729. The trial court retains great latitude in deciding what questions should be asked on *voir dire. Mu'Min,* 500 U.S. at 424. The trial judge's discretion to restrict questioning is nonetheless "subject to the essential demands of fairness." *Morgan*, 504 U.S. at 729 (quoting *Aldridge v. United States,* 283 U.S. 308, 310 (1931)); *Dennis v. Mitchell,* 354 F.3d 511, 523-24 (6th Cir. 2003). *Voir dire* is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Williams*, 380 F.3d at 944.

The standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Getsy*, 456 F.3d at 597 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). The Supreme Court, in *Witherspoon v. Illinois,* 391 U.S. 510, 519 (1968), determined that counsel could ask prospective jurors about their views concerning the death penalty during *voir dire* in capital cases. Questions on this topic would ensure the impartiality of jurors by allowing the state to properly exercise challenges for cause against potential jurors unwilling to return a capital sentence. *Stanford v. Parker*, 266 F.3d 442, 452 (6th Cir. 2001). In a capital case, a juror who will automatically vote for the death penalty in every case will not consider aggravating circumstances and mitigating factors as required by the court's instructions. *Williams*, 380 F.3d at 953 (citing *Morgan*, 504 U.S. at 729). Thus, a defendant may challenge for cause a juror who is predisposed to vote for the death penalty. *Id.*; *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003). Because of the trial judge's proximity to the venire and determination of credibility and demeanor that is involved in *voir dire*, the judge's decision to excuse or not is deferential on review. *Williams*, 380 F.3d at 953; *Bowling*, 344 F.3d at 519. A juror may not be excluded based on his or her mere reservations or scruples regarding the death penalty. *Keith v. Mitchell,* 455 F.3d 662, 688 (6th Cir. 2006).

The Ohio Supreme Court ruled on this issue as follows:

> Appellant contends that the trial court refused to allow defense counsel to fully examine prospective jurors who said that they were willing to impose the death penalty regarding their ability to fairly consider mitigating evidence and all available sentencing options. As a result, he claims, his jury may have contained jurors who automatically voted for the death penalty upon his conviction for aggravated murder. Appellant's claim is not supported by the record. Defense counsel were given extensive leeway to examine prospective jurors regarding their willingness to consider mitigating evidence and impose a life sentence. Defense counsel were permitted to ask

65

questions aimed at gauging each prospective juror's receptiveness to potentially mitigating evidence (e.g., evidence of appellant's deprived childhood and psychiatric testimony). In addition to questioning whether jurors would follow the court's instructions and fairly consider all sentencing options, defense counsel were also permitted to ask jurors about their views on capital punishment, including their best arguments for and against the death penalty. Defense counsel were also allowed to question prospective jurors on other topics, including jurors' views about race, religion, illegal drugs, and the criminal-justice system.

Notwithstanding the leeway given his counsel, appellant argues that the trial court's limitations prevented him from successfully challenging for cause those jurors who were inclined to impose the death penalty in every murder case. He identifies prospective jurors Nos. 230, 263, 291 and prospective juror No. 299 (who actually sat on his jury) and claims that if the trial court had excused these prospective jurors for cause, he would have been able to use his peremptory challenges differently.

A prospective juror in a capital case may be excused for cause if his views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. 844, 83 L.Ed.2d 841, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. A trial court's ruling on a challenge for cause will not be overturned on appeal "unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646; *accord State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915.

Appellant failed to challenge prospective juror No. 263 and waived any alleged error in regard to this prospective juror. *See State v. Smith,* 80 Ohio St.3d at 105, 684 N.E.2d 668, citing *State v. Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. In addition, appellant exercised peremptory challenges as to prospective jurors Nos. 230, 263, and 291. Thus, only prospective juror No. 299 actually sat on appellant's jury.

The trial court did not abuse its discretion by not excusing these prospective jurors for cause. All four prospective jurors stated that they would not automatically vote for the death penalty, that they could follow the court's instructions, and that they would fairly consider mitigating evidence. A trial court does not abuse its discretion in denying a challenge for cause if a juror, even one predisposed in favor of imposing death, states that he or she will follow the law and the court's instructions. *State v. Mack* (1995), 73 Ohio St.3d 502, 510, 653 N.E.2d 329; *State v. Treesh* (2001), 90 Ohio St.3d 460, 468, 739 N.E.2d 749. Deference must be paid to the trial judge who sees and hears the juror. *Wainwright v. Witt,* 469 U.S. at 425-426, 105 S.Ct. 844, 83 L.Ed.2d 841; *State v. Williams,* 79 Ohio St.3d at 8, 679 N.E.2d 646.

*State v. Jackson,* 107 Ohio St.3d at 60-61.

Jackson's counsel challenged four prospective jurors. Jurors numbered 230, 263, 291, and 299

told the court that they could follow the court's instructions. Tr. Vol. 4, pg. 415; Tr. Vol. 5, pgs. 704-07; Tr.  Vol. 6, pgs. 878-88, 949. The Court concludes that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## FIFTH GROUND FOR RELIEF

Jackson asserts in his fifth ground for relief that the trial court erred when it prevented his counsel from rehabilitating jurors who admitted that they could not impose the death penalty.  The Supreme Court rejected this issue as follows:

> Appellant asserts that the trial court erred when it denied defense counsel an opportunity to rehabilitate prospective jurors who said that they opposed the death penalty. The trial court dismissed prospective jurors Nos. 222, 228, 300, and 301 without giving defense counsel an opportunity to inquire into their views on capital punishment. Although it might have been preferable for the trial court to permit defense counsel to question these jurors, the trial court did not abuse its discretion. Each juror unequivocally stated that he or she could not fairly consider imposing the death penalty. Thus, in each instance, there was a sufficient basis to support the trial court's decision. *See State v. Spirko,* 59 Ohio St.3d at 22, 570 N.E.2d 229; *State v. Huertas* (1990), 51 Ohio St.3d 22, 29-30, 553 N.E.2d 1058.

*State v. Jackson*, 107 Ohio St.3d at 59.

This claim concerns jurors numbered 222, 228, 300 and 301. Juror # 222 said "unequivocally, without any doubt" he could not vote for the death penalty. Tr. Vol. 3, pgs. 304-06. Juror # 228 stated that he would never consider the death penalty, and that he would not disregard the paper's account that Jeronique Cunningham was the actual shooter. Tr. Vol. 3, pgs. 332-49. Juror # 300 said, "Under no circumstances would I consider the imposition of the death penalty." Tr. Vol. 6, pgs. 951-58. Finally, juror # 301 told the court that she could not consider the death penalty equally with other sentencing options. Tr. Vol. 6, pgs. 985-88.  She further stated that she could not consider the death

penalty. Tr. Vol. 6, pg. 987.  Therefore, the Court concludes that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### SIXTH GROUND FOR RELIEF

In his sixth ground for relief, Jackson contends that the trial court erred by denying his pretrial motion to apply R.C. 2945.25(C) during *voir dire,* which imposes standards for excusing jurors because of their views on capital punishment. He argues that R.C.  2945.25(C) provides more protection to the capital defendant than the standard set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985). Therefore, he allegedly had a due process right in having the State of Ohio apply its own legislative enactments, even if those standards are more strict than those provided by federal law. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985)(when a state opts to act in a field where its action has significant discretionary elements, it must act in accord with the dictates of the Constitution and in accord with the Due Process Clause).

The Ohio Supreme Court considered this claim as follows:

> Appellant next argues that the trial court erred in applying the standard set forth in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, instead of the standard in R.C. 2945.25(C), in excusing prospective jurors who expressed reservations about capital punishment. However, the *Witt* standard is the correct standard for determining when a prospective juror may be excluded for cause based on his or her opposition to the death penalty. *See State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, *vacated on other grounds by Rogers v. Ohio* (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452; *State v. Beuke,* 38 Ohio St.3d at 38, 526 N.E.2d 274.

*State v. Jackson*, 107 Ohio St.3d at 59.

Federal habeas corpus allows a district court to entertain an application for writ of habeas

corpus only on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S. C. § 2254(a). Jackson seeks to have this Court grant his Petition based on state law. The Ohio Supreme Court determined that *Witt* is the appropriate standard  for determining when a prospective juror may be excluded for cause based on his or her opposition to the death penalty, not R.C. 2945.25(C). The United States Supreme Court stated in *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  The Court concludes that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## EIGHTH GROUND FOR RELIEF - SUB-CLAIMS (a) AND (b)

In his eighth ground for relief, Jackson asserts that the trial court erred by allowing the prosecutor to introduce inflammatory, irrelevant impact evidence that included: (a) an unidentified tooth; and (b) bloody clothing of Jayla Grant.

Errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions. *Estelle,* 502 U.S. at 67. The Ohio Supreme Court rejected sub-claims (a) and (b) as follows:

> In his second proposition of law, appellant contends that the state improperly introduced irrelevant and inflammatory evidence at trial. Appellant takes issue with three physical exhibits admitted into evidence: a tooth fragment and the pants and shirt worn by Jayla Grant. The defense objected to the admission of the tooth and the clothing at the close of the state's case.
> Appellant's challenge to the admission of the tooth fragment on grounds of relevancy and lack of foundation is without merit. Defense counsel did not object to the admission of the tooth on grounds of relevancy and has waived that issue. *See State v. Tibbetts* (2001), 92 Ohio St.3d 146, 160-161, 749 N.E.2d 226. In any event, the

tooth fragment recovered from the crime scene was relevant. Coron Liles testified that he was shot in the mouth and lost two teeth as a result. Obviously, the discovery of a tooth fragment at the crime scene corroborates Coron's testimony and makes it more probable that his testimony was truthful. See Evid.R. 401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Moreover, appellant's argument that the tooth fragment was not properly identified as Coron's tooth relates to the weight of the evidence, not its admissibility. *See, e.g.*, *State v. Phillips* (1995), 74 Ohio St.3d 72, 84, 656 N.E.2d 643; *State v. Campbell* (1994), 69 Ohio St.3d 38, 50-51, 630 N.E.2d 339.

The trial court's admission of Jayla Grant's bloodstained clothes, however, was an error. Jayla was shot twice in the head, but no evidence was introduced to show that she had sustained injuries to any other part of her body. Nor was there any testimony that the blood on the clothing was hers. Her father merely identified these items as the clothing Jayla had been wearing when she was shot. Thus, the clothes were not relevant to any fact of consequence. *See* Evid.R. 401 and 402. Nevertheless, because the evidence of guilt was overwhelming, we find no basis to conclude that appellant's substantial rights were affected by the admission of this evidence. Evid.R. 103 and Crim.R. 52(A); *see, e.g.*, *State v. Lundgren,* 73 Ohio St.3d at 486, 653 N.E.2d 304. Thus, any error in this regard was harmless beyond a reasonable doubt.

*** 

Appellant complains that Officer Hammond was not qualified as an expert in identifying tooth fragments. But Hammond's testimony was admissible as opinion testimony of a lay witness under Evid.R. 701. Evid. R. 701 permits lay-witness opinion testimony if the opinion is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

Hammond had recovered the tooth fragment from the scene, so his opinion was based on his firsthand perception. His opinion testimony was also helpful in understanding his testimony about the evidence he had gathered at the scene. *See, e.g.*, *State v. Jells* (1990), 53 Ohio St.3d 22, 29, 559 N.E.2d 464 (permitting lay opinion testimony that is more in the nature of a description by example than the expression of a conclusion). Even if we were to hold otherwise, the lack of scientific authentication of the tooth would not have affected the outcome of appellant's trial.

*State v. Jackson*, 107 Ohio St.3d at 66-68.

In *Payne*, 501 U.S. at 827, the Supreme Court stated:

We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about

70

the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*See Mitts v. Bagley*, 2005 WL 2416929 * 76 (N.D. Ohio Sep. 29, 2005)(the Supreme Court in *Payne* has left the decision of whether to admit victim-impact evidence to the State). The Sixth Circuit held in *Cooey v. Coyle,* 289 F.3d 882, 921 (6th Cir.2002), that impact evidence can be admitted during the guilt phase of the trial. *Hasan v. Ishee*, 2006 WL 3253081, *33 (S.D. Ohio Aug. 14, 2006). The Court must determine whether the victim impact evidence was so unduly prejudicial as to render Petitioner's trial fundamentally unfair. *Payne,* 501 U.S. at 825.

Evidence of a tooth fragment found at the scene was relevant. (Sub-claim (a)). Coron Liles testified that he was shot in the mouth and, as a result, lost two teeth. Discovery of the tooth fragment corroborates his testimony. The Court finds that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States as to sub-claim (a).

The Ohio Supreme Court determined that the evidence of the bloody clothing was irrelevant, but ruled that, because evidence of guilt was overwhelming, Jackson's substantial rights were not affected by the admission of this evidence, and that the error was harmless.  (Sub-claim (b)). Under *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993), the standard of review for harmless error is whether the erroneously admitted evidence had a substantial and injurious effect or influence in determining the jury's verdict. *See Fry v. Pliler*, 127 S.Ct. 2321, 2327 (2007)(*Brecht* standard is used to assess the prejudicial impact of federal constitutional error in a state court criminal trial). The Court finds that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States as to sub-claim (b).

71

### TENTH GROUND FOR RELIEF

In his tenth ground for relief, Jackson contends that the trial court erred by allowing all of the trial testimony as well as numerous photographs of the deceased victims during the penalty phase of the trial. As previously stated, errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions. *Estelle,* 502 U.S. at 67. In *State v.DePew*, 38 Ohio St.3d 275, 282 (1988), photos and exhibits relevant to the specific aggravating circumstance were allowed to be introduced in the penalty phase. The Ohio Supreme Court stated in *DePew*, 38 Ohio St.3d at 282-83:

> We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce "* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *." While this appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation. R.C. 2929.03(D)(1).

As seen by the above statement, the Ohio Supreme Court recognized that allowing evidence relevant to the specific aggravating circumstance the defendant was found guilty of in the guilt phase of the trial could mean allowing the admission of all evidence presented at the guilt phase during the penalty phase. Two district courts have found that any possible error in readmitting trial phase evidence in the penalty phase, assuming it is error, was insufficient to warrant habeas corpus relief. *Davis v. Mitchell,* 110 F.Supp.2d 607, 626 (N.D.Ohio 2000), *rev'd on other grounds,* 318 F.3d 682 (6th Cir. 2003)(finding no violation of clearly established federal law in the trial court readmitting in the penalty phase all evidence from the trial phase); *Morales v. Coyle,* 98 F.Supp.2d 849, 885 (N.D. Ohio 2000), *aff'd and remanded*, 507 F.3d 916 (2007)(holding that any possible violation of state law in

72

admitting into evidence at the penalty phase all exhibits from the trial phase was insufficient to warrant habeas corpus relief). In *Jackson v. Bradshaw*, 2007 WL 2890388 *69 (S.D. Ohio Sep. 28, 2007), the court held that there was no prejudice by counsel's failure to object to the reintroduction of all of the culpability evidence in the mitigation phase of the trial.

The Ohio Supreme Court ruled on this claim as follows:

Appellant argues in his sixth proposition of law that the trial court erred when it readmitted guilt-phase testimony from the surviving victims in the penalty phase. Appellant contends that the vast majority of guilt-phase testimony constituted improper victim-impact evidence.

At the beginning of the penalty phase, the trial court merged the two capital specifications that appellant had been found guilty of committing, leaving only the R.C. 2929.04(A)(5) course-of-conduct aggravating circumstance for the jury's consideration. Over defense counsel's objection, the trial court told the jurors that they could consider any of the guilt-phase testimony that related to the course-of-conduct aggravating circumstance.

R.C. 2929.03(D)(1) requires the jury to consider "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." *See, also, State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus; *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 352-353, 662 N.E.2d 311. Contrary to appellant's argument, testimony from the surviving victims regarding the nature and extent of their injuries was directly relevant to the course-of-conduct aggravating circumstance and to the nature and circumstances of the aggravating circumstance. Appellant also complains that the trial court erred in readmitting certain photos during the penalty phase, but we rejected this same argument regarding appellant's fourth proposition of law. For the foregoing reasons, we overrule appellant's sixth proposition.

*State v. Jackson*, 107 Ohio St.3d at 71-72.

Respondent points out that a mass introduction of exhibits and testimony did not occur. The record shows that the court reviewed the exhibits that the Respondent wanted resubmitted to the jury. Tr. Vol. 12, pg. 2028. The court allowed eight photographs and four other exhibits that had been admitted during the guilt phase of the trial. Tr. Vol. 12, pgs. 2028-29. Only testimony relating to the

aggravated circumstances was to be considered by the jury. Tr. Vol. 12, pg. 2043. The Court finds that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## ELEVENTH GROUND FOR RELIEF

Jackson asserts that the trial judge erred by allowing the victims of the offense to remain in the courtroom during the penalty phase of the trial. Ohio Revised Code Section 2930.09 provides that a victim in a case may be present during any critical stage of the trial, unless the court determines that exclusion of the victim is necessary to protect the defendant's right to a fair trial. Jackson contends that the court should have made a determination as to whether the presence of the victims during the mitigation phase of the trial would violate his right to a fair sentencing.

The Ohio Supreme Court considered this claim and ruled as follows:

> Appellant argues in his seventh proposition of law that his right to a fair sentencing proceeding was violated when the trial court permitted the surviving victims to be present in the courtroom throughout the penalty phase. R.C. 2930.09 provides that a victim in a case may be present whenever the defendant is present during any stage of the case that is conducted on the record, other than a grand-jury proceeding, unless the court determines that exclusion of the victim is necessary to protect the defendant's right to a fair trial.
>
> Appellant contends that the trial court failed to make a determination that the presence of these victims would not violate his right to a fair sentencing determination. Although R.C. 2930.09 provides that a defendant's fair-trial rights are superior to a victim's right to be present, the statute clearly gives the trial court discretion to make the determination whether the victim's presence will prejudice the defendant. *See State v. Martin,* 151 Ohio App.3d 605, 2003-Ohio-735, 784 N.E.2d 1237, at ¶ 66. Here, nothing in the record supports appellant's claim that the trial court failed to consider whether his rights would be jeopardized by the presence of the surviving victims. In fact, the trial court excluded these witnesses from the courtroom during the guilt phase in order to protect appellant's fair-trial rights.
>
> Moreover, appellant offers no evidence or argument beyond pure speculation that the presence of the surviving victims at the penalty-phase proceedings was prejudicial. None of the surviving victims testified during the penalty phase, and it is not clear which victims, if any, were present in the courtroom. Thus, appellant has not

demonstrated that his right to a fair trial was compromised in any way. Therefore, we deny appellant's seventh proposition.

*State v. Jackson*, 107 Ohio St.3d at 72.

The record shows that the trial court was mindful of the presence of the victims in the courtroom. After opening statements, the court ordered the separation of witnesses. Tr. Vol. 8, pg. 1301. The judge acknowledged the statutory right for a victim's presence in the courtroom, but he concluded that any victim testifying should be removed from the courtroom. Tr. Vol. 8, pgs. 1301-02. Later, the court reconsidered the motion to separate the witnesses. He stated:

> [T]he Court is ever trying to be conscious of all rights-not only the defendant's, but also the victims [sic]. Under the circumstances [sic] the court is going to find and determine that the exclusion of the victims is necessary at this time to protect the defendant's right to a fair trial.

Tr. Vol. 10, pg. 1718. Although defense counsel moved for a separation of witnesses during the mitigation phase of the trial, the victims were allowed to remain. Tr. Vol. 12, pg. 2024. Apparently, the judge considered the fact that the victims were not going to testify at this stage of the trial. The jury had already heard from them. Jackson has not shown how presence of the victims in the courtroom during the mitigation hearing deprived him of his right to a fair trial. *See State v. Board*, 2004 WL 2340640 * 1 (Ohio App. Sep. 30, 2004) (victim may be present in the courtroom unless the court determines that exclusion is necessary to protect defendant's right to a fair trial). Therefore, the Court finds that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## TWELFTH GROUND FOR RELIEF - SUB-CLAIMS (d) AND (e)

In his twelfth ground for relief, Jackson contends that: (d) the prosecutor presented inconsistent theories in the Jackson and Cunningham trials; and (e) the prosecutor withheld an exculpatory photo array in violation of *Brady*.

### (d) Prosecutor Presented Inconsistent Theories in the Jackson and Cunningham Trials

The Ohio Supreme Court ruled on this sub-claim as follows:

> Appellant contends that the prosecutor committed misconduct by relying on opposing theories during the trials of appellant and Jeronique. Appellant argues that the state presented evidence and argument at his trial that he was the person primarily responsible for committing these crimes but that during Jeronique's trial, the prosecutor had argued that Jeronique was the primary planner and actor. For the following reasons, appellant's claim is without merit.
>
> First, appellant offers only a conclusory argument that the state relied on inconsistent theories in appellant's and Jeronique's trials. The record indicates that appellant's counsel received complete transcripts of the testimony that Tara Cunningham and the surviving victims gave in Jeronique's trial. Yet appellant fails to identify any portions of the record that would support his claim that the prosecutor pursued conflicting theories. Second, a comparison of the record in this case with this court's decision in Jeronique's direct appeal shows that the prosecutor's theory was the same in both cases. *See State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504. Both appellant and Jeronique were indicted on identical charges of aggravated murder and attempted aggravated murder. Neither was charged as a principal offender in the aggravated murders, and the prosecutor argued in both cases that appellant and Jeronique had acted in concert. Moreover, appellant has not shown that the prosecutor acted in bad faith and deliberately presented false or conflicting evidence in his and Jeronique's trials. In fact, the state's evidence in both trials was substantially identical. Thus, appellant has not presented any argument or evidence that the state advanced factually inconsistent theories to secure convictions against appellant and Jeronique. Cf. *Stumpf v. Mitchell* (C.A.6, 2004), 367 F.3d 594, *judgment reversed in part and vacated in part* (2005), 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143.

*State v. Jackson*, 107 Ohio St.3d at 76-78.

The petitioner must show the existence of an inconsistency at the core of the prosecutor's cases

against defendants for the same crime, and the state's error must have "rendered unreliable" the habeas petitioner's conviction. *Clay v. Bowersox,* 367 F.3d 993, 1004 (8th Cir. 2004) (citing *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000)). Jackson asserts that, at his trial, the State presented evidence and argument that he was the person primarily responsible for the murders. He planned the robbery and was the primary shooter. The same evidence was presented concerning Cunningham at Cunningham's trial. The Court agrees with the decision of the Ohio Supreme Court. Both the defendants were charged with causing death purposely with prior calculation and design. Neither was charged as a principal offender. Furthermore, both were seen shooting at the victims. Therefore, the prosecutor's theories were not inconsistent.

### (e) Prosecutor Withheld an Exculpatory Photo Array in Violation of *Brady*

Jackson argues that the State violated *Brady* by failing to turn over to the defense a photo array used for identification purposes. The State claimed it was not necessary to turn over the photos because identification was not an issue. The photo array was used with two of the State's witnesses. Coron Liles was able to pick out Jackson and Cunningham. However, James Grant could identify only Cunningham. Grant's failure to recognize Jackson allegedly qualified as exculpatory evidence. Jackson learned of the photo array after the testimony of Coron Liles. During cross-examination, Liles admitted that police had shown him a photo line-up. Tr. Vol. 9, pgs. 1608-09. A bench conference was then held. Tr. Vol. 9, pg. 1609. The jury was excused for the day, and the court ordered the State to produce any photo array that was used along with the names of any witnesses who were shown a photo array. Tr. Vol. 9, pgs. 1610-15. The next day, a hearing was held on the photo array, which had been located overnight. Tr. Vol. 10, pg. 1616. A copy was given to the defense the previous evening. *Id.* At that time, the prosecution learned that these two witnesses had seen a photo array. *Id.* The State

77

explained that it had inadvertently not disclosed the photo array, as identification had not been an issue because both defendants had given several confessions. Tr. Vol. 10, pg. 1630. In addition, the State claimed that the report was apparently overlooked because of the large amount of documents and reports involved in the case. Tr. Vol. 10, pg. 1635. When Liles resumed the stand, he testified that he knew Jackson from playing basketball at the local park. Tr. Vol.10, pg. 1640. The photo array was not mentioned during Grant's testimony. Furthermore, since defense counsel now knew about the photo array, they allegedly had the opportunity to cross-examine Liles and Grant about it.

A prosecutor is required to turn over material that is both favorable to the defendant and material to guilt or punishment. *Brady*, 373 U.S. at 87. The prosecutor's duty to disclose includes impeachment evidence, exculpatory evidence and evidence known only to police investigators. *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). Materiality is relevant to the issue of guilt or innocence and not to the defendant's ability to prepare for trial. *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994). In order to prove a *Brady* violation, the petitioner must show that: (1) the evidence in question was favorable to the defendant; (2) the evidence was suppressed by the state, either wilfully or inadvertently; and (3) the defendant was prejudiced by the suppression. *Strickler*, 527 U.S. at 281-82.

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court emphasized the following four aspects of materiality. First,

> a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

78

*Id.* at 434.

Second, materiality is not a sufficiency of the evidence test. Even if the evidence, including the suppressed exculpatory evidence, is sufficient to support a conviction, a *Brady* claim may still be successful. *Id.* at 435. A *Brady* violation is proven "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Third, once a *Brady* violation is found, there is no need for further harmless-error review. *Id.* A *Brady* violation is never harmless. *Bell v. Bell*, 460 F.3d 739, 750 (6th Cir. 2006), *on reh. en banc, aff'd*, 2008 WL 50315 (6th Cir. Jan 4, 2008). Fourth, when materiality is assessed, the court must look at the suppressed evidence collectively, not item by item. *Kyles,* 514 U.S. at 436.

As long as the evidence was disclosed during trial, *Brady* is not violated unless the defendant is prejudiced by the late disclosure. Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. *United States v. Blood,* 435 F.3d 612, 627 (6th Cir. 2006)(citing *Bencs,* 28 F.3d at 560). *See United States v. Word*, 806 F.2d 658, 665 (6th Cir.1986).

The Ohio Supreme Court determined this issue as follows:

Finally, appellant contends that the state failed to disclose material exculpatory evidence to defense counsel prior to trial. During defense counsel's cross-examination of Coron Liles, it was discovered that the state had failed to disclose to the defense that detectives had shown Coron a photo array containing a photo of appellant. During a sidebar, the trial court ordered the state to produce the photo array and a list of witnesses who were shown the array.

The next day, the trial court held a hearing on this issue outside the presence of the jury. During the hearing, the prosecution acknowledged that it had located two photo arrays, one with appellant's photo and another that included a photo of Jeronique. Both arrays were provided to defense counsel. Detective Leland then testified that he had shown the arrays to Coron and James Grant. Coron had been able to identify both appellant and Jeronique as the shooters. James Grant had identified Jeronique but had not been able to identify appellant from the array.

79

The prosecutor then proffered a professional statement for the record that his failure to disclose the photo arrays to the defense was due to inadvertence and not bad faith. The prosecutor explained that he did not believe that the identification of the assailants was an issue, because one of the victims knew the assailants by name and both appellant and Jeronique had given statements to police about their involvement. Because it never occurred to the prosecutor that identification would become an issue in this case, the photo arrays had been overlooked.

Defense counsel moved for sanctions and a mistrial. The trial court denied both motions. The trial court found that the prosecutor had violated Crim. R. 16(E)(3) by failing to timely disclose the photo arrays but that the violation was not willful or prejudicial. The trial court also determined that the photo arrays and the procedure that Detective Leland had used to show them to the victims were not impermissibly suggestive. Appellant complains on appeal that James Grant's failure to identify appellant in the array was exculpatory and that he was prejudiced by the state's failure to disclose this evidence prior to trial. He also contends that defense counsel were unable to have an expert review the array for suggestibility. For the following reasons, appellant's arguments are not well taken.

First, James Grant's failure to identify appellant in the photo array is not material evidence. Under *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215, the prosecutor is obligated to disclose all material evidence favorable to the defense on the issue of guilt or punishment. But "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

At trial, five witnesses, including James Grant, identified appellant as one of the shooters in this case. In addition, Shane Liles, Coron Liles, and Tomeaka Grant knew appellant prior to the shootings. Moreover, appellant admitted during trial that he had been at the scene and that he had shot Shane Liles in the back. Therefore, while Grant's failure to identify appellant from the photo array may arguably be favorable evidence, in light of the substantial testimony identifying appellant, it is not material evidence, as explained in *Brady v. Maryland.* The state's failure to disclose this evidence does not undermine confidence in the outcome of the trial. *See, e.g.*, *State v. Waddy* (1992), 63 Ohio St.3d 424, 432-434, 588 N.E.2d 819.

Furthermore, prosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice. *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 453 N.E.2d 689. Here, the trial court found that the prosecutor's failure to disclose was not a willful violation of the rule, and we can find no reason to overturn that determination on appeal.

Moreover, defense counsel were provided with the photo array prior to James Grant's being called as a witness. Defense counsel had the opportunity but never attempted to impeach Grant's in-court identification of appellant based on Grant's inability to

identify appellant in the photo array. Defense counsel also declined an opportunity to cross-examine Coron Liles on this issue. Thus, appellant cannot now claim that he was prejudiced regarding the photo array. See *State v. Joseph* (1995), 73 Ohio St.3d 450, 458, 653 N.E.2d 285. Based on the foregoing, we overrule appellant's ninth proposition of law.

*State v. Jackson*, 107 Ohio St.3d at 78-79.

Jackson has not satisfied the third criteria for proving a *Brady* violation. Defense counsel learned of the photo array in time to use it for cross-examination. The photo array was not material, in that its absence would not have put the whole case in such a different light as to undermine confidence in the verdict. There was overwhelming evidence to support Jackson's guilt.

The Court finds that, as to sub-claims (d) and (e), the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

**THIRTEENTH GROUND FOR RELIEF**
**AND**
**FOURTEENTH GROUND FOR RELIEF**

The thirteenth and fourteenth grounds for relief involve claims of ineffective assistance of counsel.  In *Strickland v. Washington,* 466 U.S. 668, 687 (1984), the Supreme Court of the United States set forth a two-pronged analysis for a claim of ineffective assistance of counsel -- deficient performance and prejudice. The deficient performance prong requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. If deficient performance is demonstrated, then the prejudice prong requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. As the Supreme Court stressed in *Strickland*, the overriding principle with respect to ineffectiveness claims in general

is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

From Petitioner's standpoint, his trial counsel was ineffective because the worst possible outcome occurred -- conviction and imposition of the death penalty. But the standard for deficient performance is not whether counsel wins the case. Rather, the standard is whether "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As the Supreme Court cautioned,

> [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* (citation omitted). The propriety of this cautionary statement is especially evident where Petitioner challenges – years later - the decisions of his trial counsel.

> [I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t.]" Rather, ... it is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an ineffective claim are subject to the deference requirement of § 2254(d)...both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

*Groseclose v. Bell,* 130 F.3d 1161, 1163-64 (6th Cir. 1997) (citing *Strickland,* 466 U.S. at 698). In *United States v. Cronic,* 466 U.S. 648, 658 (1984), the United States Supreme Court, in analyzing ineffective assistance of counsel, stated:

82

[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867- 869, 102 S.Ct. 3440, 3446-3447, 73 L.Ed.2d 1193 (1982); *United States v. Morrison,* 449 U.S. at 364-365, 101 S.Ct. at 667-668; *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Moreover, because we presume that the lawyer is competent to provide the guiding hand that the defendant needs, *see Michel v. Louisiana*, 350 U.S. 91, 100-101, 76 S.Ct. 158, 163-164, 100 L.Ed. 83 (1955),  the burden rests on the accused to demonstrate a constitutional violation.

With this framework in mind, the Court reviews Jackson's claims of alleged ineffective assistance of counsel. Once an unreasonable performance by counsel is found to be ineffective, the petitioner must show that he or she was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Prejudice exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694; *Hicks v. Collins*, 384 F.3d 204, 214 (6th Cir. 2004), *cert. denied*, 544 U.S. 1037 (2005).

Failure to present additional mitigating evidence that is merely cumulative does not rise to the level of a constitutional violation. *Broom v. Mitchell,* 441 F.3d 392, 410 (6th Cir. 2006); *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005); *Hill v. Mitchell,* 400 F.3d 308, 319 (6th Cir. 2005), *cert. denied,* 546 U.S. 1039 (2005).

### THIRTEENTH GROUND FOR RELIEF

In his thirteenth ground for relief, Jackson alleges that he was denied effective assistance of counsel when his counsel: (a) failed to demonstrate the need for adequate investigative and expert assistance; (b) failed to investigate and prepare evidence in support of a motion to suppress; (c) failed

83

to effectively investigate and present evidence in support of pre-trial motions; (d) were ineffective

during *voir dire*; (e) failed to provide any guidance during opening statements; (f) failed to object to

inflammatory portions of the State's opening statement; (g) failed to properly cross-examine Tara

Cunningham concerning bias; and (h) failed to effectively cross-examine Dr. Cynthia Beisser.

The Ohio Supreme Court considered all of these sub-claims and found them to be without

merit as follows:

> In his tenth proposition of law, appellant makes various claims relating to ineffective
> assistance of counsel. Reversal of a conviction or sentence based upon ineffective
> assistance of counsel requires satisfying the two-pronged test set forth in *Strickland
> v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland*
> requires that the defendant show, first, that his counsel's performance was deficient
> and, second, that his counsel's deficient performance prejudiced the defense so as to
> deprive the defendant of a fair trial. *Id.* at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In
> order to show deficient performance, defendant must prove that his counsel's
> performance fell below an objective level of reasonable representation. To show
> prejudice, defendant must show a reasonable probability that, but for his counsel's
> errors, the result of the proceeding would have been different. *Strickland v.
> Washington; State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373. Expert
> and Investigative Assistance. Appellant first contends that his trial counsel were
> ineffective for failing to request or demonstrate the need for expert or investigative
> assistance in order to present an effective penalty-phase defense. But appellant's trial
> counsel did request funds for a defense psychologist and a defense investigator. The
> trial court granted both requests, and defense counsel employed a psychologist and an
> investigator to prepare appellant's mitigation defense. Thus, appellant's claim is not
> supported by the record.          Motions to Suppress Statements. Appellant claims
> that his trial counsel failed to investigate the circumstances surrounding his statements
> to police and to effectively prepare and litigate the motion to suppress those
> statements. However, even if this were true, appellant cannot show that he suffered
> prejudice. The state did not introduce any evidence at trial of appellant's statements
> to police.          Pretrial-Motion Practice. Appellant claims that
> his trial counsel did not adequately support legal arguments contained in their pretrial
> motions. But appellant fails to show how his counsel's performance was deficient or
> prejudicial in regard to any particular motion. Therefore, we find that no basis exists
> to find deficient performance or prejudice. *State v. Bradley*, 42 Ohio St.3d 136, 538
> N.E.2d 373, paragraph two of the syllabus, following *Strickland*, 466 U.S. 668, 104
> S.Ct. 2052, 80 L.Ed.2d 674.          Inadequate *voir dire*. Appellant contends that his
> counsel's *voir dire* performance was deficient. Appellant argues that his counsel did

84

not zealously demand the right to fully examine jurors. Appellant also claims that his trial counsel failed to consistently and effectively question prospective jurors on their racial attitudes and their ability to put aside such attitudes. Trial counsel, who saw and heard the jurors, were in the best position to determine the extent to which prospective jurors should be questioned. *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765; *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, at ¶ 108. As we discussed regarding appellant's revised first proposition of law, his trial counsel thoroughly examined prospective jurors regarding their exposure to pretrial publicity, their views concerning capital punishment, their ability to consider potentially mitigating evidence, and their opinions on race and religion, as well as other topics. Moreover, defense counsel did vigorously contest the trial court's rulings restricting *voir dire*. Defense counsel placed several objections on the record and also moved for a mistrial on the basis that the trial court was unduly restricting the *voir dire*. Defense counsel also raised an objection claiming that death-penalty-opposed jurors were being systematically excluded. Thus, we conclude that appellant's counsel's performance during *voir dire* reflected reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Failure to inquire into witness consideration. Appellant claims that his trial counsel were deficient for failing to cross-examine Tara Cunningham on whether she had received consideration from the state in exchange for her testimony. However, appellant's argument is based on pure speculation and is rejected.                   There is no evidence in the record that the state offered anything to Tara for her testimony. Had the state made a deal with Tara in exchange for her testimony, this information would have been discoverable under Crim.R. 16(B)(1)(f). *See, e.g., State v. Joseph*, 73 Ohio St.3d at 458, 653 N.E.2d 285. Under Evid. R. 607(B), "[a] questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." *See, also*, *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, paragraph two of the syllabus, *overruled on other grounds by State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112. Because there is no reasonable basis for believing that a deal existed, defense counsel cannot be deemed ineffective for failing to question Tara about whether she received a deal for her testimony.  Counsel's failure to interview expert witness. Appellant next claims that defense counsel provided ineffective assistance by failing to interview the coroner before cross-examining her, which resulted in an unsuccessful attempt to elicit favorable testimony on the trajectory of the bullets that killed Jayla Grant and injured others. Alternatively, appellant contends that defense counsel should have sought the assistance of an independent ballistics expert. However, appellant overstates the importance of the ballistics evidence. Appellant was charged and tried as an accomplice in the aggravated murders and not as a principal offender. Thus, whether the bullets that killed Jayla Grant and Leneshia Williams came from his gun or Jeronique's was not critical to establishing appellant's guilt of the aggravated murders.  Moreover, we find that substantial evidence, both testimonial and physical, linked appellant to these murders. Several victims testified that appellant had been shooting a black, automatic handgun, and all of the ballistics

85

evidence recovered from the scene, except one bullet fragment, was identified as ammunition typically fired from an automatic handgun. In contrast, the victims recalled that Jeronique had been shooting a revolver. Therefore, appellant cannot prove that he suffered any prejudice from his counsel's failure to interview the coroner. Similarly, appellant has not shown that his counsel's failure to employ a ballistics expert deprived him of a fair trial. FN1

FN1. The trial court did grant defense counsel's motion for funds to hire a ballistics expert, but apparently defense counsel decided that such an expert would not aid appellant's defense.

Failure to object to prosecutorial misconduct. Appellant also claims deficient performance in his trial counsel's failure to object to various instances of alleged prosecutorial misconduct. But as mentioned in our discussion of appellant's ninth proposition of law, none of the alleged instances of prosecutorial misconduct prejudicially affected appellant's substantial rights. Thus, appellant's trial counsel were not ineffective for failing to object to the prosecutor's alleged misconduct.

Failure to present mitigating evidence. Appellant's final claim is that his counsel were ineffective during the penalty phase of his trial because they failed to fully investigate appellant's background and present "compelling mitigating evidence arising from [appellant's] psychosocial history and elsewhere." However, the record does not support appellant's claim. *See State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, at ¶ 59-62. *See, also, Wiggins v. Smith* (2003), 539 U.S. 510, 534-538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (a case in which the Supreme Court vacated the defendant's death sentence because defense counsel had failed to pursue and present migrating [sic] evidence that it was clear from the record should have been pursued and presented). Therefore, appellant's tenth proposition of law is overruled.

*State v. Jackson*, 107 Ohio St.3d 53 at 79-82.

## (a) Failed to Demonstrate the Need for Adequate Investigative and Expert Assistance

On February 5, 2002, defense counsel requested the appointment of a neuro-psychologist to evaluate Jackson. Apx. Vol. 1, pg. 80. Later, the court ordered that records of the Allen County Children Services, the Ohio Department of Youth Services and the transcript of Jeronique Cunningham's trial be provided to Jackson's counsel. Apx. Vol. 3, pgs. 30, 32, 222. Jackson listed the "Keeper of the Records, Allen County Children Services" as a possible witness, Apx. Vol. 3, pg.

290, and issued a subpoena for trial. Apx. Vol. 3, pg. 300. On April 13, 2002, defense counsel requested the services of a ballistic/forensic scientist. Apx. Vol. 2, pg. 307. Further, two mitigation specialists and the neuro-psychologist submitted bills to the court for services rendered. Apx. Vol. 3, pgs. 394, 379, 383. The Court finds to be reasonable the state court's reasoning as to this sub-claim.

**(b) Failed to Investigate and Prepare Evidence in Support of a Motion to Suppress**

Jackson argues that his counsel failed to effectively investigate, prepare and litigate his motion to suppress evidence. Since the State did not introduce his confession into evidence, he has not shown any prejudice. Counsels' performance in this regard is immaterial.

**(c) Failed to Effectively Investigate and Present Evidence in Support of Pre-trial Motions**

Jackson contends that counsel failed to investigate, present and otherwise demonstrate at pretrial hearings that there was substantial evidence to support legal arguments contained in the pretrial motions. Given that Jackson has not fully explained how counsels' performance was deficient, this Court will not second guess defense counsels' strategy at pretrial hearings.

**(d) Were Ineffective During *Voir Dire***

Although counsels' performance during *voir dire* was allegedly deficient in part because of the unreasonable restrictions by the trial court, Jackson asserts that trial counsel did not demand the right to fully examine jurors on their ability to consider a sentence of death, theories of defense and/or mitigation to fully consider a life sentence and their views about racial issues.

Jackson must show that counsels' failure to conduct a more thorough *voir dire* substantially undermined the fairness of the trial. *Keith*, 455 F.3d at 677. The record shows that Jackson's counsel thoroughly examined prospective jurors during *voir dire*, which lasted a week and took 1,260 pages

to record.  They were questioned about pretrial publicity, their views on capital punishment and their ability to consider whether they could vote for the death penalty.

Also, Jackson admits that the trial court restricted counsels' *voir dire*. Counsel cannot be found ineffective if hindered by the trial court. Generally, counsels' actions during *voir dire* are presumed to be matters of trial strategy. *Miller v. Francis*, 269 F.3d 609, 615-16 (6th Cir. 2001). Counsel are granted deference when conducting *voir dire*. *Miller v. Webb,* 385 F.3d 666, 672 (6th Cir. 2004). The trial was fundamentally fair, and the failure, if any, to conduct a more thorough *voir dire* did not undermine the reliability of the result. *Keith*, 455 F.3d at 677.

### (e) Failed to Provide Any Guidance During Opening Statements

Jackson does not provide any explanation as to how counsel failed in this regard.  There is no constitutional requirement that opening statement follow some standard outline. In fact, even failure of counsel to make an opening statement is ordinarily a mere matter of trial tactics and will not constitute a claim of ineffective assistance of counsel. *Millender v. Adams,* 376 F.3d 520, 525 (6th Cir. 2004). The Court agrees with Respondent's statement that "it would be pure speculation for anyone to claim that Jackson would not have been convicted but-for opening statements." Ret. pg. 111.

### (f) Failed to Object to Inflammatory Portions of the State's Opening Statement

Jackson does not explain what portion of the opening statement he is complaining about. The Ohio Supreme Court discussed this issue under the prosecutorial misconduct claim in regard to the alleged inconsistent theories of culpability concerning his trial and that of Jeronique Cunningham, and the court also referred to it under ineffective assistance of counsel. *Jackson*, 107 Ohio St.3d at 77, 82. This Court discussed the inconsistent theories issue in sub-claim (d) of the twelfth ground for relief, finding the state court's rejection to be reasonable. Thus, his ineffective assistance of counsel claim

88

based on this issue cannot succeed.

### (g) Failed to Properly Cross-examine Tara Cunningham Concerning Bias

Jackson contends that counsel should have cross-examined Tara Cunningham concerning her motive for lying in her testimony against her brother and half brother. As Respondent points out, defense counsel, during cross-examination of Tara Cunningham, demonstrated that she might have had a motive for lying about Jackson and Cunningham. Tara testified that Jackson and Cunningham were wiping down guns and bullets shortly before the incident, and Jackson admitted to her that he didn't mean to kill the baby. On cross, defense counsel elicited a strong inference that Tara Cunningham was a dope addict. Tr. Vol. 9, pg. 1445. Tara admitted to smoking marijuana up to, and even on, the day of the murders. Tr. Vol. 9, pg. 1445. Defense counsel got her to admit that, in her testimony at Jeronique's trial, she never said anything about Jackson's statement, "I didn't mean to shoot the baby." Tr. Vol. 9, pgs. 1445-1446. In fact, at Jeronique's trial, Tara testified that she had no memory of any conversations after Cunningham and Jackson returned from the crime. Tr. Vol. 9, pgs. 1446-1447. Trial counsel referred Tara to the transcript of Cunningham's trial  where Tara told Det. Kleman that nothing was said after Jackson/Cunningham returned from the crime scene. Tr. Vol. 9, pgs. 1447-1448.

Trial counsel then got Tara to admit she lives in M.E.T. housing. Tr. Vol. 9, pg. 1449. She then admitted that she had two children. Tr. Vol. 9, pg. 1449. Tara informed the jury that she told Det. Kleman that she did not want to get involved because M.E.T. housing might evict her. Tr. Vol. 9, pg. 1450. She admitted to smoking marijuana the morning before the murders. Tr. Vol. 9, pgs. 1452-1453. When Shane Liles came over, Tara smoked more marijuana. Tr. Vol. 9, pg. 1453. Defense counsel then implied that she told a friend that she did what she had to do when she spoke to the police. Tr.

Vol. 9, pg. 1454. In conclusion, the defense attorney asked, "You knew at that time that you were going to lose your M.E.T. housing; right?" Tr. Vol. 9, pg. 1455. At that point, it did not really matter if she admitted or denied the answer.

Trial counsel did their best to lay the groundwork to infer that Tara made up a story in order to keep her M.E.T. housing. Counsel was not ineffective for failing to ask Tara whether she received a deal for testifying during Jackson's trial.

**(h) Failed to Effectively Cross-examine Dr. Cynthia Beisser**

Dr. Beisser, a forensic pathologist and Lucas County Coroner, was called by the State to establish the cause of death of the two victims. On cross-examination, defense counsel attempted to elicit favorable testimony on the trajectory of the bullets that killed Jayla Grant and injured others. Jackson's counsel wanted the jury to believe that the shots Cunningham fired at James Grant killed Jayla Grant. At a minimum, counsel should allegedly have interviewed Dr. Beisser prior to trial.

As the Ohio Supreme Court found, the ballistic evidence was not so important because Jackson was tried as an accomplice and not as a principal offender. So, whether the bullets came from Jackson's gun was not critical in establishing his guilt. Further, the testimony of the witnesses linked Jackson to an automatic handgun. All of the bullets found at the scene were from that handgun. Cunningham shot a revolver. Counsel submitted a hypothetical to Dr. Beisser that showed that one of the bullets from Cunningham's gun could have gone through one victim and then into another. Tr. Vol. 10, pgs. 1742-47. Based on the Ohio Supreme Court's reasoning and counsel's attempted hypotheticals, Jackson has not shown that he suffered any prejudice by his counsels' failure to interview Dr. Beisser.

The Court finds that, as to all sub-claims, the decision of the Ohio Supreme Court was not

90

contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## FOURTEENTH GROUND FOR RELIEF

In his fourteenth claim for relief, Jackson alleges that he was denied effective assistance of counsel when: (a) counsel failed to investigate and present compelling evidence about Jackson's childhood during mitigation; (b) counsel failed to employ and present a cultural expert; and (c) counsel failed to obtain expert and investigative assistance to uncover Jackson's history.

The Ohio Court of Appeals, Third Appellate District, addressed this claim during post-conviction proceedings as follows:

> In his petition for post-conviction relief, Jackson asserted twenty-six claims for relief. His first eleven claims related to the alleged deficient performance of his trial counsel. The bulk of Jackson's argument is that his counsel failed to develop and present compelling mitigation evidence by failing to introduce particular records or experts. Specifically, Jackson asserted that his trial counsel failed to thoroughly investigate his background; introduce his lengthy history or his records with Children's Services; present his mother's history of mental illness and neglect of Jackson; introduce his juvenile record; present a cultural expert; request expert and investigative assistance; present evidence in support of pre-trial motions; conduct an inquiry into the consideration received by a witness in exchange for her testimony; and interview an expert witness prior to trial.
>
> A petitioner alleging ineffective assistance in a post-conviction proceeding bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel. *State v. Jackson* (1980), 64 Ohio St.2d 107, 413 N.E.2d 819; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. The defendant must also demonstrate he was prejudiced by counsel's ineffectiveness. *Strickland* at 689.
>
> When determining a claim of ineffective assistance, judicial scrutiny of counsel's performance and strategies must be highly deferential. *Strickland,* supra at 689. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* For instance, the decision to forego the presentation of mitigating evidence at sentencing does not itself constitute proof of ineffective assistance of counsel. *State v. Johnson* (1986), 24 Ohio St.3d 87, 91, 494 N.E.2d 1061. The presentation of mitigating evidence is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47. Likewise, the questioning of particular witnesses is within the purview of trial counsel's trial tactics. *See State v.*

*Coulter* (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324. A defendant is not deprived of effective assistance of counsel when counsel chooses, simply for strategic reasons, not to pursue every possible trial tactic. *State v. Brown* (1988), 38 Ohio St.3d 305, 319, 528 N.E.2d 523.

The trial court determined Jackson's ineffective assistance claims had no merit. With regard to Jackson's claims regarding the introduction of mitigating evidence, the trial court found that the bulk of the evidence Jackson presented in his petition *was* introduced during the penalty phase and in the presence of the jury, by the testimony of Jackson's mother, his aunt, and a psychological expert. In fact, Jackson's relatives testified to the following: Jackson was in and out of foster care for the majority of his childhood due to the neglect by his mother; there were times, while Jackson was living with his mother, that there would be no furniture and no food in the house; Jackson was raped while in foster care; Jackson's mother had problems with drugs and alcohol; there was physical abuse in Jackson's home; when Jackson was four he witnessed his mother stab and kill his father; and his mother attempted suicide multiple times. Moreover, the psychologist testified regarding her review of Jackson's records from Children's Services, as well as various agencies and treatment facilities Jackson was admitted to while he was a juvenile.

The trial court further found that even if trial counsel erred in failing to present other mitigating evidence, the existence of such evidence would not constitute proof of counsel's ineffectiveness when the record demonstrates, as in this case, counsel competently presented the case in mitigation in light of the available facts. *See State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754. Moreover, the trial court determined that Jackson had not demonstrated that, but for counsel's ineffectiveness, the result of his sentencing would have been different. With regard to the questioning of witnesses, the trial court found that Jackson had failed to set forth operative facts that would demonstrate a violation of trial counsel's essential duties or prejudice as a result of counsel's performance.

After a review of Jackson's claims of the ineffective assistance of counsel, we do not find that Jackson demonstrated his trial counsel's performance fell below an objective standard of reasonableness. Moreover, Jackson has failed to show how trial counsel's failure to introduce what amounts to cumulative evidence of mitigation resulted in prejudice. Therefore, we do not find that the trial court abused its discretion in denying Jackson's claims for relief based on ineffective assistance of trial counsel.

*State v. Jackson*, 2004 WL 2260095, *2-4 (Ohio App. 3rd Dist. Oct. 4, 2004).

The Supreme Court, in *Rompilla v. Beard,* 545 U.S. 374, 387 n.7 (2005) and *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), has unequivocally declared that a thorough and complete mitigation investigation is absolutely necessary in capital cases. The Sixth Circuit uses the ABA Guidelines

92

adopted in 2003. *Dickerson v. Bagley*, 453 F.3d 690, 694-95 (6th Cir. 2006) (citing *Hamblin*, 354 F.3d at 485-88). The ABA Guidelines provide that penalty phase preparation requires extensive investigation into personal and family history, anything in the life of the defendant which might mitigate against the appropriateness of the death penalty. The investigation should begin with the moment of conception and should include medical history, family and social history, educational history and employment and training history.  According to the ABA Guidelines, it is necessary to locate and interview the defendant's family members and virtually anyone else who knew the defendant and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers and others. Also, records from government agencies, the military and employers should be requested. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ¶ 10.7 (2003), pgs. 80-83. A partial, but incomplete mitigation investigation does not satisfy the requirements of *Strickland*.  *Dickerson*, 453 F.3d at 694. A strategic decision not to perform a complete investigation is inadequate when a full investigation would have revealed extensive mitigation evidence. *Id.* at 696. An investigation must be performed if the investigator does not know the relevant facts that the investigation would uncover. *Id.*

**(a) Counsel Failed to Investigate and Present Compelling Evidence About Jackson's Childhood During Mitigation, and**

**(c) Counsel Failed to Obtain Expert and Investigative Assistance to Uncover Jackson's History**

The record shows that defense counsel did not fail to investigate Jackson's background. On February 5, 2002, defense counsel requested the appointment of a neuro-psychologist to evaluate Jackson. Apx. Vol. 1, pg. 80. Later, the court ordered that records from the Allen County Children Services, the Ohio Department of Youth Services and the transcript of Jeronique Cunningham's trial

93

be provided to Jackson's counsel. Apx. Vol. 3, pgs. 30, 32, 222.  Jackson listed the "Keeper of the Records, Allen County Children Services" as a possible witness, Apx. Vol. 3, pg. 290, and issued a subpoena for trial. Apx. Vol. 3, pg. 300. On April 13, 2002, defense counsel requested the services of a ballistic/forensic scientist. Apx. Vol. 2, pg. 307. William Kluge charged for 485 hours work on Jackson's case. Apx. Vol. 3, pg. 375. John Sabol worked 428 hours. Apx. Vol. 3, pg. 389. Another mitigation investigator, Gary Ericons, charged for 58 hours of work, and James Crates, also a mitigation specialist, spent 27 hours. Apx. Vol. 3, pgs. 379, 384. Dr. Kathleen Burch, a neuro-psychologist, charged for 22 hours of work and also testified. Apx. Vol. 3, pg. 383. It appears that counsel had the information needed to present sufficient mitigation evidence.

Jackson argues that counsel failed to develop the relationship that Jackson had with his considerably older half brother, Jeronique Cunningham, who allegedly had enormous influence over him. Records of the Allen County Children Services concerning Jackson's lengthy and unusual history allegedly should have been introduced. Counsel allegedly failed to present testimony that Jackson's mother had sub-standard parenting skills. She tried to commit suicide several times when Jackson was young, and her home was filthy. When Jackson was four years old, he witnessed his mother stab his father to death in self-defense. He also had a long, detailed history with the Welfare Department and Juvenile Court that was allegedly unexplored and not presented to the jury. His teenage years were spent alternating between living at home with his mother and an aging grandmother and being in the custody of the Allen County Juvenile Court, the Allen County Children Services and the Ohio Department of Youth Services.

Examination of the record demonstrates that all of the evidence Jackson complains was absent from the mitigation phase of the trial was presented through the testimony of two aunts, his mother

94

and Dr. Burch. The family members discussed his terrible childhood years and his mother's problems. Tr. Vol. 12, pgs. 2045-68. Dr. Burch interviewed Jackson and performed psychological tests. Tr. Vol. 12, pg. 2077. She explained conduct disorders, the familial and social correlates of crime and the concept of a dysfunctional family, relating them to Jackson's situation. Furthermore, Dr. Burch reviewed Jackson's records from the Allen County Children's Services, as well as other agencies that Jackson had contact with when he was a juvenile. Tr. Vol. 12, pgs. 2081-2122. The actual records from these agencies would not have been substantially different than that testified to by the psychologist. A strategic decision to pursue or not to pursue a particular trial tactic "after thorough investigation of law and facts," is "virtually unchallengeable." *Clark,* 425 F.3d at 286. Counsel is entitled to choose a mitigation strategy as long as it is within the wide range of professional competent assistance. *Jackson*, 2007 WL 2890388 at * 62. *See Hartman v. Bagley*, 492 F.3d 347, 360 (6th Cir. 2007)(counsel might quite reasonably have made a strategic decision to present the report's mitigation findings through the more sympathetic lens of family members' testimony).

**(b) Counsel Failed to Employ and Present a Cultural Expert**

Jackson asserts that his counsel were ineffective for failing to call a cultural expert to present to the jury the effect of Jackson's heritage and horrendous upbringing on his behavior as an adult. As previously discussed, counsel did a thorough investigation. It appears that they made an informed strategic decision to bring testimony through a psychologist rather than, or in addition to, a cultural expert. Testimony from a psychologist was appropriate. Any additional testimony from a cultural expert would have been, as the Ohio court of appeals found, cumulative and unnecessary.

The Court finds that, as to all sub-claims, the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States.

## FIFTEENTH GROUND FOR RELIEF
## AND
## SIXTEENTH GROUND FOR RELIEF

The fifteenth and sixteenth grounds for relief pertain to Jackson's post-conviction proceedings. In his fifteenth ground for relief, Jackson alleges that the trial court erred when it denied Jackson's request for leave to conduct discovery during state post-conviction proceedings. He contends in his sixteenth ground for relief that the trial court erred when it denied his request for appropriation of funds for expert and investigative assistance in post-conviction proceedings.

A petition for writ of habeas corpus is not the proper method for a criminal defendant to challenge errors or deficiencies in state post-conviction proceedings because the claims usually address collateral matters and not the underlying conviction giving rise to the defendant's incarceration. *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986)(court not required to analyze the substance of Kirby's equal protection and due process arguments or the government's exhaustion argument or to determine the correctness of the district court's conclusion that the Sixth Amendment cannot apply to Kirby's post-conviction proceeding because the post-conviction proceeding is civil, not criminal in nature). Jackson simply asserts that the State violated his right to equal protection. He provides no support or explanation for this conclusory allegation that petitioners cannot obtain discovery and present such material at an evidentiary hearing. Such a conclusory allegation does not set forth a cognizable equal protection claim. *Clark v. McLemore*, 291 F. Supp.2d 535, 542 (E.D. Mich. 2003). *See Pennsylvania v. Finley,* 481 U.S. 551, 559 (1987)(state can provide post-conviction relief without requiring the full panoply of procedural protections that the Constitution requires be

96

given to defendants who are in a fundamentally different position at trial and on first appeal as of right). The Court finds that, as to the fifteenth and sixteenth grounds for relief, the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### SEVENTEENTH GROUND FOR RELIEF - SUB-CLAIM (a)

In his seventeenth claim for relief, Jackson contends that he was denied due process of law when the trial court and the Ohio Supreme Court failed to give effect to mitigation evidence and improperly considered aggravating factors.

The Ohio Supreme Court reweighed the aggravating circumstances and mitigating factors as follows:

> During the penalty phase, appellant called four mitigation witnesses. Joyce McNeal, appellant's aunt, testified that appellant was three or four years old when his mother killed his father with a knife. She also testified that appellant's mother, Betty Cunningham, had been a heavy drinker, had physically abused her children, and had attempted suicide. She said that at times, there had been no food in the house and no furniture because Betty had sold it to buy drugs.
> Throughout childhood, appellant was intermittently placed in his grandmother's care and in foster homes. Despite Betty's problems, the children's services agency often returned appellant to her care. Appellant loved his grandmother, and after she died in 1999, no one was there to care for appellant. During appellant's early childhood, he suffered from asthma attacks. According to McNeal, appellant's half-brother Jeronique Cunningham had a negative influence over him, and she blamed Jeronique for appellant's current situation. Denise Cage, another aunt, also testified that Betty had not been a good mother and that her children had suffered as a result. She said that Betty had mental health problems and had made several suicide attempts. Both Betty and appellant's father had abused drugs and alcohol, and their relationship was violent. Cage said that appellant had often witnessed his parents arguing and fighting and that during one altercation, Betty killed appellant's father with a knife. After that, appellant lived with his grandmother and was in and out of foster homes. Cage said that appellant had reported that he had been raped while in foster care, but she did not know the details of the crime. Cage testified that appellant's grandmother had been the only person who loved appellant unconditionally. Because of Betty's problems with drugs, appellant's grandmother tried to provide him with a stable home and proper

guidance. Betty did have periods of sobriety during which she was a good mother, and during these times, the children's services agency would return appellant and the other children to Betty's care. However, Betty's sobriety was usually short-lived, and only when appellant lived with his grandmother did his life have security and structure.

Betty Cunningham testified that appellant was the fourth of her five children. She said that appellant's father, Cleveland Jackson Sr., had often turned violent when he drank, and during one fight, Betty killed him in self-defense. Betty claimed that all of her children saw this happen.

Betty testified that after appellant's father's death, appellant had no positive male role model in his life. She said that she had continued to drink heavily and started using cocaine. She also attempted suicide. Because of her substance abuse, Betty frequently lost custody of her children. Betty's mother would care for the children on some of these occasions, and at other times, a children's services agency took custody of them. Betty testified that her mother had been more of a mother to appellant than Betty had been. She said that after his grandmother became seriously ill, appellant was very depressed and seemed lost. After his grandmother's funeral, Betty had to plead with appellant to get him to leave the funeral home.

Dr. Kathleen Burch, a psychologist, interviewed appellant, administered psychological tests, conducted a mental-status examination, and consulted with another psychologist. Burch also examined various records relating to appellant, including children's services records, and interviewed his aunt Denise Cage.

Burch concluded that appellant had suffered through a dysfunctional, chaotic childhood. She said that appellant's witnessing his mother kill his father had instilled in appellant at a very early age a belief that "the world is a very unsafe, dangerous, and violent place."

Burch determined that appellant's mother had been a chronic abuser of drugs and alcohol and had not adequately cared for her children. Betty also had a history of mental instability and suicide attempts. Betty had sometimes left her children unsupervised for long periods of time. Children's services' records from the 1980s described appellant's home environment as filthy, with garbage and dirty clothes on the floor. Appellant and his siblings had played on floors littered with broken glass. At times, there were no beds for the children to sleep in, no furniture, and no refrigerator. Betty had sold furniture to get money to purchase drugs. Sometimes, appellant and his siblings would get only one meal a day, which consisted of bread and honey for breakfast. The children's services records also indicated that there had been some physical abuse of the children. And appellant told Burch that his mother would smoke crack cocaine and blow the smoke in his face.

Burch testified that her review of the children's services' records also showed that on several occasions, the children were removed from the home and placed with their maternal grandmother or in foster care. In addition, appellant spent time in a number of juvenile institutions. Appellant did spend a lot of time with his grandmother, and she was a positive influence. But when his grandmother developed Alzheimer's disease in 1990, appellant "began to run the streets." Burch identified several contributing factors to appellant's criminal behavior. First, Burch indicated that appellant had not been provided with the love, affection, and basic necessities that

most parents provide to their children and that a lack of nurturing in young children is often related to later criminal activity. Second, she noted that appellant had lacked a positive male role model and that this is also associated with increased risks of criminal activity. Third, Burch noted that appellant's parents had been chronic substance abusers and had been involved in criminal activity. As a result, they had failed to provide appellant with models of normal, prosocial, and lawful behavior. Fourth, she noted that appellant had grown up in a poor neighborhood, where there are higher rates of crime and deviant, antisocial behavior. Dr. Burch testified that she believes that the way appellant "thinks about himself and the way he looks at the world makes him feel like he's pretty messed up and * * * can't trust anybody, and the world is dangerous." Burch also found that appellant is "more inclined than most people to deal with feelings on an intellectual level." He does not effectively deal with his emotions. She also determined that appellant is extremely self-centered and narcissistic, possessing a sense of entitlement that "the world owes him a living; and [he has] a tendency to blame other people for his problems." He also has "negative and unfavorable attitudes towards his body," and questions his own worth and adequacy. Dr. Burch concluded that appellant does not have a formal thought disorder, such as schizophrenia. He can think logically. But he is paranoid and likely to misinterpret other people's views of him. Burch diagnosed appellant with an antisocial-personality disorder. This disorder formed very early in appellant, perhaps when he witnessed his father's death, and he never received therapy to deal with this tragedy. She explained that because of appellant's upbringing, he developed a pessimistic view of the world that severely limits his ability to trust others. Burch, however, noted that not everyone who is labeled with a personality disorder ends up in jail and that his disorder did not excuse his conduct.                              On cross-examination, Burch testified that appellant has a tendency to disregard the rights and welfare of others and to blame others for his behavior. She also admitted that appellant had been provided with many treatments over the past ten years, without any apparent improvement.

## B. Sentence Evaluation

The jury convicted appellant of two death-penalty specifications: R.C. 2929.04(A)(5), aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons, and R.C. 2929.04(A)(7), aggravated murder with prior calculation and design, during an aggravated robbery. For the penalty phase, the trial court merged the two aggravating circumstances and submitted only the course-of-conduct specification for the jury's consideration.  Upon independent assessment, we hold that the evidence establishes beyond a reasonable doubt the R.C. 2929.04(A)(5) aggravating circumstance charged against appellant. As to Count Two, the murder of Leneshia Williams, the offense was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

Nothing in the nature and circumstances of the offenses is mitigating. Appellant and Jeronique formulated a plan to rob Shane Liles. During the course of the robbery, appellant forced Shane into an upstairs bedroom at gunpoint, where he robbed him of money and drugs. Appellant then tied Shane's hands behind his back and forced him into the kitchen, where Jeronique was holding Dwight Goodloe, Coron Liles, Armetta

Robinson, Leneshia Williams, and Tomeaka, James, and Jayla Grant at gunpoint. Appellant shot Shane in the back, and appellant and Jeronique then opened fire on the rest of the group, killing Jayla and Leneshia.

Appellant's history and background provide some mitigating features. Appellant had a dysfunctional, chaotic upbringing. Aside from his maternal grandmother's care, appellant was given little moral guidance, support, or affection. At a young age, appellant watched his mother kill his father. Appellant had no positive male role model, and his parents abused drugs and alcohol and engaged in criminal activity. His mother has a lengthy history of mental-health problems in addition to her substance-abuse problems. Most of the time, Betty was unable to properly care for appellant, and he was often neglected. There is also evidence in the children's services records that appellant was abused physically. On several occasions, children's services removed appellant and his siblings from Betty's custody. Appellant was at times cared for by his grandmother, who provided a secure and stable environment for appellant. However, appellant's time with her was not enough to have any lasting, positive effect.

Upon review of the mitigating evidence, we find that appellant clearly had a troubled and neglected childhood. However, we have upheld the death sentences of other defendants who had backgrounds similar to and worse than appellant's. *See*, *e.g.*, *State v. Campbell* (2002), 95 Ohio St.3d 48, 50-54, 765 N.E.2d 334; *State v. Biros* (1997), 78 Ohio St.3d 426, 455-457, 678 N.E.2d 891. In this case, we determine that appellant's history and background are entitled to only some weight in mitigation, just as we have determined in other capital cases in which the defendants had similar backgrounds. *See, e.g., State v. Grant* (1993), 67 Ohio St.3d 465, 486, 620 N.E.2d 50; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 186-195. We find, however, that appellant's character is entitled to no weight in mitigation. There was no evidence presented that appellant possessed any specific redeeming qualities.

No evidence was presented in regard to R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), or (B)(3) (mental disease or defect). The trial court did assign weight under R.C. 2929.04(B)(5) to appellant's apparent lack of a significant criminal history. However, our review of the record indicates that appellant never presented any evidence to prove the existence of this factor. *See* R.C. 2929.03(D)(1) (defendant shall have the burden of going forward with evidence of mitigating factors). Instead, it appears that the trial court found the existence of this factor based on a lack of evidence from the state that appellant had ever been convicted of a crime as an adult. Moreover, appellant was adjudicated a delinquent child under R.C. Chapter 2151. Because appellant has not carried his burden under R.C. 2929.03, we conclude that the R.C. 2929.04(B)(5) mitigating factor is inapplicable. In contrast, appellant's age of 23 years at the time of the offenses qualifies as a mitigating factor under R.C. 2929.04(B)(4) (youth of offender). However, we accord this factor only modest weight. *See, e.g., State v. Fears* (1999), 86 Ohio St.3d 329, 349, 715 N.E.2d 136; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988. In addition, R.C. 2929.04(B)(6) (accomplice only) directly applies as a mitigating factor because appellant was indicted, tried, and convicted as an accomplice, not as a principal offender.

Nevertheless, after reviewing the facts of this case, we assign no weight to the R.C. 2929.04(B)(6) mitigating factor. Appellant was a crucial participant in the murders. *See State v. Issa* (2001), 93 Ohio St.3d 49, 71, 752 N.E.2d 904.                    As to the R.C. 2929.04(B)(7) "other factors," appellant's antisocial-personality disorder deserves some weight in mitigation. Appellant's personality disorder was likely the result of his troubled and dysfunctional upbringing. Nevertheless, we accord little weight to this disorder, as it did not inhibit his ability to control his actions. *See, e.g., State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 119; *Wilson,* 74 Ohio St.3d at 401, 659 N.E.2d 292.

In summary, appellant's collective mitigation evidence is modest when compared with the aggravating circumstance. Upon independent weighing, we hold that the course-of-conduct aggravating circumstance in Count Two, the murder of Leneshia Williams, outweighs appellant's combined mitigating factors beyond a reasonable doubt. Accordingly, we find that the sentence of death for Leneshia's murder is appropriate in this case.

Finally, the sentence imposed here is proportionate to death sentences we approved in other cases of murder as a course of conduct involving the purposeful killing of two or more persons. *See, e.g., State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895; *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

*State v. Jackson*, 107 Ohio St.3d at 82- 88.

A trial judge has the duty to reweigh the aggravating circumstances and mitigating factors before determining whether to impose a death sentence or a life sentence, R.C. 2929.03(D)(3), and to state this finding in a separate opinion. R.C. § 2929.03(F). Usually, the Ohio Supreme Court independently reviews the death sentence. The issue of whether the reweighing of the trial court's sentencing decision cured any lower court defects was before the Sixth Circuit in *Baston v.Bagley*, 420 F.3d 632 (6th Cir. 2005).  The court determined that reweighing by the Ohio Supreme Court cured alleged sentencing errors. The premise applies to improper consideration of aggravating circumstances as well as failure to consider a mitigating factor. "Weighing aggravating and mitigating factors against each other requires considering both sets of factors. Thus, there is no reason that an appellate court could properly reweigh after removing an aggravating factor from consideration, but

101

could not do so after adding an additional mitigating factor." *Id.* at 638 (citing *Clemons v. Mississippi*, 494 U.S. 738, 750 (1990)). The Court finds that, as to the seventeenth ground for relief, sub-claim (a), the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## NINETEENTH GROUND FOR RELIEF

Jackson asserts in nineteen sub-claims that the death penalty is unconstitutional. The Sixth Circuit has consistently upheld Ohio's death penalty statutes. *Williams*, 380 F.3d at 961.  All of the contentions that have been presented have been considered and rejected by the Sixth Circuit. Although sub-claims (d), (e), (n), (q), (r) have been procedurally defaulted, the Court will address all sub-claims in this section.

### (a) Ohio Death Penalty Statute is Unconstitutional Because Too Much Discretion is Given to Prosecutors During the Indictment Stage

In *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), the Supreme Court set forth the following capital sentencing procedures likely to prevent arbitrary and capricious imposition of the death penalty: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. Ohio's death penalty statutes contain these preventative sentencing procedures. *Buell*, 274 F.3d at 367. *See Bryd*, 209 F.3d at 539.

**(b) Proof of Aggravating Factors at the Guilt Phase Precludes an Individualized Determination as Required by the Constitution**

In *Coleman v. Mitchell*, 268 F.3d 417, 433 (6th Cir. 2001), the Sixth Circuit held that Ohio's scheme is consistent with *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), wherein the Supreme Court stated:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

**(c) Ohio Death Penalty Statute Creates an Impermissible Risk of Death on Defendants Who Exercise Their Right to Trial**

Ohio Criminal Rule 11(C)(3) allows a judge, in the interest of justice, to dismiss capital specifications if the defendant pleads guilty or no contest. The specifications are not automatically dismissed. If the judge does not dismiss the specifications, the rule requires three judges to determine if the offense was aggravated murder and, if so, they must determine the presence or absence of the specified aggravating circumstances, if any, compared to any mitigating circumstances and impose sentence accordingly. In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court held unconstitutional a statute that automatically dismissed the capital specifications when a defendant pled guilty or waived a jury. The death penalty could be imposed if recommended by a jury, but the statute did not include a procedure for imposing the death penalty on a defendant who waived a jury or pled guilty.  However, the Supreme Court has never decided that a statute allowing a defendant to avoid the possibility of a death sentence with a guilty plea was invalid. *Benge v. Johnson*, 312 F. Supp. 2d 978, 1033-34 (S.D. Ohio 2004), *aff'd*, 474 F.3d 236 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 626

(2007); *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 839 (N.D. Ohio 2001),  *rev'd in part on other grounds by Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003); *Jamison v. Collins*, 100 F. Supp. 2d 647, 763 (S.D. Ohio 2000). There is no *per se* rule against encouraging guilty pleas. *Benge*, 312 F. Supp. 2d at 1034 (citing *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)).  Under Ohio Criminal Rule 11(C)(3), a defendant who pleads guilty to an indictment containing a death penalty specification can still receive the death penalty. *Id.* The Sixth Circuit has rejected the same argument. *See Cooey*, 289 F.3d at 924-25.

### (d) Ohio Revised Code Section 2929.04(A)(7) Delegates Harsher Punishment to Felony Murder Than Premeditated Murder and Therefore Violates the Constitution

Based on *Tison*, 481 U.S. at 157, which held that the imposition of the death penalty on felony murders is not unconstitutional, the Court finds that there is no merit to this claim, the adjudication of which did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  *Hartman v. Bagley*, 333 F. Supp. 2d 632, 678 (N.D. Ohio 2004),  *aff'd.* 492 F.3d 347, 360 (6th Cir. 2007)*; Keene v. Mitchell*, 2004 WL 3325797  * 77 (S.D. Ohio Aug. 25, 2004); *See Frazier*, 188 F. Supp. 2d at 842 (treatment of death penalty murders more harshly than premeditated murders not unconstitutional because R.C. 2929.04(A)(7) sufficiently narrows the class of homicides).

### (e) Ohio Death Penalty Statutory Scheme is Unconstitutional Because it Does not Require a Finding That the Defendant Had: (1) a Conscious Desire to Kill; (2) Premeditation; or (3) Deliberation as a Required Mental State

The Constitution does not require a premeditated and conscious desire to kill before a death sentence can be imposed. *Tison*, 481 U.S. at 158; *Hartman*, 333 F. Supp. 2d at 677.

104

**(f) Ohio Revised Code Section 2929.03(D)(1) Causes Ineffective Assistance of Counsel Because Mental Examination Results Are Shared With the Prosecution**

Section 2929.03(D)(1) provides in relevant part:

Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division.

A defendant may request a pre-sentence investigation or mental examination. If he so requests, the resulting reports must be provided to the court, the jury and the prosecutor. The Supreme Court found that this procedure enhances the search for the truth and does not render the proceedings unfair. *Williams v. Florida*, 399 U.S. 78, 82 (1970); *Frazier*, 188 F. Supp.2d at 838. The Sixth Circuit has also rejected this claim without discussion. *Cooey*, 289 F.3d at 925-26; *Byrd*, 209 F.3d at 539. In *Keene*, 2004 WL 3325797 at * 76 and *Jamison*, 100 F. Supp.2d at 763-64, the courts denied relief on this issue, reasoning that a defendant is not required to request a pre-sentence investigation report or a mental examination. Also, R.C. 2929.024 allows a trial court to provide funds to an indigent defendant for investigative services, experts and other necessary services to prepare a defense. Since an indigent defendant is not required to utilize R.C. 2929.03(D)(1), this procedure is not unconstitutional.

**(g) Ohio's Death Penalty Statute is Unconstitutional Because the State Should Have the Burden of Proving the Absence of Mitigating Factors During the Penalty Phase**

The Supreme Court rejected this argument in *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002)(overruling *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary

105

for imposition of the death penalty). A state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional as long as a state's methods of allocating the burdens of proof does not lessen the state's burden to prove every element of the offense charged, or to prove the existence of aggravating circumstances. A defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency. The state still has the burden to show the existence of aggravating circumstances that outweigh the existence of any mitigating factors. *Wiles v. Bagley*, 2005 WL 1181859 * 43 (N.D. Ohio May 18, 2005); *Madrigal v. Bagley,* 276 F. Supp.2d 744, 780 (N.D. Ohio 2003).

**(h) Ohio Death Penalty Scheme is Unconstitutional Because the Defendant is Required to Prove Mitigating Factors by a "Preponderance of the Evidence"**

In *Walton*, the Supreme Court wrote:

So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

497 U.S. at 650. The prosecution must prove beyond a reasonable doubt that any aggravating circumstances outweigh any mitigating factors. In addition, Ohio allows capital defendants "great latitude" in presenting mitigating evidence. *See* Ohio Rev.Code 2929.03(D)(1); *Jamison*, 100 F. Supp.2d at 764-65. Further, in *Buchanan v. Angelone*, 522 U.S. 269, 275-76 (1998), the Supreme Court held that the Eighth Amendment does not require the jury to be instructed on the concept of mitigating evidence or on particular statutory mitigating factors, and that states are free to structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it. *Smith,* 348 F.3d at 214.

106

**(i) The Death Penalty Scheme is Unconstitutional Because There is no "Mercy" Option**

A jury may consider mercy, but Ohio law does not mandate that a trial court give a mercy instruction. *Mapes v. Coyle*, 171 F.3d 408, 415-16 (6th Cir. 1999); *Hartman*, 333 F. Supp.2d at 677. "Where the trial court instructs the jury in accordance with state law and sufficiently addresses the matters of law at issue, no error results, and the petitioner is not entitled to habeas relief." *Goff v. Bagley,* 2006 WL 3590369, at 36 (S.D. Ohio Dec. 1, 2006) (citing *White*, 431 F.3d at 534-35).

**(j) The Mitigating Factors Are Unconstitutionally Vague**

The record on appeal must disclose to the reviewing court the considerations which motivated the death sentence. *Gardner v. Florida*, 430 U.S. 349, 361 (1977). But there is no requirement that the trial judge or jury identify and articulate the specific factors used to arrive at the decision. Also, R.C. 2929.03(F) compels a trial judge to make written findings as to the existence of mitigating factors and aggravated circumstances and the reason why the aggravating circumstances outweigh the mitigating factors, thereby allowing a reviewing court to make an independent determination of the appropriateness of the sentence. *Dickerson,* 336 F.Supp.2d at 791; *See Wiles*, 2005 WL 1181859 at * 42.

**(k) A Bifurcated Capital Case with the Same Jury During the Guilt and Penalty Phases Violates the Constitution**

Death penalty statutes should be drafted in a manner that ensures that the sentencing authority is given adequate information and guidance. This is best accomplished by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and is provided with standards to guide its use of the information. *Gregg,* 428 U.S. at 195.

107

Although two hearings are required, there is no requirement that the same jury sit for both hearings. *Lockhart v. McCree*, 476 U.S. 162, 174-77 (1986). The Supreme Court has upheld against constitutional attack the Georgia capital sentencing plan which provided that the same jury must sit in both phases of a bifurcated capital murder trial. *Id*. at 179-80.

**(l) A Jury Must Give Reasons When it Gives a Life Sentence**

Again, there is no requirement that the trial judge or jury identify and articulate the specific factors used to arrive at the decision whether or not to reject the death penalty. In *Buell,* 274 F.3d at 368, the Sixth Circuit held that the Ohio death penalty statute does not require identification of mitigating factors when a life sentence is imposed.

**(m) The Death Penalty Statute in Ohio is Unconstitutional Because it Requires a Finding of Death if the Aggravating Circumstances Outweigh the Mitigating Factors**

This argument was rejected in *Buell*, 274 F.3d at 368.  The sentencer is required to have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of the death penalty. *Sumner v. Shuman*, 483 U.S. 66, 72 (1987); *Buell,* 274 F.3d at 368. Further, the Supreme Court held that the death penalty is constitutional if it is imposed only after a determination that the aggravated circumstances outweigh the mitigating factors present in the particular case, or there are no mitigating circumstances. *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990). *Buell* held that Ohio's death penalty statute complies with both *Sumner* and *Blystone*. *Buell,* 274 F.3d at 368; *Williams,* 380 F.3d at 964-65; *Hartman*, 333 F. Supp.2d at 676-77; *Benge*, 312 F. Supp.2d at 1034-35.

### (n) Juries Must Find that the Death Penalty is the Only Appropriate Punishment Under the Constitution

There is no constitutional mandate requiring that a jury find that death is the only appropriate punishment. Furthermore, the Ohio scheme provides for an appropriateness review on direct appeal. *Jones v. Bradshaw*, 489 F.Supp.2d 786, 844 (N. D. Ohio 2007).

### (o) The Constitution Requires Proportionality Review

Proportionality was discussed in Jackson's seventeenth ground for relief, sub-claim (b), wherein the Court found that proportionality review is not required, and that the Sixth Circuit has held that by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed.  *Id*.; *Buell*, 274 F.3d at 369.

### (p) Ohio Appellate Review is Inadequate

After the sentencer has found that a defendant convicted of aggravated murder is eligible for the death penalty because one or more aggravating circumstances have been found beyond a reasonable doubt, a separate review of whether the aggravating circumstances outweigh the mitigating factors is conducted to determine the appropriateness of the death penalty.  *Buell*, 274 F.3d at 368. The Ohio Supreme Court is required to review the trial court's decision and also independently determine whether the sentence is proportionate, non-excessive and appropriate in accordance with the aggravating circumstances and mitigating factors. This requirement gives the sentencing authority sufficient information to enable it to consider the character and individual circumstances of the defendant. The court in *Buell*, 274 F.3d at 368-69, found that this procedure sufficiently discerns who deserves the death penalty. *Benge*, 312 F. Supp.2d at 1035-36; *Jamison*, 100 F. Supp.2d at 765-66.

**(q) Ohio Death Penalty is not the Least Restrictive Method of Achieving Compelling State Interest and Serves no Legitimate Purpose**

The Supreme Court held that it could not require a state legislature to select the least restrictive penalty, as long as the penalty selected is not inhumanely cruel or disproportionate to the crime. *Gregg*, 428 U.S. at 175. Further, the Court found that the death penalty serves a compelling state interest and is not "invariably disproportionate to the crime" of murder. *Id.* at 183, 187; *Williams,* 380 F.3d at 966; *Greer v. Mitchell*, 264 F.3d 663, 690 (6th Cir. 2001); *Madrigal,* 276 F.Supp.2d at 809. *See Tyson*, 481 U.S. at 172-73(death penalty appropriate if it contributes to two social purposes - deterrence and retribution).

**(r) Lethal Injection is Unconstitutional**

(b) Death By Electrocution Is Unconstitutional

Ohio Revised Code Section 2949.22 provides:

A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death. The application of the drug or combination of drugs shall be continued until the person is dead. The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

The Supreme Court has held the death penalty to be constitutional. *Gregg,* 428 U.S. at 179. Recently, the Court held that Kentucky's method of execution, the same method used by Ohio, is constitutional. *Baze v. Rees*, _S.Ct._ 2008 WL 1733259 (Apr. 16, 2008).[11] Some risk of pain is

---

[11] At least 30 of 36 states use the same method of execution as Kentucky. *Baze*, 2008 WL 1733259 at * 1.

110

inherent in any method of execution, even if caused by error in following the required procedure. *Id.* at * 8. The Constitution does not require the avoidance of all risk of harm. *Id.* Cruel and unusual punishment occurs where an execution method presents a "substantial" or "objectively intolerable risk of serious harm." *Id.* at * 10. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* The protocol commonly used for execution cannot be regarded as "objectively intolerable" when it is actually widely used. *Id.* at * 3. The Court concluded that a state method of execution similar to the protocol used by Kentucky would not create a risk that meets that standard.

**(s) Ohio's Death Penalty Violates International Law**

There is no indication that international law influences rulings under the federal constitution regarding the death penalty. In *Stanford v. Kentucky*, 492 U.S. 361, 391 (1989), the dissent relied partly on the decisions of respected organizations such as those mentioned by Jackson. But the majority, although not expressly stating, appeared to reject the dissent's reliance on international law, holding that the execution of juveniles was constitutional and that "no modern societal concerns" forbids the imposition of the death penalty on individuals as young as sixteen. *Buell*, 274 F.3d at 375; *Madrigal,* 276 F. Supp.2d at 809-10.

In *Jamison*, 100 F. Supp.2d at 766-67, the court also considered organizations mentioned by Jackson in determining that international law does not preclude the State of Ohio from establishing and carrying out a capital punishment scheme. Since about 90 countries still maintain the death penalty, no international law exists that supports the prohibition of the death penalty. *Id.* The countries that have abolished the death penalty have done so for moral, political or other reasons, rather than

111

because of a sense of legal obligation. *Buell*, 274 F.3d at 373. The Sixth Circuit stated in *Buell*,

> We hold that the determination of whether customary international law prevents a State from carrying out the death penalty, when the State otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it their constitutional role to determine the extent of this country's international obligations and how best to carry them out.

*Id.* at 376.

The Court finds that, as to sub-claims (a), (b), (c), (f), (g), (i), (j), (k), (l), (m), (o), (p), and (s), the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Sub-claims (d), (e), (h), (n), (q), and (r) are without merit.

## CONCLUSION

The Court must now determine whether a Certificate of Appealability ("COA") is appropriate for the claims raised in the Petition. In *Castro v. United States*, 310 F.3d 900 (6th Cir. 2002), the Sixth Circuit reasoned that, because a district judge who has recently denied a writ of habeas corpus will have "an intimate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of appealability when he denies the initial petition," it follows that a proper time to determine whether to grant a COA is at the conclusion of the opinion granting or denying the writ. *Id.* at 901 (internal quotation marks and citations omitted). Neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case, as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also*

*Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001)(remanding motion for certificate of appealability for district court's analysis of claims).

      28 U.S.C. § 2253 states in relevant part:

           ***

      (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

      (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court

      ***

      (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre-and post-AEDPA statutes is that the petitioner now must demonstrate he was denied a constitutional right, rather than the federal right that was required prior to the AEDPA's enactment.

      The Sixth Circuit determined in *Slack v. McDaniel*, 529 U.S. 473 (2000) that,

      To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further."'

*Id.* at 483-84 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).

      The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision

113

"debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined procedurally defaulted. In those instances, the Court held, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

After taking the above standard into consideration, the Court finds that there are no issues meriting further review. The Court will discuss each claim and its defaulted status below.

Grounds 3, 7, 8 (c), 9, 12 (a), (b), (c), 17 (b), 18, 19 (d), (e), (h), (n), (q), (r) and 20  are procedurally defaulted. Grounds 3 (trial judge limited counsels' ability to uncover juror bias), 7 (trial court's cumulative errors during *voir dire* violated his right to due process of law and a fair trial), 17(b) (trial court failed to consider cases where the death penalty was sought and not obtained), 18 (Ohio courts failed to properly consider the proportionality of his death sentence), 19 (d) (Ohio death penalty unconstitutional because R.C. 2929.04(A)(7) delegates harsher punishment to felony murder defendants than premeditated murder and therefore violates the Constitution), 19 (e) (Ohio's death penalty statutory scheme is unconstitutional because it does not require a finding that the defendant had a conscious desire to kill, premeditation, or deliberation as a required mental state), 19 (h) (Ohio death penalty scheme is unconstitutional because the defendant is required to prove mitigating factors by a preponderance of the evidence), 19 (n) (Ohio death penalty unconstitutional because juries must find that the death penalty is the only appropriate punishment under the Constitution), 19 (q) (Ohio death penalty unconstitutional because it serves no legitimate purpose), 19 (r) (Ohio death penalty unconstitutional because lethal injection is unconstitutional) and 20 (convictions and death sentence

114

are unconstitutional because of the cumulative effect of the many errors that occurred during his trial) are defaulted because of Jackson's failure to present them to the Ohio courts. Grounds 8 (c) (prosecutor allowed to introduce inflammatory, irrelevant impact evidence that included Jayla Grant's pleas for help), 9 (trial court erred by failing to prevent the prosecutor from introducing into evidence prejudicial victim impact evidence) and 12 (a) (prosecutor committed misconduct by making inflammatory statements during closing), 12 (b) (prosecutor committed misconduct by misleading the jury as to mitigating evidence), and 12 (c) (prosecutor committed misconduct by improperly vouching for Tara Cunningham's credibility) are defaulted because Jackson's counsel failed to object. The Court finds that jurists of reason would not find debatable its decision determining that these grounds are procedurally defaulted.

If the Court were to have considered grounds 3, 7, 8 (c), 9, 12 (a), (b), (c), 17 (b), 18, 19 (d), (e), (h), (n), (q), (r) and 20, it would have found that jurists of reason would not debate this Court's decision on the merits.

The Court finds that jurists of reason would not debate this Court's decision as to Jackson's third ground for relief (trial judge limited counsels' ability to uncover juror bias) because all the empaneled jurors indicated that he or she had not formed an opinion based on pretrial publicity, and that he or she could render an impartial verdict.

In his seventh ground for relief, Jackson alleged that the trial court's cumulative errors during *voir dire* violated his right to due process of law and a fair trial. This ground relates to grounds one through six. The Court finds that jurists of reason would not debate this Court's decision as to this ground because grounds one through six have been found to be without merit.

The Court finds that jurists of reason would not debate this Court's decision as to ground 8

115

(c) (prosecutor allowed to introduce inflammatory, irrelevant impact evidence that included Jayla Grant's pleas for help) because Jayla Grant's plea for help was admitted under the Ohio rules of evidence pursuant to the excited utterance exception to hearsay and was relevant to the circumstances surrounding the shooting and her death.

The Court finds that jurists of reason would not debate this Court's decision as to ground 9 (trial court erred by failing to prevent the prosecutor from introducing into evidence prejudicial victim impact evidence) because any prejudice experienced by Jackson was substantially outweighed by the high probative value of the victim impact evidence.

The Court finds that jurists of reason would not debate this Court's decision as to ground 12 (a) (prosecutor committed misconduct by making inflammatory statements during closing) because the prosecutor's remarks pointed out the offensive nature of the crime and asked the jury to hold Jackson responsible for his actions. The jury was not mislead. The prosecutor was merely reiterating the evidence. In ground 12 (b), Jackson asserted that the prosecutor committed misconduct by misleading the jury as to mitigating evidence. The Court finds that jurists of reason would not debate this Court's decision because, although the prosecutor strayed from the definition of mitigating evidence, the trial court correctly instructed the jurors how to weigh the aggravating circumstances with the mitigating factors, and he advised them that the issue before them was punishment. The prosecutor was commenting on Jackson's mitigating evidence, which he was entitled to do. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim 12 (c) because even if the prosecutor's remarks were improper, they were not so egregious as to render the trial fundamentally unfair. The statements did not mislead the jury, Jackson was not prejudiced, and the facts showed that the evidence against him was overwhelming.

116

In ground 17 (b), Jackson asserted that the trial court and Ohio Supreme Court failed to consider cases where the death penalty was sought and not obtained in making its determination. The Court finds that jurists of reason would not debate this Court's decision as to this ground because proportionality review is not required, and review of the Ohio Supreme Court's opinion shows that it conducted a meaningful review of his sentence.

The Court finds that jurists of reason would not debate this Court's decision as to Jackson's eighteenth ground for relief (Ohio courts failed to properly consider the proportionality of his death sentence) for the same reasons found in ground 17 (b).

In his twentieth ground for relief, Jackson contended that his convictions and death sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial. The Court finds that jurists of reason would not debate this Court's decision as to this ground for relief because the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief, and Jackson has not shown that any error occurred in the state courts.

As to Jackson's preserved claims, the Court finds that jurists of reason would not debate this Court's decision as to ground one (Ohio Supreme Court erred when determining that defense counsel should have been allowed to question potential jurors during *voir dire* concerning their views on the killing of a three year old child, and it should have vacated the underlying conviction on both sentences instead of vacating only the death sentence as to the three-year-old) because Jackson's counsel were not precluded from asking about possible bias because of the murder of a seventeen year old, and there is no relation to the court's refusal to allow questions about a three year old and the murder of Williams, who was seventeen years old.

The Court finds that jurists of reason would not debate this Court's decision as to ground two

117

(trial court abused its discretion in preventing Jackson's counsel from making inquires into pretrial publicity during *voir dire*) because all the empaneled jurors indicated that he or she had not formed an opinion based on pretrial publicity, and that he or she could render an impartial verdict.

The Court finds that jurists of reason would not debate this Court's decision as to ground four, sub-claim (a) (the trial judge prohibited Jackson's counsel from examining prospective jurors about whether they could consider a life sentence for the killing of a young child and sub-claim (b) (whether they would automatically impose the death penalty upon a finding of guilt) because the four prospective jurors in question told the court that they could follow the court's instructions.

In his fifth ground for relief, Jackson asserted that the trial court erred when it prevented his counsel from rehabilitating jurors who admitted that they could not impose the death penalty. The Court finds that jurists of reason would not debate this Court's decision as to this ground because the four prospective  jurors in question indicated unequivocally that they could not consider the death penalty.

In his sixth ground for relief, Jackson alleged that the trial court erred by denying his pretrial motion to apply R.C. 2945.25(C) during *voir dire*. The Court finds that jurists of reason would not debate this Court's decision as to this ground because the Ohio Supreme Court determined that *Witt* is the appropriate standard for determining when a prospective juror may be excluded for cause based on his or her opposition to the death penalty, not R.C.  2945.25(C).

118

The Court finds that jurists of reason would not debate this Court's decision as to ground 8 (a) (trial court erred by allowing the prosecutor to introduce inflammatory, irrelevant impact evidence that included an unidentified tooth) because evidence of a tooth fragment found at the scene was relevant.  In ground 8 (b), Jackson contended that the trial court erred by allowing the prosecutor to introduce inflammatory, irrelevant impact evidence that included the bloody clothing of Jayla Grant. The Court finds that jurists of reason would not debate this Court's decision as to ground 8 (b) because, although irrelevant, evidence of guilt was overwhelming, Jackson's substantial rights were not affected by the admission of this evidence, and the error was harmless.

The Court finds that jurists of reason would not debate this Court's decision as to ground 10 (the trial court erred by allowing all of the trial testimony as well as numerous photographs of the deceased victims during the penalty phase of the trial) because admittance  of guilt phase evidence in the mitigation phase of the trial does not constitute error. Further,  a mass introduction of exhibits and testimony did not occur.

The Court finds that jurists of reason would not debate this Court's decision as to ground 11 (trial judge erred by allowing the victims of the offense to remain in the courtroom during the penalty phase of the trial) because a victim may be present in the courtroom unless the court determines that exclusion is necessary to protect defendant's right to a fair trial, and  Jackson has not shown how the presence of the victims in the courtroom during the mitigation hearing deprived him of his right to a fair trial.

The Court finds that jurists of reason would not debate this Court's decision as to ground 12 (d) (the prosecutor presented inconsistent theories in the Jackson and Cunningham trials) because the prosecutor's theories were not inconsistent. Both defendants were charged with causing death

119

purposely with prior calculation and design. Neither was charged as a principal offender. Furthermore, both were seen shooting at the victims. In sub-claim (e), Jackson argued that the prosecutor withheld an exculpatory photo array in violation of *Brady v. Maryland*.  The Court finds that jurists of reason would not debate this Court's decision as to ground 12 (e) because Jackson did not satisfy the third criteria for proving a *Brady* violation.

The Court finds that jurists of reason would not debate this Court's decision as to ground 13 (a) (counsel failed to demonstrate the need for adequate investigative and expert assistance) because counsel requested the services of several mitigation specialists. The Court finds that jurists of reason would not debate this Court's decision as to ground 13 (b) (counsel failed to investigate and prepare evidence in support of a motion to suppress) because prejudice was not shown since the State did not introduce his confession into evidence. In sub-claim (c), Jackson asserted that his counsel failed to effectively investigate and present evidence in support of pretrial motions. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (c) because Jackson did not fully explain how counsels' performance was deficient, and defense counsels' strategy at pretrial hearings should not be subjected to second guessing and hindsight by this Court.  In sub-claim (d), Jackson argued that  his counsel were ineffective during *voir dire*. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (d) because the trial was fundamentally fair, and the failure, if any, to conduct a more thorough *voir dire* did not undermine the reliability of the result. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (e) (counsel failed to provide any guidance during opening statements) because there is no constitutional requirement that opening statements follow some standard outline. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (f) (counsel failed to object to

120

inflammatory portions of the State's opening statement) because the Court considered and rejected the underlying issue in Jackson's twelfth claim for relief, sub-claim (a). In sub-claim (g), Jackson alleged that counsel failed to properly cross-examine Tara Cunningham concerning bias. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (g) because the Court examined counsel's cross-examination of Tara Cunningham and found it to be sufficient. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (h) (counsel failed to effectively cross-examine Dr. Cynthia Beisser) because the Court concluded that Jackson had not shown that he suffered any prejudice by his counsels' failure to interview Dr. Beisser.

In ground 14, sub-claims (a) and (c), Jackson alleged that counsel failed to investigate and present compelling evidence about Jackson's childhood during mitigation and failed to obtain expert and investigative assistance to uncover Jackson's history. The Court finds that jurists of reason would not debate this Court's decision as to sub-claims (a) and (c) because  the record showed that defense counsel did not fail to investigate his background, and examination of the record demonstrated that all of the evidence Jackson complained was absent from the mitigation phase of the trial was presented through the testimony of two aunts, his mother and Dr. Burch. The Court finds that jurists of reason would not debate this Court's decision as to sub-claim (b) (counsel failed to employ and present a cultural expert) because   the Court found that testimony from a psychologist was appropriate, and any additional testimony from a cultural expert would have been cumulative and unnecessary.

In his fifteenth ground for relief, Jackson alleged that the trial court erred when it denied his request for leave to conduct discovery during state post-conviction. He contended in his sixteenth ground for relief that the trial court erred when it denied his request for appropriation of funds for

121

expert and investigative assistance in post-conviction proceedings. The Court finds that jurists of reason would not debate this Court's decision as to the fifteenth and sixteenth grounds for relief because a petition for writ of habeas corpus is not the proper method for a criminal defendant to challenge errors or deficiencies in state post-conviction proceedings, because the claims usually address collateral matters and not the underlying conviction giving rise to the defendant's incarceration, and Jackson provided no support or explanation for his equal protection argument.

The Court finds that jurists of reason would not debate this Court's decision as to ground 17 (a) (denial of due process of law when the trial court and the Ohio Supreme Court failed to give effect to mitigation evidence and improperly considered aggravating factors) because the Ohio Supreme Court properly reweighed the aggravating circumstances and mitigating factors, thus curing any alleged sentencing errors.

The Court finds that jurists of reason would not debate this Court's decision as to the nineteenth ground for relief (Ohio's death penalty statutes are unconstitutional) because all of his sub-claims have been previously rejected by the Sixth Circuit Court of Appeals.

For the reasons stated in this Opinion, this Court finds that none of the claims asserted in Jackson's Petition for a Writ of Habeas Corpus under 28 U.S.C. §2254 are well-taken. Accordingly, Jackson's request for habeas corpus relief is **DENIED**. The Petition is hereby **DISMISSED**.

Further, the Court finds no claims to be debatable among jurists of reason, as no ground for relief comes close to presenting a federal constitutional or legal violation. The Court finds that jurors

of reason would not find the Court's decision as to procedural default to be debatable. Consequently, the Court hereby denies a Certificate of Appealability pursuant to 28 U.S.C. §2253(c) for the reasons set forth in the above certificate of appealability analysis.

**IT IS SO ORDERED.**

Date: <u>May 1, 2008</u>                    <u>*s/ Donald C. Nugent*            </u>
                                            JUDGE DONALD C. NUGENT
                                            UNITED STATES DISTRICT JUDGE